

**U.S. Department of Justice**

*United States Attorney*
*Southern District of New York*

---

Jacob K. Javits Federal Building
26 Federal Plaza, 37th Floor
New York, New York 10278

July 9, 2024

**BY CM/ECF**
The Honorable Sarah Netburn
United States District Court
Southern District of New York
500 Pearl Street
New York, New York 10007

      Re:   *United States v. William Lonergan Hill*, S2 24 Cr. 82 (RMB)

Dear Judge Netburn:

      The Government writes to oppose Defendant William Lonergan Hill's request to be released on bail pending trial in Portugal (Docket No. 32). As further discussed below, the defendant is charged with serious crimes relating to his role as one of the Co-Founders and Chief Technology Officer for a cryptocurrency mixing service known as Samourai Wallet ("Samourai"), which was designed to serve as a haven for criminals to engage in large-scale money laundering and sanctions evasion. For the reasons described below, the least restrictive conditions that will reasonably assure the defendant's appearance in court and the safety of the community necessarily include a requirement that the defendant remain in the United States pending trial, where he can be subject to pretrial supervision, GPS location monitoring, and travel restrictions.

      **A.  Procedural Background**

      The S2 24 Cr. 82 (RMB) Indictment (the "Indictment") charges the defendant and co-defendant Keonne Rodriguez with participating in a money laundering conspiracy, in violation of 18 U.S.C. § 1956(h); and conspiracy to operate an unlicensed money transmitting business, in violation of 18 U.S.C. § 371. These charges relate to the defendants' role in the development, marketing, and operation of a cryptocurrency mixing service known as Samourai Wallet ("Samourai"), an unlicensed money transmitting business from which the defendants earned millions of dollars in fees. Between in or about 2015 and at least in or about February 2024 (when the indictment was returned by the grand jury), Samourai executed anonymous financial transactions valued at over $2 billion in cryptocurrency for its customers, even though the defendants knew that they were facilitating the concealment of criminal proceeds, including from illegal darkweb markets, cyber intrusions, and fraud. To date, law enforcement has identified at least $100 million in crime proceeds that have been laundered through Samourai—almost

certainly a small fraction of the overall amount of cryptocurrency that criminals laundered through the defendants' mixing service.

On April 24, 2024, the defendant was arrested in Portugal and has been detained there pending extradition. In June 2024, the defendant consented to extradition after learning that the Government would be willing to entertain a potential bail package if he consented. Based on conversations with the U.S. Marshals Service, the Government has been informed that the defendant will likely be arriving in the United States during the week of July 8, 2024.

### B. Discussion

The Court should deny the defendant's request to be released on bail to Portugal pending trial. As further discussed below, pretrial services supervision in the United States, location monitoring, and travel restrictions are all necessary here to ensure the defendant's appearance at trial and to ensure that he does not engage in additional criminal activities while on bail.

#### 1. The Defendant is Charged with Serious Crimes Supported by Overwhelming Evidence

To begin with, the defendant has been charged with extremely serious offenses warranting pretrial supervision in the United States. For years, the defendant served as the Chief Technology Officer for Samourai—a cryptocurrency mixing service that was designed for criminals from around the world to launder the proceeds of their criminal activities. At trial, the Government will offer statements by the defendant and his co-defendant indicating that Samourai's purpose from its inception was to allow its users to evade sanctions and launder their criminal proceeds. For example, in June 2022, Samourai's Twitter account[1] posted the following message encouraging Russian oligarchs seeking to evade law enforcement sanctions to use Samourai:



---

[1] The @SamouraiWallet was registered using a particular cellphone number that has been also used to open a Twitter account used by co-defendant Keonne Rodriguez.

Similarly, in or around December 2023, Samourai's Twitter account posted the following message encouraging Japanese individuals seeking to evade the payment of inheritance taxes to use Samourai:



The defendant also posted messages to his Samourai-affiliated Twitter account indicating that the purpose of Samourai was to aid customers seeking to evade law enforcement detection. In March 2024—less than a month before he was arrested—the defendant posted a provocative cartoon of a samurai wielding a ninja sword at an individual wearing a t-shirt labeled "FINCEN"—the Financial Crimes Enforcement Network, one of the law enforcement agencies primarily tasked with combatting domestic and international money laundering, terrorist financing, and other financial crimes:



In private messages, the defendant also admitted that Samourai is designed to serve as a tool to facilitate transactions in criminal dark web marketplaces like the Silk Road, which was shut down by the Department of Justice in October 2013 and ultimately led to the conviction of Silk Road Founder Ross Ulbricht in February 2015. *See United States v. Ross Ulbricht*, 14 Cr. 68 (S.D.N.Y.). For example, in the below message on or about August 27, 2020, the defendant—using a Twitter account with username "Samourai Dev"[2]—discussed the use of Samourai by criminals operating in online black markets like the Silk Road:

**Twitter User**: <u>Silk Road is why I first found Bitcoin</u> and the desire to keep engaging in those types of markets is one reason that I want to defend/strengthen those use cases . . .

**Samourai Dev:** No, not at all. We probably have different views on some basic tenets of bitcoin, you and I – so to each his own so to speak. <u>At Samourai we are entirely focused on the censorship resistance and black/grey circular economy. This implies no foreseeable mass adoption, although black/grey markets have already started to expand during covid and will continue to do so post-covid</u>. . . .

Similarly, the defendant personally advertised Samourai in online forums dedicated to discussions about dark net marketplaces (also known as "DNMs"). Leaving no doubts about his views regarding the purpose of Samourai, the defendant—using the online moniker "McCoyPauly"[3]—posted a message in October 2023 promoting Samourai on the dark web discussion forum Dread in response to a post titled "How to clean dirty BTC?" that is depicted below:

---

[2] The Samourai Dev Twitter account was registered using a phone number that was also used to register for an Amazon account in the defendant's name in France.

[3] One of the devices seized from the defendant in Portugal contains Telegram messages sent by the "McCoyPauly" Telegram account, and a cellphone number linked to the defendant's Twitter and Amazon accounts is linked to an Apple iCloud account registered with the email address mccoy.pauly@tutanota.com.



The defendant's post in this thread, depicted below, states: "Wasabi [a competitor cryptocurrency mixing service] is dangerously broken. Avoid Wasabi at all costs . . . Samourai Whirlpool is a much better option."



In other words, the defendant unambiguously claimed in October 2023 that Samourai is a tool to "clean dirty BTC"—or, in other words, commit money laundering.

      Additionally, in or around 2021, another Dread forum user posed the question: "Why do Darknet markets allow bitcoin still for transactions? . . . Anyone else feel like private cyrptocurreincies [sic] are the way markets should be going?"  In response, the defendant stated: "It does seem that the trend is going that way on DNMs [*i.e.* darknet markets] . . . If you are going to handle BTC make sure that your utxos are 100% entropy outputs.[4]  You can obtain these using Samourai Whirlpool . . . ."  In this message, the defendant again actively encouraged a Dread forum user to become a Samourai customer to launder the proceeds of any cryptocurrency that was potentially linked to dark net marketplaces.

---

[4] Samourai has advertised that their mixing service creates "100% maximum entropy" because of the inability for law enforcement to accurately trace or link the five input-five output transactions that are executed by Samourai on the blockchain.

Samourai's marketing materials also indicated that their business model was centered around assisting criminals and others seeking to hide their proceeds. For example, in the below excerpt, the defendants acknowledge that the individuals most likely to use a service like Samourai ("Who is willing to pay for privacy?") include individuals engaged in criminal activities, such as those involved in "Restricted Markets":

### Who is willing to pay for privacy?

| | |
|---|---|
| Online Gambling | **$28.54 B** - global market value. <br> *SoftSwiss Platform* - **$10m / month** <br> Largest % of on-chain transaction volume |
| Restricted Markets | **$237.25 M** - amount transacted in 2014 |
| Asset Protection | **$1.5 B** - amount held in the top 100 bitcoin addresses |

Similarly, in the below excerpt from Samourai's marketing materials, the defendants acknowledge that Samourai's revenues will be derived from "Dark/Grey market participants" seeking to "swap their bitcoins with multiple parties" to "destroy the metadata"—that is, data that could permit law enforcement detection:

### Revenue
#### Samourai Premium Add Ons

| | |
|---|---|
| Online Gamblers <br> Dark/Grey Market participants <br> Ultra High Net Worth Individuals <br> Asset Protection/Capital Flight | **On Demand Swap** <br> Users can swap their bitcoins with multiple parties to destroy the metadata that has been created. <br> 0.1% of the amount transacted + 0.0005 BTC flat fee <br> **User Monthly Value** <br> *Assumption*: 2 Swaps of 1.00 BTC a month: **£7.80** |

In the below excerpt, also from Samourai's marketing materials, Samourai also promoted its cryptocurrency mixing service as a "Premium Privacy Service" for transactions involving the proceeds of goods and services that include, among other things, "Illicit Activity":



In his submission, the defendant alleges that the Government's proof at trial will not include any instances where the defendant became aware of specific money laundering transactions involving the use of Samourai by particular criminals. But even assuming such proof is necessary to sustain the Government's conspiracy claim (it is not), this allegation is simply incorrect. *See* Docket No. 32 at 5, 7. For example, in one of the defendant's cellphones seized on the date of his arrest in Portugal (the "HILL Cellphone"), the defendant exchanged the following messages with another individual on the Telegram encrypted messaging application on February 19, 2024—just a few days after a prominent cryptocurrency exchange was the victim of a hack ("Victim-1"):

| | |
|---|---|
| **HILL Cellphone:** | Not sure if you are using 0.5 pool right now but liquidity in that pool is very high as of 72 hours ago |
| **Telegram User:** | [Name of Victim-1] hacker sent a lot of funds in your pool, they constantly remixing |
| **HILL Cellphone:** | anyway, I'll keep and I [i.e., "an eye"] on it. Thanks for reaching out. |

All of this evidence—just a sample of the overwhelming evidence that the Government will present at trial—shows that the defendants designed Samourai to be used as a money laundering tool for criminals, and the defendant was fully aware that criminals were actually using Samourai for this intended criminal purpose.

### 2. The Charges in This Case Are Appropriate

Next, the defendant suggests that he may avoid facing a criminal conviction in this case or a lengthy term of imprisonment because he merely operated a cryptocurrency mixing service that was incidentally used by criminals to engage in money laundering and otherwise had no idea that he was engaged in criminal activity. *See* Docket No. 32 at 7-8. As described above, however, the evidence paints a very different picture. From its inception, Samourai's business model contemplated that the defendants would make money from criminals seeking to use Samourai as a means to commit money laundering and sanctions evasion. Indeed, the defendant stated himself in messages excerpted above that Samourai was created for criminals as a tool to "clean dirty BTC" and "This implies no foreseeable mass adoption."

The defendant also suggests that Samourai should not be considered a "money transmitting business" for purposes of 18 U.S.C. § 1960 because it operated as a "non-custodial" wallet and did not have sufficient control over the stored cryptocurrency to qualify as a money transmission service. The Government will oppose these meritless arguments, to the extent they are raised in a motion to dismiss before trial. For present purposes, two things are worth mentioning in response to this argument. First, the Indictment alleges that Samourai exerted significant control over the cryptocurrency transactions that were being executed through the Samourai mixing service. Samourai operated a centralized coordinator server that communicated with other Samourai users, selected the cryptocurrency units that would be mixed together, and automatically mixed the outputs indefinitely as new cryptocurrency entered the pool. Samourai also generated the new cryptocurrency addresses that were required for these transactions, and the defendants collected substantial fees ranging from 3.5 percent to 5 percent from each transaction that were transmitted to addresses that they controlled. Given the significant level of control that Samourai exerted over these cryptocurrency transactions, Samourai is a "money transmitting business" for purposes of 18 U.S.C. § 1960. In any event, any challenge to Samourai's status as a money transmitting business would only apply to Count Two of the Indictment—charging the conspiracy to operate an unlicensed money transmitting business. Regardless of whether Samourai is an unlicensed money transmitting business, the defendant also participated in a money laundering conspiracy by creating and operating Samourai, a service they designed to facilitate money laundering transactions.

Finally, the defendant is simply wrong that these types of charges were completely unforeseeable to the defendant and unlikely to lead to convictions after trial or lengthy sentences. Quite to the contrary, multiple defendants have been charged, convicted, and/or sentenced to terms of imprisonment for their creation and operation of mixing services and cryptocurrency exchanges that allowed for large-scale money laundering and unlicensed money transmitting. *See, e.g.*, *United States v. Sterlingov*, 573 F. Supp. 3d 28, 31-32 (D.D.C. 2021) (the "BitcoinFog Case") (defendant convicted after trial in March 2024 of money laundering and unlicensed money transmitting); *United States v. Harmon*, 474 F. Supp. 3d, 76, 82-83 (D.D.C. 2020) (the "Helix Case") (defendant pleaded guilty in August 2021 to money laundering conspiracy and sentenced to 51 months' imprisonment); *United States v. Roman Storm and Roman Semenov*, 23 Cr. 430 (S.D.N.Y. 2023) (the "Tornado Cash Case"); *United States v. Minh Quoc Nguyen*, 23

Mag. 528 (E.D.P.A. 2023) (the "ChipMixer Case"); *see also* U.S. Treasury Sanctions Notorious Virtual Currency Mixer Tornado Cash (Aug. 8, 2022)*,* available at https://home.treasury.gov/news/press-releases/jy0916; Tornado Cash Developer Alexey Pertsev Found Guilty, Sentenced to 64 Months in Prison by Dutch Court (May 14, 2024), available at https://www.coindesk.com/policy/2024/05/14/tornado-cash-developer-alexey-pertsev-found-guilty-of-money-laundering/; U.S. Treasury Issues First-Ever Sanctions on a Virtual Currency Mixer, Targets DPRK Cyber Threats (May 6, 2022), available at https://home.treasury.gov/news/press-releases/jy0768 (relating to Blender.io cryptocurrency mixer). And of course, for decades scores of defendants have been convicted of money laundering offenses for facilitating transactions involving criminal proceeds generated by third parties, including, for example, Silk Road operator Ross Ulbricht, of which the defendant is aware.

The defendant—describing himself as a "privacy advocate" (Docket No. 32 at 8) and regularly posting on Twitter about law enforcement efforts to dismantle cryptocurrency-related money laundering networks—would have certainly been aware of these types of criminal cases and efforts by law enforcement. Notably, in none of these cases have defendants been permitted to reside outside of the United States pending trial.

Put simply, the defendant is facing serious criminal money laundering and unlicensed money transmission charges, which are supported by overwhelming evidence—including powerful evidence of the defendant's knowledge and intention that Samourai would be used by criminals to engage in widespread money laundering. Contrary to the defendant's assertions, these charges are neither novel nor unprecedented.

### 3. Pretrial Supervision in the United States Is Necessary to Reasonably Assure the Defendant's Presence at Trial and to Prevent the Defendant From Committing Additional Crimes

Given the seriousness of the charges here, any bail package allowing the defendant to reside in Portugal pending trial would *not* reasonably assure the defendant's presence at trial or protect the community from additional crimes by the defendant.

To begin with, the defendant faces very serious consequences as a result of his participation in the operation of Samourai. Notwithstanding the defendant's self-serving assertion that his conduct is "unworthy of a lengthy sentence," Docket No. 32 at 8, Counts One and Two of the Indictment carry a statutory maximum of 25 years' imprisonment, with a Guidelines range that will likely exceed this statutory maximum after trial. Given the overwhelming strength of the evidence here, these likely penalties alone provide the defendant with enormous incentives to flee prosecution. *See United States v. Sabhani*, 493 F.3d 63, 76 (2d Cir. 2007) (observing that strong motives to flee exist where the evidence is strong and the potential penalties are severe). Additionally, there is evidence that the defendants actually created a plan to escape law enforcement detection if there were attempts to apprehend them for their roles in operating Samourai. During the search of co-defendant Keonne Rodriguez's home

in Pennsylvania in April 2024, law enforcement officers discovered a document containing plans for escaping the United States and meeting in Cyprus. This document is powerful evidence of the defendants' consciousness of guilt, criminal intent, lack of good faith, and, as relevant here, their risk of flight. Excerpts from the document are depicted below, with "SW" referring to @samouraiwallet (the Twitter username for co-defendant Keonne Rodriguez) and "TD" referring to "tdevd" (the Twitter nickname for the defendant):



As the above images show, the defendants planned in the event of a law enforcement operation against Samourai to meet in Cyprus—a country reachable by sea that would then be an easy layover to a host of countries where extradition to the United States or Western Europe would be unlikely or impossible.

Based on the Government's investigation, the Government also has significant concerns about the defendant's international connections and resources that would allow the defendant to flee at some point in advance of trial, especially if he were released to Portugal outside of the supervision of Pretrial Services. As noted above, the defendants generated millions of dollars in fees from the operation of Samourai—which took the form of cryptocurrency, an inherently pseudonymous form of money. Nearly all of Samourai's fees were additionally mixed using Samourai's own Whirlpool service, making the tracing of these fees very difficult, if not virtually impossible. As a result, the Government has not been able to identify all of the potential cryptocurrency addresses and accounts that are currently in the defendant's control—stores of value that the defendant could easily use to book travel to flee from law enforcement. During the course of the conspiracy, the defendant also regularly used Telegram—an encrypted messaging application—to communicate with co-conspirators and others, which would make it particularly difficult for U.S. law enforcement to know if the defendant were making plans to flee prior to trial. Releasing the defendant to Lisbon, Portugal would also place the defendant just an approximate six-hour drive and two-hour ferry ride away to Morocco—a country with no current extradition treaty with the United States. All of these factors strongly weigh in favor of requiring that the defendant remain in the United States pending trial for these serious money laundering and unlicensed money transmitting conspiracy charges.

Finally, the Government also respectfully submits that the Court should require that the defendant remain in the United States pending trial to ensure that the defendant does not engage in any additional criminal activities, including additional financial or monetary transactions involving proceeds from Samourai—which would constitute additional money laundering offenses under 18 U.S.C. §§ 1956 and/or 1957. Based on the Government's investigation and evidence seized from the defendant on the date of his arrest, it appears that the defendants jointly operated Samourai for years, up until the date of their arrest in April 2024. Additionally, a review of the defendant's cellphones has revealed that the defendant actively participated and encouraged others to use criminal darknet marketplaces. For example, one of the defendant's cellphones exchanged the following messages with another individual via Telegram on or about March 12, 2024—approximately six weeks before the defendant's arrest:

| | |
|---|---|
| **Telegram User:** | Are you apart of any drug group on telegram you can share |
| **Telegram User:** | My friend got operated and needs painkillers and doctor won't prescribe them |
| **Telegram User:** | So we're looking actively for a plug |
| **HILL Cellphone:** | You should try DNMs [dark net marketplaces] using Tor browser. Telegram is not private . . . Go to dark.fail to start off. There are a few DNMs in there. It's a clearness site but the addresses are all onions. |

On March 13, 2024, the defendant then sent to this user two links to what the defendant described as "The DNM Bible" and "Dread (good bulletin board w/ lost [sic] of DNM info". Later that day, the defendant also stated: "Here is an Onion directory[5] that I run [hyperlink] I need to update the DNM section as a few DNMs have been seized or exit-scammed." The defendant later told the Telegram user: "This DNM has painkillers: [hyperlink]" "They take BTC but I repeat: NEVER send BTC from any exchange (Coinbase etc) directly to a DNM."

      All of this evidence shows that the defendant was not merely operating a cryptocurrency mixing service that he mistakenly believed was a legitimate business. The defendant actively understood and intended that Samourai would serve as a laundering tool for participants in illegal dark net marketplaces like the Silk Road, and he was personally active and encouraged the use of those criminal online marketplaces. He referred these dark net marketplaces to others for the purchase of drugs, and he even ran his own directory of dark net marketplaces. Indeed, the defendant's own directory of dark net marketplaces includes links to a dark net market for 3D-printed guns and illegal drugs, with excerpts below.

## Receivers/Frames

| Name | Firearm/Platform | Download | Magnet [I2P] |
|---|---|---|---|
| FGC-9 Mk II "Stingray" Rev2 | FGC-9 Mk II | Direct | 🧲 |
| Partisan-9 | FGC-9 Mk II/Partisan-9 | Direct | 🧲 |
| UBAR-9 v1.2 | AR-9 | Direct | 🧲 |
| UBAR-9 Competition v1.2 | AR-9 | Direct | 🧲 |

## SEARS

| Name | Platform | Download | Magnet [I2P] |
|---|---|---|---|
| Mom's Demand Full Auto Swift Link 1.0 | AR-15 | Direct | 🧲 |
| Choosy Express v2 | AR-15 | Direct | 🧲 |
| Make Glocks Full Auto | Glock | Direct | 🧲 |
| Yankee Boogle Swift Link 1.0 | AR-15 | Direct | 🧲 |

---

[5] "The Onion Router" (also known as Tor) is an internet overlay network that makes it more difficult to trace a user's Internet activity. Tor is frequently referred to as the "dark web" because of its extensive use by cyber criminals.



## Stimulants



Uncut cocaine and speed!
We are shipping from germany and france every day.
We have the best stealth packaging on the market and are shipping worldwide.

| Product | Price | Quantity | | |
|---|---|---|---|---|
| 1g pure Cocaine | 75 EUR = 0.00125 ฿ | 1 | X | Buy now |
| 2g pure Cocaine | 130 EUR = 0.00218 ฿ | 1 | X | Buy now |
| 5g pure Cocaine | 250 EUR = 0.00418 ฿ | 1 | X | Buy now |
| 25g pure Cocaine | 950 EUR = 0.01590 ฿ | 1 | X | Buy now |
| 5g pure Crystal Meth | 120 EUR = 0.00201 ฿ | 1 | X | Buy now |
| 10g pure Crystal Meth | 200 EUR = 0.00335 ฿ | 1 | X | Buy now |
| 50g pure Crystal Meth | 800 EUR = 0.01339 ฿ | 1 | X | Buy now |
| 50g MDMA Crystals | 140 EUR = 0.00234 ฿ | 1 | X | Buy now |
| 100g MDMA Crystals | 220 EUR = 0.00368 ฿ | 1 | X | Buy now |
| 10 x 80mg Oxycodone (Oxycodone Hydrochloride) | 180 EUR = 0.00301 ฿ | 1 | X | Buy now |
| 50 x 80mg Oxycodone (Oxycodone Hydrochloride) | 600 EUR = 0.01004 ฿ | 1 | X | Buy now |

In short, the defendant's engagement in criminal activities on Tor and in encrypted messaging platforms like Telegram, and his extensive knowledge and use of cryptocurrency and mixing services like Samourai, all inherently increase the risk that the defendant will continue to engage in criminal activities and seek to flee if he is placed on pretrial release in Portugal, where it will be essentially impossible for Pretrial Services and law enforcement to meaningfully monitor his activities in real time. The defendant's participation in these types of criminal activities on encrypted messaging platforms and on the dark web using cryptocurrency also distinguish the defendant from the list of examples cited in the defendant's submission where courts have allowed criminal defendants to be released on bail outside of the United States.

Ultimately, the Government recognizes that requiring the defendant to remain in the United States pending trial would impose some amount of hardship on the defendant, despite the United States being one of the largest markets of Samourai users from which the defendant collected fees for years. But the flight and dangerousness concerns described above demonstrate the need for a condition that the defendant remain in the United States pending trial. The defendant is simply wrong that there is no meaningful difference between being supervised in the United States and in Portugal. In the United States, the defendant will be actively supervised by a pretrial services officer, subject to GPS location monitoring, and living in close proximity to the family members in Brooklyn who he has proposed to serve as his bond cosigners. All of these restrictions make flight and continuing criminal activity significantly less likely. For this reason, Judge Koeltl recently denied a defendant's request to be released on bail to Switzerland, observing that "there is no reasonable way for the Pretrial Services Officer to monitor the defendant's conduct if the defendant resides in Switzerland." *United States v. Brackett*, 23 Cr. 392 (JGK), Docket No. 19 at 2 (S.D.N.Y. Oct. 26, 2023); *see also United States v. Rains*, 22 Cr. 18 (NSR), Docket No. 38) (S.D.N.Y. Sept. 28, 2022) (denying release on bail in France because of flight risk concerns).

Significantly, as the defendant appears not to dispute in his bail submission, the defendant is also a U.S. citizen, has family in the United States, has regularly traveled in and out of the United States during his lifetime, and has sufficient resources to live comfortably in the United States pending trial. The Government respectfully submits that its proposed bail conditions are reasonable, appropriate, and necessary given the circumstances here.

For all of these reasons, the Government respectfully requests that the Court deny the defendant's request to be released on bail to Portugal. Rather, any bail package for the defendant's release in this case should require that the defendant remain in the United States and be subject to pretrial services supervision, location monitoring, and travel restrictions.

Respectfully submitted,

DAMIAN WILLIAMS
United States Attorney

By: /s/ Andrew K. Chan
    Andrew K. Chan / David R. Felton
    Assistant United States Attorneys
    Tel: (212) 637-1072 / 2299

cc: Roger A. Burlingame, Esq.