IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF NEW YORK

|  |  |
|---|---|
| UNITED STATES OF AMERICA<br><br>v.<br><br>WILLIAM LONERGAN HILL,<br><br>Defendant. | Case No. 24 Cr. 82 (DLC)<br><br>Hon. Denise L. Cote |

**WILLIAM LONERGAN HILL'S**
**<u>SENTENCING MEMORANDUM</u>**

October 24, 2025

## TABLE OF CONTENTS

**Page**

INTRODUCTION ...................................................................................................................1

I.    FACTS ........................................................................................................................2

    A.    Childhood in Brooklyn ..................................................................... 4

    B.    Adulthood in Paris ............................................................................ 6

    C.    Computer Coding............................................................................... 9

    D.    Sabrina .............................................................................................. 10

    E.    Bitcoin ............................................................................................... 15

    F.    Samourai Wallet................................................................................ 23

    G.    Bill's Culpability............................................................................... 25

    H.    Punishment......................................................................................... 29

    I.    Bill's Last Chapter ........................................................................... 31

II.    THE COURT SHOULD IMPOSE A SENTENCE OF TIME SERVED, A PERIOD
    OF HOME CONFINEMENT, TREATMENT, AND COMMUNITY SERVICE ............32

    A.    The Nature and Circumstances of the Offense/History and Characteristics
        of the Defendant................................................................................ 33

    B.    Need for the Sentence Imposed ....................................................... 38

    C.    Kinds of Sentences Available........................................................... 40

    D.    Relevant Sentencing Guidelines ..................................................... 41

    E.    Need to Avoid Unwarranted Sentencing Disparities ...................... 42

CONCLUSION...................................................................................................................45

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Dean v. United States*,
    581 U.S. 62 (2017)..................................................................................32

*United States v. Adelson*,
    441 F. Supp. 2d 506 (S.D.N.Y. 2006)......................................................41

*United States v. Aleksei Andriunin*,
    No. 24-cr-10190 (D. Mass. June 18, 2025)..............................................43

*United States v. Algahaim*,
    842 F.3d 796 (2d Cir. 2016).....................................................................41

*United States v. Corsey*,
    723 F.3d 366 (2d Cir. 2013).....................................................................42

*United States v. D.W.*,
    198 F. Supp. 3d 18 (E.D.N.Y. 2016) .......................................................37

*United States v. Emmenegger*,
    329 F. Supp. 2d 416 (S.D.N.Y. 2004)......................................................38

*United States v. Fregoso-Bonilla*,
    No. 05-CR-325, 2007 WL 4358326 (E.D. Wis. Dec. 10, 2007).............34

*United States v. Gaind*,
    829 F. Supp.669 (S.D.N.Y. 1993), *aff'd*, 31 F.3d 73 (2d Cir. 1994)......38

*United States v. Gonzalez*,
    945 F.2d 525 (2d Cir. 1991).....................................................................37

*United States v. Hayes et al.*,
    No. 20-cr-500 (S.D.N.Y. Nov. 18, 2022) ................................................43

*United States v. Huseth*,
    No. 18-20027-JAR, 2021 WL 4940915 (D. Kan. Oct. 22, 2021)..............36, 37, 40

*United States v. Johnson*,
    No. 16-CR-457-1, 2018 WL 1997975 (E.D.N.Y. Apr. 27, 2018) ...................39, 42

*United States v. Kelly*,
    16-cr-00837 (S.D.N.Y. Dec. 19, 2016)....................................................43

*United States v. Klein*,
No. 11-CR-255, 2011 WL 6779309 (E.D.N.Y. Dec. 27, 2011) ..............................................39

*United States v. Knott*,
638 F. Supp. 3d 1310 (M.D. Ala. 2022) ...............................................................................37

*United States v. Lawrence*,
254 F. Supp. 3d 441 (E.D.N.Y. 2017) ...................................................................................37

*United States v. Legkodymov*,
23-CR-496 (E.D.N.Y. July 30, 2024) ....................................................................................43

*United States v. Leitch*,
No. 11-CR-609, 2013 WL 753445 (E.D.N.Y. Feb. 28, 2013) ...............................................40

*United States v. Musgrave*,
647 F. App'x. 529 (6th Cir. 2016) ........................................................................................37

*United States v. Nesbeth*,
188 F. Supp. 3d 179 (E.D.N.Y. 2016) ...................................................................................38

*United States v. Pisano*,
No. 08-CR-76, 2009 WL 361953 (E.D.N.Y. Feb. 12, 2009) .................................................39

*United States v. Roberts*,
No. 01-CR-410, 2005 WL 1153757 (S.D.N.Y. May 16, 2005) .............................................35

*United States v. Sarao*,
15 Cr. 75 (N.D. Ill. Jan. 29, 2020) .......................................................................................36

*United States v. Tsai*,
19-cr-675 (S.D.N.Y. Jan. 10, 2020) ......................................................................................42

*United States v. Warner*,
792 F.3d 847 (7th Cir. 2015) ...............................................................................................39

*United States v. Watt*,
707 F. Supp. 2d 149 (D. Mass. 2010) ..................................................................................42

*United States v. Xu*,
No. 14-CR-319 (N.D. Ill. Sept. 8, 2025), ECF 130 ..............................................................34

*United States v. Zimmerman*,
No. 10-CR-598, 2012 WL 3779387 (E.D.N.Y. June 19, 2012) ............................................40

*Van Loon v. Dep't of the Treasury*,
122 F.4th 549 (5th Cir. 2024) ..............................................................................................33

**Statutes**

18 U.S.C. § 371 .................................................................................................................33

18 U.S.C. § 1960(b)(1)(A) ...............................................................................................29

18 U.S.C. § 1960(b)(1)(C) ..........................................................................................29, 33

18 U.S.C. § 3553(a) ..................................................................................................... *passim*

**Other Authorities**

Greenberg, et al., Moral Foundations in Autistic People and People with
    Systemizing Minds, *Molecular Autism* 15:20 (2024) .............................................20

# INTRODUCTION

Bill Hill has led a quiet but also remarkable life of 67 years. Largely self-educated, he moved from his native Brooklyn in his early 20s to Paris, where he remained for over four decades. While working as a clerk in the U.S. Embassy in the mid-1980s, Bill discovered computers and taught himself to code, leading to a series of IT jobs. He has always lived modestly, first alone and later with his wife, Sabrina. He follows a careful routine—reading for hours every day, taking walks along a set route, and eating according to a strict schedule. He finds social situations confusing and uncomfortable, preferring to spend time with his books and Sabrina.

Earlier this year, a leading expert at Cambridge University diagnosed Bill with autism—a neurological condition "marked by persistent deficits in social communication and interaction, as well as restrictive, repetitive and obsessive patterns of behavior, interests and activities." Though he did not know he was autistic, it has played a dominant role in Bill's life, including in the actions that led to his arrest and conviction. Bill's autism is the key that explains who he is, how he became involved in a criminal conspiracy after leading a law-abiding and productive life, and one reason why—along with his acceptance of responsibility and in consideration of the factors in 18 U.S.C. § 3553(a)—this Court should extend him leniency.

Bill has frankly acknowledged the mistakes he made in connection with Samourai Wallet. While he believed at the time that he was operating a legal business (based on his reading of official government guidance concerning money transmission and the advice of counsel with expertise in cryptocurrency law), he now sees clearly that he took things way too far when he knowingly allowed it to be used for and even actively encouraged its use for money laundering. He is ashamed of himself, hardly able to believe that he was so foolish at his age to put everything he cares about at risk. He made the first approach to the government to ask for the

plea offer that was subsequently extended, and he readily agreed to all of the government's terms.

Bill has already suffered significant consequences for his actions. He spent 11 weeks in a notorious, medieval prison in Portugal—a living nightmare for an autistic person—and over a year under pretrial supervision, including a strict curfew enforced by location monitoring. He has maintained perfect compliance with his conditions of release, but the physical and mental strains of facing criminal prosecution have been enormous. The carefully constructed, set routines upon which he depends were upended. Over a decade of his work and most of his savings have been lost. He has been broken.

We respectfully submit that further incarceration of a vulnerable person like Bill would be "greater than necessary" to satisfy the goals of sentencing. 18 U.S.C. § 3553(a). A sentence of time served, with supervised release, including a period of home confinement, mental health treatment and community service, would be "sufficient, but not greater than necessary." *Id*. By contrast, a prison term would be unwarranted and unjust, especially given the extraordinary leniency afforded to other cryptocurrency industry participants, including those convicted of serious crimes who have recently been pardoned.

## I.    FACTS

While the term had yet to be coined, Bill was born with autism, a genetic, neurological condition that affects brain structure and function, is lifelong, and cannot be "cured" or overcome. People with autism experience the world wholly through its—their own—lens. As such, Bill's autism necessarily shaped his life. And because understanding autism is central to understanding Bill and how he came to live the life he did—including how he ended up coming before Your Honor for sentencing at age 67—it is worth reviewing how autism expresses itself in those who have it.

2

Undersigned counsel previously represented an autistic client, and following my first two-hour meeting with Bill in a Lisbon jail, I believed he was obviously autistic. To diagnose him, we retained Professor Simon Baron-Cohen of the University of Cambridge in England. Professor Baron-Cohen founded and heads Cambridge's Autism Research Centre (ARC), has written six books and over 750 scientific articles on autism, developed numerous influential theories and made many significant discoveries about it, and has received myriad awards and recognition for his work, including a knighthood. He is among the world's foremost authorities on the subject.

Professor Baron-Cohen's full report detailing what autism is and his diagnosis of it in Bill is attached at Exhibit A. His report explains that autism is characterized by (i) persistent social and communication deficits and (ii) narrow interests and difficulties adjusting to unexpected change. Baron-Cohen Rep., Ex. A at 4-5. Detailing how these characteristics manifest in autistic people, he writes:

1. The social and communication difficulties include challenges in the ability to:
   a. make friends or have relationships,
   b. read social cues,
   c. understand other people's behaviour,
   d. fit into social conventions and expectations,
   e. take another person's perspective (also called difficulties in 'theory of mind' or 'cognitive empathy'),
   f. interpret another person's emotional expressions or body language,
   g. understand another person's intended meaning or their intentions, thoughts or beliefs,
   h. understand what another person might know or need to know,
   i. understand social norms (even though they may 'camouflage' or mask their autistic symptoms to be accepted),
   j. be aware of the risks of being exploited or manipulated,
   k. exercise safe social judgement,
   l. be aware of their own vulnerability, and
   m. be aware of the consequences of their actions.

2. The narrow interests and difficulties with adjusting to unexpected change mean that autistic people:

   a. are strongly obsessional,

   b. pursue their interests to extraordinary detail and lengths and in great depth,

   c. have an aptitude in understanding systems, rules, or patterns, and have a strong drive to build systems (to 'systemise'), and tend to strictly adhere to the rules within the systems they learn or establish,

   d. focus on local detail over global information (sometimes called 'weak central coherence'),

   e. may develop 'tunnel vision' that prevents them from seeing the bigger picture in situations, including the repercussions of their actions,

   f. often have excellent attention to detail and pattern recognition which can be a strength and a talent in some areas,

   g. have deep, focused interests that can lead to them spending a huge amount of time on one topic or activity whilst neglecting other areas of their lives,

   h. may collect objects or information on a specific topic,

   i. may struggle with planning (also called 'executive dysfunction') because of their focus on seemingly irrelevant detail,

   j. have a different way of processing information which reflects autism as an example of neurodiversity,

   k. often prefer to do one thing at a time and may struggle to switch between tasks or activities,

   l. prefer repetition and predictability and may become very stressed by unexpected change or lack of routine,

   m. prefer systematic information and precision and exactness rather than approximation or ambiguity, which they may struggle with, and

   n. may also experience sensory hyper-sensitivity.

*Id.* The expression and impact of these traits have shaped Bill's life to a profound degree, with his obsessional drive to "systemize" and the "tunnel vision" with which he pursued his interests forging the spine of his life story.

### A.    Childhood in Brooklyn

Bill Hill was born in 1958 to a homemaker and printer in the Bay Ridge section of Brooklyn. He was his parents' first child and was followed four years later by his sister, Suzanne. Bill's maternal grandfather, a recluse, lived with the family, occupying the third floor of their home and rarely venturing out, other than for church. Bill, also an introvert, was extremely close

to his grandfather. *See* PSR ¶ 75, at 21; Suzanne D'Emic (sister), Ex. D.2 at 1 ("[G]randpa Lonergan shared the third floor with Bill, each having a room on opposite ends of the floor. . . . Our grandfather was a major influence on my brother.").[1]

The Hill family was by no means well off—"going out [to] dinner or seeing a movie in the theatre was extravagant and a 'real treat'"—but Bill's basic needs were met, and the home was free of violence or serious strife. PSR ¶ 75. And while Bill had few friends and was bullied as a child—according to Baren-Cohen, autistic people are common targets of bullying—Bill characterizes his childhood as a normal and happy one. *See* Baron-Cohen Rep., Ex. A at 2, 6; PSR ¶ 75.

Those who have written letters to the Court in support of Bill uniformly note his extraordinary intelligence and devotion to learning.[2] But as a child, Bill did not excel in school. He calls himself a "lazy student" in his letter to the Court, though he nevertheless performed well enough to gain admission to Pace University. William Hill Ltr., Ex. C at 1. He briefly attended,

---

[1] Bill received 20 letters of support from family and friends, many of which were also written in French. *See* Exs. D.1-D.20. We have translated these letters to English for the Court's convenience, but are able to provide the originals if Your Honor would like. One letter is provided to the Court in both English and the original French at the writer's request. *See* Ex. D.20.

[2] *See, e.g.*, Suzanne D'Emic (sister), Ex. D.2 at 1 ("He loved a challenge—he was an avid chess player, and was much happier to play for hours than to socialize at a party."); Sabrina Hill (wife), Ex. D.1 at 2 ("I look back to the computer classes after work and a lot of money spent on books that were hard to find in France. No vacations, no days off. He has the ambition to perfect himself, but not to please others."); Floyd Widener (former colleague), Ex. D.8 at 1 ("I was intrigued by this person who was constantly reading the latest Economist, Financial Times and other journals (Bill is and has always been a voracious reader) and thought that I might be able to use his knowledge to help with the company business. I found that if I went to Bill to ask specific questions and shaped them in a way that was related to his part of the business he could provide important insight."); Renaud Filbien (brother-in-law), Ex. D.12 at 1 ("What mattered to him was knowledge and the sharing of it. He often spoke to me about the training courses he wanted to take, always in pursuit of growth and learning."); Caroline D'Emic (niece), Ex. D.10 at 1 ("I have always known Uncle Billy to be a hardworking and highly intelligent person.").

but his studies failed to capture his attention—something Professor Baron-Cohen notes is a typical school experience for many brilliant people with autism—and Bill withdrew from college after a semester to spend the next few years performing entry-level, unskilled office work in Manhattan. *See* Baron-Cohen Rep., Ex. A at 6.

### B.    Adulthood in Paris

Deciding that he needed "the kind of pursuit that would keep [him] motivated," in 1981, at the age of 23, Bill decided to leave Bay Ridge, move to Paris, and dedicate himself to learning French, something he thought could hold his attention because it was an "open-ended learning endeavor[]."[3] William Hill Ltr., Ex. C at 1. It was Bill's first major life decision, and it was an extraordinary one for a college drop-out who had never strayed further from Bay Ridge than Niagara Falls on a family trip when he was 13. Bill had not found the life he wanted. His solution was to move to France—not to experience a new culture or see what life there offered, but because he believed he could find direction learning a big, complex, rule-bound system: French.

Bill did not know that he was an autistic person seeking to systemize, but he understood himself well enough to know that he needed something big that he could throw himself into learning. It was a pattern that would recur next with computer coding, and then with bitcoin. *See* Suzanne D'Emic (sister), Ex. D.2, at 2 ("in the 60s, kids like him were left to figure out how to navigate the world on their own. And he did—he immersed himself in his own world of

---

[3] This proved true. Notebooks seized from Bill's Lisbon apartment include long lists of French words, some along with their English translations. When asked about them, Bill, who at the time he took the notes had been fluent in French for more than 40 years, explained that he studied the language each day as part of his continuing quest to fully master it, and these were lists of Parisian slang.

technology, finding like-minded people to collaborate with. His path could have gone many ways, and he was somehow successful in finding a career and a wife to share his life with.").

To begin his quest to learn French, Bill joined an immersion program, living with a French family for a year while attending language classes during the day. After the program's conclusion, he stayed, eventually landing a job tending the American Embassy's bar.

Over the next eight years, Bill lived alone. He did not have friends or a community, but his goal was to master French, and he was content learning by living in Paris and spending his free time reading French novels—a habit he continues to this day. *See* Sabrina Hill (wife), Ex. D.1 at 3 ("[H]e escapes to [ ] the world of books. I have never seen my husband without a book: at a bus stop, in the metro, in a waiting room . . . everywhere, all the time."). Each Christmas, Bill came home to visit his family in Bay Ridge, another habit he maintained over the course of his life as his family first grew—his sister Suzanne, a nurse who stayed in Bay Ridge, married a firefighter and had three children—and then contracted, as his grandfather, and then his parents, passed.

Bill is devoted to his family, and they understand and love him. In their letters, Bill is:

- [A] hardworking and highly intelligent person. He would recommend French books to my sister, while she was studying the language in school. He took us all over Paris when my sister and I were finally able to visit as teenagers. . . . Billy sometimes comes across as shy, but if there is a shared interest, he can talk for hours. He has these niche, intense areas of focus that I do not myself have, but always admired and found interesting to be on the periphery of. . . . [H]e values [ ] spending time in peace with his wife . . . [and] my family and her family, which is why despite the ocean between us, he has been an active son to my grandparents, brother to my mother, and uncle to my siblings and me." Caroline D'Emic (niece), Ex. D.10 at 1.

- I have known Bill since about 1981. I know him to be a very intelligent, serious-minded and quiet person who loves his family and cherishes his wife. When Bill is interested in something he has

an intense focus to learn as much as he can and master it. He has always worked hard to accomplish whatever he started. William D'Emic (brother-in-law), Ex. D.3 at 1.

- In retrospect, a lot of Billy's interests and quirks relate closely to the qualities we notice in our son.[4] From casting a small net socially, to intense areas of interests, to difficulty relating to peers and adults in school—if Bill were in a classroom in 2025 and were identified as neurodivergent, I would not have been surprised. . . . . I love my brother . . . he is [ ] a hardworking, focused man dedicated to his family. Suzanne D'Emic (sister), Ex. D.2 at 2.

Bill has been a particular source of strength for his nephew, Liam:

- Since my son graduated from college after years of working hard and overcoming [the] challenges of autism and managing the bureaucracy of school as a person with a neurodivergence, Billy has been a mentor to him. He has connected with my son in a way that we are so appreciative of. Billy and he share an understanding of communication style, and a deep, niche interest in technology that my husband and I could never recreate ourselves. Suzanne D'Emic (sister), Ex. D.2, at 2.

- Whatever Liam's interests were as he grew, Bill was there with advice, encouragement and books on the subject, from robotics to coding language to building internet networks, Bill always made sure that Liam had him as someone he could reach out to for support. . . . I feel Bill saw a lot of himself in Liam. William D'Emic (brother-in-law), Ex. D.3, at 1.

- My parents chose my Uncle Bill to be my Godfather. He took this role in my life seriously. Bill knows that I have always taken an interest in technology. He cares about this fact, which is why he has gifted me numerous items relevant to my interest. . . . He always took time for me and seemed to understand the struggles I have living with A.S.D. . . . He can be somewhat insensitive, but he means well, and his actions show that. I will always be grateful to him for what he has done for me." Liam D'Emic (nephew), Ex. D.11 at 1.

---

[4] Bill's nephew, Liam, was diagnosed with autism at age two.

### C.    Computer Coding

In 1986, the American Embassy reassigned Bill from the bar to its Foreign Commercial Service section and made him a clerk. He used a computer for the first time, was riveted by it, and soon figured out how to write scripts to automate the formatting for the typing pool's correspondence. It was Bill's second encounter with a complex, rule-based system he could devote himself to mastering, and he again opted for total immersion.

Professor Baron-Cohen notes that computer programming, "which requires excellent attention to detail and pattern-recognition skills," often attracts autistic people. Ex. A at 6. In the years that followed, Bill took some night classes, but largely taught himself—another hallmark of autism—to code by reading what he could get his hands on in Paris and returning from his trips to the U.S. each year with a suitcase stuffed with coding books. *See* Baron-Cohen Rep., Ex. A at 7 ("Self-directed learning . . . is a common feature of autism"). By this point, Bill had met and married his wife, Sabrina (more on this below), and she recalls his contentment and absorption each night during the period that he allotted to studying computer programming manuals. Baron-Cohen Rep., Ex. A at 9.[5]

His sister observes, "he wears the same three tee shirts on rotation every week, and lived in the same shoe box apartment in France for decades. He was obsessed with the business and the coding." Suzanne D'Emic (sister), Ex. D.2 at 2. Sabrina also recalls his neglect of everything else to this cause: "Without realizing it, I started looking after him in ways that went beyond

---

[5] Bill has always methodically parceled out his time each day. Until his arrest, he devoted set times to work—which is also broken down into rigid routines—study, walking and eating certain foods (with chili peppers) at unvarying meal times. When in the grip of a tunnel-focused project, the work piece would expand to overwhelm the others, sometimes growing to stretches exceeding 24 hours. Professor Baron-Cohen notes that this sort of regimented routine and the discomfort of varying from it are hallmarks of autism, as is the obsessive devotion to an area of interest. Baron-Cohen Rep., Ex. A at 5.

typical spousal relationships. Gradually, this fostered great anxiety: every incident, from the smallest—like the time, six months after moving into an apartment he used as an office, I discovered that, apart from a table and a chair, he hadn't arranged for lighting or heating (seeing my reaction, he replied, "The computer keeps me warm and gives me light…')…." Sabrina Hill (wife), Ex. D.1 at 3.

Not long after his first exposure to the Commercial section's desktop, Bill was able to secure a job in IT at the British embassy. It was not only his first position in what was to be his life's work, but it brought him together with his wife, Sabrina.

### D.    Sabrina

Sabrina was the daughter of an Algerian father and a French mother. She lived in Algiers until 1990, when her employer, the British Embassy, transferred her to Paris. At the time she and Bill met, Sabrina was at the nadir of a lengthy struggle with anorexia. They were each outsiders—after nine years in Paris, Bill still had no friends; Sabrina, newly arrived and in the depth of her anorexia, was adrift and in trouble. Over the course of long walks through the city, they fell quickly and deeply in love, marrying four months after meeting, surrounded by her family in Algiers.

Sabrina and her family credit Bill as her savior. *See* Karina Kherbiche Filbien (sister-in-law), Ex. D.9 at 1 ("For me, he was like a savior, a true crutch. We were in France, far from our family, and I was carrying the weight of [Sabrina's] illness alone—the terrible ordeal that is anorexia. Then Bill entered her life. With his kindness, his generosity, his listening, and all the love he gave her, he knew how to take over"). In 1992, during the Algerian Civil War, this role expanded to include her parents:

- Due to the tragic events of a dark decade in Algeria, I had to return
  to Paris hastily, against my will and at the peril of my life. I had no
  place to go in Paris. Bill took responsibility for our entire settlement

and accommodation. He was always there to take care of us as if we were his own parents[.] Christiane Kherbiche (mother-in-law), Ex. D.5 at 1.

- Not knowing where to go, it was my daughter and son-in-law who opened the doors of their home to us. We were welcomed with open arms for a long time to help us find our bearings. He was there, helping us regain life when we were on the brink of despair, having lost all our possessions. He welcomed us, shared his one-bedroom apartment, provided food and shelter, helped us search for housing, supported us financially, and looked for job opportunities to help us get back on our feet. Kadour Kherbiche, (father-in-law), Ex. D.4 at 1.

Like Bill's, Sabrina's family also understands and appreciates who Bill is. They write:

- Bill has always had his own way of being in the world. Sometimes, during family holidays, he would start unexpected conversations that seemed to come out of nowhere. It made us smile, and it was his unique way of reminding us that he was there, in his own way. He often lived in his own universe, an inner space that belonged to him. But despite this apparent distance, he was very much with us. Karina Kherbiche Filbien (sister-in-law), Ex. D.9 at 2.

- Bill is a naturally reserved person. He values tranquility, his routines, and sometimes needs moments to himself in his own world. Deeply attached to his habits and a calm life, he may seem detached or somewhat aloof. But this trait does not indicate any issue; on the contrary, he is profoundly sincere, attentive, and loyal to those he loves. Nyna Abderrahim (niece), Ex. D.13 at 1.

- I was very happy that my daughter had married a caring and attentive man. I love reading immensely, and Bill has always advised me on which authors to choose. Bill is very reserved, even shy, with us, but over time, this did not bother us. However, during family gatherings, such as Christmas or other celebrations, his solitary nature would take over, and he would become quiet, showing signs of impatience to leave. I often understood him. Christiane Kherbiche (mother-in-law), Ex. D.5 at 1.

- It is true that Bill can be somewhat stern in character, but over time, one gets used to it. He is also a very solitary person; he does not enjoy the company of many people, gets bored quickly, dislikes family gatherings, and tires easily in our presence. This is all part of his character and does not detract from the man he is—always

present when called upon. Kadour Kherbiche, (father-in-law), Ex. D.4 at 1.

Sabrina is Bill's world outside work and study. Their 34-year union has been exceptionally successful; they are unusually close.[6] In her extraordinary letter to the Court, Sabrina describes what Bill means to her—"he is my rock; his kindness towards me is precious and essential to my well-being." Sabrina Hill (wife), Ex. D.1 at 4. She also details how much it pains her to see Bill, whose traits and way of being she knows better than anyone, and whom she has sought to "protect from the excesses of his uncompromising nature," make it through more than 60 years of life, only to stumble and fall. *Id.* at 3-4. She writes:

- His detached attitude and his naïve perception of human nature (he lost an important position he held in the late '90s, believing his employer's clearly false promises despite my warnings, but too late; a few years later, when he created his first company, he hired a former co-worker who took advantage of him, not showing up for days, taking numerous sick leaves and lying about potential contracts) often led to endless conversations between us where I tried to give him a more realistic reading of the world around us. *Id.* at 2.[7]

---

[6] Upon Bill's release from custody following his arraignment, I waited with Bill, together with Sabrina, his sister, Suzanne, her husband, Bill, and their son, Liam, outside the Pretrial Services office. I witnessed Bill and Sabrina seeing each other without prison restrictions for the first time in 11 weeks. They brought their faces together, inches apart, and looked into each other's eyes while cupping each other's face in their hands. Sabrina quietly wept. This lasted, without change or lessening of the initial intensity, for the entirety of the 20-plus minutes we waited to meet with his Pretrial Services officer. Bill's family did not seem to find Bill and Sabrina's behavior exceptional. For me, witnessing the intensity of their bond was a singular experience.

[7] Bill's fellow inmate in Portugal noticed the same thing. *See* Mark Bakacs (fellow inmate), Ex. D.6 at 2 ("Despite Frances' questionable reputation among other inmates—something I recognized but Bill seemed oblivious to—Bill trusted his promise [to help him obtain hot sauce] completely. When the favor inevitably failed to materialize, Bill was genuinely shocked and upset. He could not comprehend how someone would make a promise and not follow through. The concept appeared completely foreign to him, and this reaction taught me something profound about Bill's worldview: he operates from a foundation of absolute honesty and expects the same from others, even when experience might suggest otherwise.").

- [I]n the early 2000s, when the blogosphere was in vogue, . . . [Bill] started a blog where he dissected French politics in a provocative tone. Reading his posts and the comments they elicited became for me a constant source of worry. He responded to attacks that often targeted his country of origin, leading to a downward spiral that radicalized his positions. When I urged him to stop this verbal jousting, he would tirelessly respond, "We are at war" or "Always hit back twice as hard"—the same words he would use 15 years later about the detractors and competitors of Samurai when, appalled, I was reading his Twitter posts and asking him to stop. Locked in his convictions and his "battles," the reality of everyday life became even more an abstract concept to him. *Id.* at 3.[8]

- I love my husband. People would sometimes define him as 'peculiar'; I would say, 'special'. . . . Of course, lately, I've been mad at him, but my reaction might surprise you: I have scolded him as one would scold a child. For William has taken this ordeal very hard. He is completely disoriented: over ten years of work has been wiped out and confiscated. He doesn't talk much and when he does, it is to tell me how sorry he is to see me so sad. *Id.* at 4.

In 1992, Bill secured a job running IT for a European Yellow Pages company. He enjoyed continuing to master the language of programming and using it to build tools that solved the company's problems. But he found French office culture oppressive, and in 1997, he quit to start his own consulting business. It was the birth of the internet, and for the next few years, Bill built websites and database applications, and otherwise wrote code to help his various clients adapt. Starting in 2000, he focused on the emerging technologies of geo location (GPS) and mobile applications—programs that could run on cell phones and early computing devices. *See* PSR ¶¶ 102-03, 105, at 25-26. He was ahead of the curve, and when the smart phone revolution began, demand for his expertise skyrocketed.

---

[8] Such behavior exemplifies the obsessiveness that Professor Baron-Cohen states people with autism often exhibit. Baron-Cohen Rep., Ex. A at 5, 9. Similarly characteristic in autistic people is the tendency to be "convinced of the truth and importance of [their] pursuits without reference to or consideration of others' views." *Id.* at 9.

Yet despite his interests coinciding perfectly with the rise of first the World Wide Web and then the smart phone, Bill never sought to cash in. He invested himself in solving the technical puzzles his work provided, but he also prioritized maintaining his schedule: studying French (mostly via reading), taking walks, and eating meals with Sabrina at the same times each day.[9] Indeed, rather than capitalizing on the opportunities his skill set afforded him, from 2005 to 2008, he invested his scant free time and limited savings into forming a company to publish French literature. *See* PSR ¶ 104, at 26.[10]

From the time he began working for himself in 1997 through the time he took his first job in bitcoin in 2013, Bill's annual income never exceeded $2,000 per month. He thought it was plenty to live the life he wanted, and that's what he did. The letters uniformly report that he and Sabrina live simply and are wholly unconcerned with wealth and luxury:

- Bill and Sabrina live simply. What always struck me was the incredible number of books that filled their apartment, a testament to his curiosity and love of learning. Renaud Filbien (brother-in-law), Ex. D.12 at 1.

- One will not find my uncle to be a fashion icon, sporting the latest and greatest watches or jewelry—he is not a materialist, to a fault. He lives a simple life because what is values is spending time in peace with his wife. Caroline D'Emic (niece), Ex. D.10 at 1.

---

[9] Bill still depends on rigid routines for his mental well-being. In a jail cell in Portugal, he tried to cope by putting structure on his experience. *See* Mark Bakacs (fellow inmate), Ex. D.6 at 1 (In prison, "Bill would insist on scheduling our meetings for specific times like 3 p.m. or 4 p.m., even though prison days had no real structure and we had nowhere else to be. . . . Every day, he would walk the same path up and down the hall for precisely an hour, maintaining this schedule regardless of the weather or his mood.").

[10] One of the two exceptions to Bill's French-books-only rule was a collection of poems by the Wall Street Poet Eugene Schlanger about the 9/11 attacks, which Bill published in a French/English edition with each poem appearing in English on the right-hand page and in French on the left. Sabrina, an English school teacher as well as a native French speaker and professional translator, did the translations and proofreading. The edition sold approximately 500 copies.

14

- My uncle is a simple, honest, and deeply loving man. I have always known him to lead a balanced, peaceful, and moderate life, which he shares with my aunt. Their daily life is built on modest and genuine pleasures: he enjoys eating a pizza, reading, watching movies, walking, and wearing the same pair of his favorite sneakers for many, many, years before buying new ones. Detached from material things, he prefers to devote his time to simple, enriching activities that align with his values. Nyna Abderrahim (niece) Ex. D.13 at 1.

- My sister and Bill live modestly—in a small, rented apartment, without trips or great extravagances. We didn't see each other often, but at every family gathering, Bill brought his simple and reassuring presence. Karina Kherbiche Filbien (sister-in-law), Ex. D.9 at 1.

### E.    Bitcoin

In keeping with his never-ending quest to learn all things coding-related, Bill began exploring the world of bitcoin in 2011, just as it first began gaining traction among technology enthusiasts. At the time, Bill was 54 years old, had been living in Paris for 31 years, married to Sabrina for 21, and supporting himself by coding for nearly 20. He lived the same, steady, routine-dominated existence he had since he set up his own company.

His encounter with bitcoin upended this existence.

Bill was instantly entranced by cryptocurrency. Bitcoin became his new, all-consuming passion, offering as it did what Bill refers to as another "open ended learning curve"—the same thing that attracted him to French and coding. William Hill Ltr., Ex. C at 1. He once again immersed himself fully, and within two years, Bill was sufficiently well-versed that when he happened to meet the head of, at the time, the world's premier cryptocurrency company, Blockchain.com, they got to chatting and Bill ended up with a job. *See* PSR ¶ 101, at 25.[11] Thus

---

[11] Before the advent of online cryptocurrency exchanges, bitcoin enthusiasts would find each other in online message boards and arrange to meet in person to buy and sell bitcoin. Bill met Blockchain.com's CEO, who was visiting Paris at the time, to purchase 0.2 of bitcoin, an amount that is currently worth approximately $20,000, for €200.

began the next 13 years of Bill's professional life, a period in which he worked on bitcoin, was paid in bitcoin, and tried to live his life in bitcoin to the degree possible.

As to the latter, when Bill first started at Blockchain.com, there were few products and services available for purchase in bitcoin. It was a fringe area dominated by enthusiasts proclaiming its potential to be a functioning currency, but it remained unknown to most. So, Bill set out to change this, recruiting shopkeepers, taxi drivers, and any other provider of goods or services he encountered to accept payment in bitcoin. He accrued enough success over the years that, by the time of his arrest, he could pay for much of his and Sabrina's existence in bitcoin.[12]

Bitcoin echoed Bill's dives into French and coding, but it also differed sharply in ways that led to a much deeper, more multidimensional obsession. Bitcoin offered Bill not only a new, far more complex technical system to master, but one that came with a deep and, for Bill, extraordinarily compelling ideology. And perhaps most importantly, it offered Bill a community—his first—and an important role to play in it. *See* Sabrina Hill (wife), Ex. D.1 at 4 (There is in both Bill and me "a feeling of not belonging and of often being estranged from the world around us."). Bitcoin lit an unprecedented spark in Bill, setting off the chain of events that led to this sentencing. Following that chain starts with understanding the ideas that gave rise to the world's first cryptocurrency, and which fuel the debate over its purpose and future.

In 2008, bitcoin's creator, the pseudonymous Satoshi Nakamoto, released a white paper detailing his creation to the world.[13] But bitcoin did not spring whole cloth from Satoshi's

---

[12] When Bill and I discussed legal fees, I was slack-jawed as he translated my dollar denominated figures into bitcoin to make sense of them. It was how he thought about his finances, and he encouraged others to do the same by banning from Samourai Wallet any features that converted bitcoin amounts to dollars or other "fiat" currencies.

[13] The ideas that captured Bill, summarized in the paragraphs to follow, are distilled from the report by Professor David Yermack of New York University's Stern School of Business, attached at Exhibit B. As detailed in his report's recitation of his credentials and expertise, Professor

imagination. It was the culmination of nearly three decades of thought aimed at solving two problems. The first was to address concerns about the stability of government-issued (or "fiat") currencies. A school of economists, including numerous Nobel Prize winners, argued the superiority of a "rules," as opposed to "discretion," based system of monetary control. They reasoned that governments are political, politics eventually demands expansionary fiscal policy, and replacing discretionary government monetary control with fixed, predictable rules would create a currency that would serve as a superior store of value. By minting new coins according to the operation of an algorithm, bitcoin solves this issue.

The second problem was privacy. Modern economies rely on "trusted third parties"—banks, credit card companies, payment systems such as Venmo or PayPal, and money transfer services like Western Union—to mediate and keep track of payments. These heavily regulated companies are in turn supported by an infrastructure of heavily regulated clearinghouses, all of which are audited. Trusted third parties must collect information about their customers, track their spending, and reverse—or "censor"—transactions they deem improper. This power raised concerns about Orwellian government overreach that were heightened by the meteoric rise of electronic payment systems in the 1970s and 80s. Bitcoin addressed this problem through its peer-to-peer functionality: the ability for any user to send a bitcoin directly to any other user without the need for a trusted third party. And in theory they could do so anonymously, providing

---

Yermack is one of academia's leading experts on cryptocurrency. He was originally retained to testify about why cryptocurrencies were developed, how privacy emerged as a concern among its users, and the utility of non-custodial wallets with privacy features like Samourai Wallet in addressing those concerns. Following Bill's guilty plea, he wrote the attached report summarizing his knowledge and conclusions to aid the Court in sentencing. The report exceptionally well captures the ideas that drove Bill's tunnel-focused bitcoin obsession, to which the following paragraphs' attempt to summarize does not do full justice.

users with the ability to reveal as much or as little about the details of their financial lives as they wanted to.

A community of computer scientists, academics, and economists who came to be referred to as the "Cypherpunks," began meeting in Silicon Valley in the early 1980s to address these two problems. Their goal was the creation of "digital cash," electronic currency that possessed the desirable properties of hard currency—fungibility, censorship resistance, and privacy—and would serve as a superior store of value due to its issuance pursuant to a rules-based, algorithmic system. Their work, with various milestones along the way, not only provided the building blocks Satoshi Nakamoto used to create bitcoin's functionality, but the intellectual architecture he used to explain its utility and value.

Unfortunately for Nakamoto, he did not foresee that bitcoin's rise would subvert his (the Cypherpunk) vision for it. As bitcoin gained traction and value, its anonymity fell away. The financial speculators who invested in bitcoin to seek profit in its rise (without reference to its use as a functioning currency) became more and more concerned about the risks inherent in anonymous peer-to-peer transactions—i.e., the use of bitcoin by criminals. Such transactions threatened their investments. And as these investments came to be made by well-resourced financial market participants, forensics companies such as Chainalysis arose to address their concern. Bitcoin's record-keeping system, the blockchain, is public, making each and every bitcoin transaction permanently available to anyone. By poring over transaction records, these companies began to associate people with the "wallets" they use to transact, stripping bitcoin of its anonymity, and therefore its privacy. Further, the ability to identify wallets used in criminal transactions created a class of "dirty" coins—that could, for example, be "blacklisted" by a

cryptocurrency exchange whether the holder had received it in a legal transaction or not.[14] This limited their value and destroyed the potential for a truly fungible digital cash, where each coin was like for like—a critical component for a functional currency.[15]

Addressing this privacy/fungibility problem is why Bill Hill created Samourai Wallet.

Bill was deeply attracted to bitcoin's cryptographic nature and the technical challenges it posed. But he was also captivated by the ideas that birthed it, particularly the capacity for peer-to-peer transactions and the freedom and privacy they offered. In his letter to Your Honor, Bill states that the longer he lived overseas, the more American he became. William Hill Ltr., Ex. C at 1. He explains that he found French culture conformist, and its rules around cash transactions—requiring Bill to explain the reasons for small, mundane purchases to bank clerks—a perfect

---

[14] Blacklisting applies to any coin traceable to a criminal transaction, whether later received via a legal transaction or not. Contrary to the PSR, this—and not a desire to thwart law enforcement—is the context that informed the Samourai website's description of Ricochet as a feature allowing customers to "[s]tump the blacklists and help guard against unjust 3rd party account closures." PSR ¶ 27 n.2.

[15] Professor Yermack explains fungibility's core importance to currency by citing *Crawfurd v. Royal Bank*, a Scottish case from 1749, which held that money "cannot be vindicated from the bona fide possessor, however clear the proof [of] theft may be." He explains:

> The plaintiff in the case, Mr. Crawfurd, was prevented by the court from recovering from the Royal Bank certain specific banknotes that he had lost and whose serial numbers he had recorded. When these banknotes were presented at the bank for deposit several months later by a holder who had obtained them in the routine stream of commerce, the court ruled that the banknotes should remain the property of the depositor and should not be returned to the plaintiff despite his proof that he had once owned and possessed them. If banknotes accepted in good faith could be confiscated and reassigned, the court reasoned, then merchants would not be able to accept paper money without detailed evidence of its provenance, thus creating prohibitive transaction costs that would destroy its usefulness. Yermack Report, Ex. B at 10.

example of its overreach. Bill had been an outsider in Paris for 30 years; bitcoin provided an avenue for him to express his frustration and push back.

It also gave him, for the first time in his life, a community (and one he felt comfortable in because it existed almost exclusively online).[16] Separate and apart from bitcoin forming yet another deep, rule-based system for him to master, the degree to which the originalist, Cypherpunk cause touched him was likely also an aspect of his autism. Professor Baron-Cohen notes that in his 2024 paper, "Moral Foundations in Autistic People and People with Systemizing Minds,"[17] he discussed the high correlation of autistic people to libertarian ideas that emphasize freedom and autonomy. He writes, "Autistic people tend to prioritise [liberty and fairness] over other foundational moral concepts (care, loyalty, sanctity). . . . My research has shown that

---

[16] While Bill and Sabrina say that the has no friends, he did form some offline, human connections, both by sharing knowledge and through acts of service, typically with people who felt as excluded as he did or who shared an interest that could serve as the subject—and substance—of their bond. *See e.g.*, Mark Bakacs (fellow inmate), Ex. D.6 at 1 ("Bill would carefully handwrite lists for me of French books I should read and topics he thought I should research once I had internet access again. His attention to detail in these recommendations was remarkable. Each suggestion came with specific reasons why he thought it would interest me, demonstrating both his thoughtfulness and his systematic approach to sharing knowledge."); *id.* at 2 ("Bill had difficulty with the typical social flow of conversation. He would often seem not to engage in the friendly manner I might expect given our shared backgrounds and experiences. Initially, I attributed this to the shock of our unusual environment, but I came to recognize it as part of his authentic way of being.); Floyd Widener (former colleague), Ex. D.8 at 1 ("He rarely calls or texts, but he is always there when I reach out and ask to meet to share a meal and discuss the latest events in the world or ask for advice on a business decision."); Erik Svane (friend), Ex. D.16 at 1 ("when I told him about the difficulties foreigners face getting their books accepted by French editors, to my utter surprise (and delight), he decided to found a publishing house, something in which he had no experience whatsoever. When he gave me the news at a café in Paris, I nearly fell out of my seat.").

[17] Greenberg, et al., Moral Foundations in Autistic People and People with Systemizing Minds, *Molecular Autism* 15:20 (2024), https://molecularautism.biomedcentral.com/articles/10.1186/s13229-024-00591-8.

individuals who exhibit a systemizing cognitive type, such as Autism, are more likely to hold libertarian political ideologies." Baron-Cohen Rep., Ex. A at 12.

The more Bill came to understand the threat bitcoin's lack of privacy and fungibility posed to the digital cash project, the more convinced he became that he could personally play a significant role in fixing it. Part of the project of bitcoin involves its community publishing flaws and gaps in "Bitcoin Improvement Proposals" (BIPs) that the community then strives to fix. Several of these BIPs proposed ways to make transactions private. Bill decided that by using his skills to create tools that would enhance privacy and thus fungibility, moving bitcoin toward becoming the true "digital cash" it was intended to be, he could put his shoulder to the larger wheel of the bitcoin project. He wanted to, as he put it, "build[ ] on the shoulders of giants"— building on the intellectual foundations of bitcoin's architects. William Hill Ltr., Ex. C at 2. And for someone who had never had community, the notion that he could now not only have one, but play an important role in it, was catnip.

Professor Baron-Cohen speaks of autistic people being "convinced of the truth and importance of [their] pursuits." Ex. A at 9. Bill certainly was. He had identified the "purest" way to love bitcoin, and he delighted in being on the ramparts of the war Professor Yermack describes over bitcoin's soul: whether bitcoin would "sell out" its original digital cash ambitions and succumb to the financial speculators' effort to turn it into a profitable investment vehicle, compromising its peer-to-peer, private DNA, or fight for the Cypherpunks' originalist vision. Ex. B at 12-13, 15.

Samourai Wallet was Bill's contribution to the fight. He had enjoyed his two years at Blockchain.com, where he served as the Senior Mobile Developer. It was interesting work, the company was at the center of the bitcoin universe and attracted some of its best minds. And Bill,

of course, also liked being paid in bitcoin. But Blockchain.com was ultimately a commercial venture that placed profits and growth. Bill was not against making money—he saved a portion of the bitcoin he was paid, correctly predicting its rise (and allowing for payment of his future attorney's fees)—but his salary met his needs, and his motivation lay in what he saw as the larger and more important project furthering bitcoin's evolution to becoming digital cash.

He did the small things in his own life, recruiting the shopkeepers, stretching to live in bitcoin by paying for goods and services with it to the degree practicable, but it was not enough. As bitcoin grew in popularity, relevance, and value, it attracted even more speculative interest. It was clear that the pressure to regulate bitcoin would follow this arc, stripping it of more and more privacy and fungibility. Bill understood the trade-off between privacy and the ability of bad actors to take advantage of digital cash to evade the traditional financial system's controls on money laundering. His assessment was that the good of a stable digital currency that held its value better than cash but was equally private and fungible outweighed the downsides. His black-and-white reasoning was that cash itself was legal, and bitcoin was simply its digital analog; his tunnel-visioned position was that policing money laundering was not his job or mission, whereas advancing bitcoin's cause now was.

In 2015, however, as a rule-following, law-abiding 58-year-old who had never before been in trouble, he was not willing to break the law. As such, when he and Keonne Rodriguez, who he'd met at Blockchain.com, began discussing the idea of forming their own company to create tools to enhance bitcoin's privacy and fungibility, Bill began researching whether they could do so legally.

Unafraid to apply his mind to dense, complicated projects, Bill read everything he could on the topic. He already knew that banks, credit card companies, and other businesses that

transmitted currency needed to administer the Know-Your-Customer (KYC) and Anti-Money Laundering (AML) controls that, if applied to digital currency, would destroy its peer-to-peer promise. What he came to understand was that other businesses did not have similar obligations, which arose from being deemed a money transmitter. The Financial Crimes Enforcement Network (FinCEN) provided these licenses, so Bill's research focused on their guidance about what constituted a money transmitting business in the context of cryptocurrency. He concluded that it hinged on a binary fact: if a company transmitting cryptocurrency took custody of it, it was a money transmitting business; if it did not, it was not.[18] Bill read this guidance himself, but he also read the commentary around it, which came to the same conclusion he did. As such, when he and Keonne decided to launch a privacy enhancing bitcoin wallet, he built it from the ground up to ensure that it never took custody of its users' bitcoin.[19]

### F.    Samourai Wallet

Samourai Wallet's goal—an easy-to-use mobile app that enabled anonymous transactions that maintained user privacy and therefore enhanced bitcoin's fungibility—was straightforward.[20]

---

[18] *See, e.g.*, "Application of FinCEN Regulations to Virtual Currency Mining Operations," FIN 2014-R001, at 3 (Jan. 30, 2014) (explaining that activities that "involve neither 'acceptance' nor 'transmission' of the convertible virtual currency … are not the transmission of funds within the meaning of the Rule"); "Application of FinCEN's Regulations to Certain Business Models Involving Convertible Virtual Currencies," FIN 2019-G001, at § 4.5.1(b) (May 9, 2019) ("[S]uppliers of tools (communications, hardware, or software) that may be utilized in money transmission, like anonymizing software, are engaged in trade and not money transmission.").

[19] The government aptly explains the mechanics of this process and does not contest Samourai Wallet's non-custodial functioning, so it is not necessary to delve into the technical details. In essence, Samourai Wallet routed communications that permitted parties to a transaction to communicate with each other and engage in the transaction without disclosing their identity or giving Samourai Wallet custody of their bitcoin.

[20] Paragraphs 22-23 of the PSR state that Samourai Wallet was not living up to its ideals by collecting certain information on users, suggesting this reveals its stated ideals were subterfuge to cover its true goal of assisting criminals. In fact, the need to collect this "XPUB" data was driven the functional necessity of calculating balances. As with other "light wallets," users who

Building it was not. Single-handedly, Bill wrote the hundreds of thousands of lines of code that powered the app. And like all user-facing software, his job was never done. From 2015 to 2018, he and Keonne ran Samourai Wallet as a money-losing labor of love. After he started working full time on Samourai Wallet, he lived on his saved bitcoin and spent 14-to-16 hours a day, seven days a week at his keyboard. The work consisted of first building and then maintaining the app, as well as developing new features to increase Samourai Wallet's functionality and further its mission.

The two features that led to this prosecution were Ricochet and Whirlpool. As detailed in the indictment, Ricochet built extra "hops" into a Samourai Wallet transaction. The bitcoin still ended up going directly between two transacting parties, but the routing instructions made it appear that other transactions took place in between. The prosecutors are correct that the purpose of Ricochet was to defeat KYC and AML efforts designed to understand who the parties were and whether the transaction was suspicious. But they are wrong as to Bill's motivation. Ricochet, like the rest of Samourai Wallet, was not built to help criminals launder money. It was created to frustrate Chainalysis and the other forensic companies that were stripping bitcoin of the privacy and fungibility that were the Cypherpunks' ideals.[21] For its part, Whirlpool provided a complex set of communications to effectuate a "Chaumian coin join."[22] Effectively creating a new bitcoin

---

did not have their own bitcoin "nodes"—a computer connected to the blockchain full-time— provided XPUB information to allow the Samourai Wallet app to interact with their wallet via its public key (the "PUB" in XPUB). This affected only 20% of Whirlpool users, and contrary to the PSR's claim, the Samourai Wallet app could not function for this 20% without it.

[21] Bill conceived of and coded Ricochet after watching a lecture by leading Cypherpunk, Adam Back.

[22] The name honors Davis Chaum, an early leader of the Cyberpunk movement who, in 1983, completed his dissertation, "Blind Signatures for Untraceable Payments," the first significant

by enabling users to join together fractions of existing bitcoins, Whirlpool came much closer to fully resolving fungibility and privacy concerns.

### G.    Bill's Culpability

Bill was a man on a mission. And, importantly, he was an autistic man on that mission. Professor Baron-Cohen explains that part of systemizing involves learning and mastering a system's rules—and then assiduously following them. Ex. A at 5. But he notes that autistic people tend to view those rules in binary ways, become tunnel visioned, fall victim to black-and-white thinking, are convinced of the righteousness of their cause, and often have trouble gauging the effects of their actions. *Id.* at 2, 5.

Here, Bill's autism worked against him in a number of ways. First, as he describes in his letter, Bill did not pause to truly consider the harm his product could and did cause. To him, he was on his side of the bitcoin war, his side was right, the other side was the enemy, and the enemy stood in the way of his goal. It was . . . black and white. In his view, Samourai Wallet promoted privacy and human freedom; Chainalysis destroyed it. Bill did not sniff the step of the analysis in which, to take the most horrifying example, those engaged in human trafficking could use Samourai Wallet to help them escape detection, furthering a far more acute affront to human freedom. He was blind to it not because he wanted to enrich himself or further others' criminal endeavors, but because he had a side, his side was right, and he could not—neurologically—see the nuance or other side of the argument. He was tunnel-visioned and, in his vision, policing money laundering was not his concern.

---

milestone in the digital cash project, which proposed electronic money exchanged via a network of peer-to-peer wallets. Yermack Rep., Ex. B at 6-7.

Autistic persons' "mind blindness"—the inability to imagine another perspective—is both a cause of black-and-white thinking and, together with it, form the second way Bill's binary view of the world worked against him. Bill *knew* Samourai Wallet was legal. He'd read the FinCEN guidance himself and the answer lay within it, period. In 2020, Samourai-retained outside counsel confirmed Bill's understanding that non-custodial software developers were not money transmitters, but this confirmation was not news to Bill—he was already sure he was right. So, given that Samourai was legal, Bill believed he had nothing to fear, and he acted accordingly, giving in to "the excesses of his uncompromising [autistic] nature." *See* Sabrina Hill (wife), Ex. D.1 at 2-3.

He also acted in accord with the community of which he was a part. Bill formed no close friendships in his 43 years in Paris. He also relished quitting his office job to start consulting so he could get away from its conformist French culture. He then came to be surrounded by the terminally online, bitcoin-enthusiast community of "true believers, libertarians and wildcat risk-takers who have colorful nicknames and communicate in hyperbolic language." Yermack Rep., Ex. B, at 13 (they "often rail against government regulation, believing that it does not anticipate or address issues that are relevant to cryptocurrency technology, due to its novel peer-to-peer, decentralized architecture"). It is of course a well-known phenomenon that people sitting behind keyboards shooting messages into the ether tend to behave with less nuance and more force than they do in person. Bill took this in and—and without the ability to gauge how he was coming across or appreciate the potential negative consequences of it—responded in kind.[23] *See* Baron-

---

[23] Many of the statements the government cites as evidence of Bill's intent are attacks on Samourai Wallet's main competitor, Wasabi Wallet. *See* PSR ¶¶ 30(b), 30(c), 31, 32, 32(c), 32(d), 34, 34(b). Launched in 2018, Wasabi Wallet was also a privacy wallet and offered WabiSabi, an analog of Whirlpool. Bill examined Wasabi's code, understood WabiSabi did not perform as advertised, and he was outraged. His outrage was compounded by the fact that Wasabi competed

Cohen Rep., Ex. A at 12-13 ("Among the communication difficulties people with autism experience, communication via the internet is particularly challenging. In fact, data shows that people with autism are disproportionately prone to both victimization, and offensive conduct on the internet as a consequence of their lack of social discernment.").

His statements, quoted at length in the indictment and the PSR, were offensive and went inexcusably far. Nearly all the letter writers comment on how quiet and polite Bill is in real life.[24] But this person did not often appear in Bill's online world. Instead, he was a caustic, forceful, fearless warrior for his side in the bitcoin war. Bill did not pause to consider the consequences. When he said, for example, "avoid[ ] Wasabi Wallet at all costs" and that "Samourai Wallet is a much better option" in a darknet subforum titled "Laundromat," formed in response to a question about "[s]ecure methods to clean dirty BTC," he didn't assess whether he was crossing a line. PSR ¶ 30(b).

Bill pled guilty because he is guilty. He understood that criminals used Samourai Wallet to launder money and he did nothing to stop them or change course. And at his most tunnel-visioned moments, he even invited that use. His purpose, however, was not to help criminals launder money, but something much less worthy of punishment. And his conduct was informed

---

with—and indeed out-competed—Samourai not by fixing its faulty tech, but by ramping up its marketing. From early 2020 on, with the zeal of a convert, Bill made spreading the word about Wasabi Wallet's flaws a core mission. And in keeping with who he is, it became a regimented part of his daily schedule. Each day, after coding and taking care of any technical issues that arose, Bill searched the relevant online forums for mentions of Wasabi Wallet. When he found one, he launched a fusillade against them. Sabrina's concern about his online warring was apt.

[24] *See, e.g.*, Kadour Kherbiche (father-in-law), Ex. D.4 ("In all the time I have known my son-in-law, I have never had an altercation with him. Our family relations have always been warm and courteous—never a raised voice. Our conversations have always been open and sincere, and his kindness and respect have been ever-present and impeccable."); Floyd Widener (former colleague), Ex. D.8 ("Bill was very shy and into his work, not really venturing out in terms of people or situations").

by a genetic, neurological condition that reduces his moral culpability. It is also worth underlining that the government does not allege and could not prove—because it did not happen—that Bill ever communicated with, let alone formed a specific agreement with, any criminal in advance of any specific transaction that included the proceeds of crime. Also worth noting is that Bill's, Samourai Wallet's, and presumably Google's lawyers'[25] reliance on FinCEN's guidance to determine that Samourai Wallet's non-custodial nature meant it was not a money transmitting business, was not a stretch. In August 2023, six months prior to charging Bill with operating an unlicensed money transmitting business, the prosecutors called FinCEN to ask for its take on its own guidance. They agreed with Bill and the lawyers.[26]

According to the indictment, more than $2 billion worth of bitcoins ran through Whirlpool and Ricochet. The government alleges that at least $250 million of it represented proceeds of crime, i.e., 87.5% did not. The defense does not contest these figures—they formed the basis of the unchallenged guidelines calculation—but assuming they are accurate, Samourai Wallet possessed broad appeal to those looking simply for the privacy that was Samourai's promise to its users and the fulfillment of the ideals that drove Bill's work.[27]

---

[25] Google made the Samourai Wallet app available for download on the Google Play Store for a decade.

[26] FinCEN, the principal regulator of money transmitting businesses, told prosecutors that a non-custodial application like Samourai Wallet would not qualify as a money transmitter under FinCEN guidance because it did not take custody of users' bitcoin. *See* Letter to Hon. Richard M. Berman, May 5, 2025, at Ex. A (filed as endorsed at ECF No. 87).

[27] Political activists fighting authoritarian regimes such as Alexey Navalny's Anti-Corruption Foundation and Ziya Sadr in Iran rely on tools such as Samourai Wallet to be able to obtain funding and do their work without being arrested, imprisoned, and tortured. *See* "Bitcoin Education for Activists and Nonprofits," Human Rights Foundation, *at* https://hrf.org/program/financial-freedom/unstoppable/ (last visited Oct. 24, 2025). And stories of individuals who are kidnapped and tortured have proliferated. *See, e.g.*, Bruna Horvath, *Crypto kidnapping: How armed gangs are hunting the internet's high rollers*, CBS News, (July 27,

In April 2025, concerns about the unfairness of criminally prosecuting people who created neutral cryptocurrency tools that could be used for lawful and unlawful purposes alike led the Deputy Attorney General to issue a memo stating that Department of Justice prosecutors should not target them for the "acts of their end users or unwitting violations of regulations." *See* Mem. from Deputy Attorney General to All Department Employees, Apr. 7, 2025.[28] Following consideration of this memo, the government dropped one leg of its money transmitting business charge—the leg based on Samourai Wallet's failure to register as a money transmitter, in violation of 18 U.S.C. § 1960(b)(1)(A). ECF 116 at 1. Soon thereafter, Bill sought a plea offer to the other leg, which forbids unlicensed money transmitting that "involves the transportation or transmission of funds that are known to the defendant to have been derived from a criminal offense." 18 U.S.C. § 1960(b)(1)(C).

## H.     Punishment

On April 24, 2024, Portuguese police arrested Bill in his home and took him to Portugal's worst jail, the ancient and notorious Estabelecimento Prisional De Lisboa, where he remained for the ensuing 77 days. Built in the 1600s and scheduled to be shut down in 2026, the jail does not segregate inmates serving lengthy sentences for violent crimes from pretrial detainees. Prisoners are afforded limited time outside their cells, and 22-hour lockdowns are a regular occurrence. Each 10'x10' cell contains an open toilet shared by its two inhabitants, and the food, served in the cell and thus eaten next to the toilet, is often unfit for consumption. Many guards are violent, medical attention is scarce, and obtaining prescribed drugs for medical needs is extremely

---

2025); C. Marcius & M. Coleman, "Another Suspect is Charged in Bitcoin Kidnapping and Torture Case," N.Y. Times, May 27, 2025.

[28] *Available at* https://www.justice.gov/dag/media/1395781/dl?inline (last visited Oct. 23, 2025).

difficult (Bill could not obtain permission to obtain from Sabrina the daily eyedrops necessary to control his glaucoma). PSR ¶ 85, at 23.[29]

Bill lost more than 20 pounds during his first two weeks in jail, unable to adjust to the food, the routine, or the sounds and smells. As Professor Baron-Cohen notes, Bill, like many autistic people, suffers from hypersensitivity. Ex. A at 13. This combined with the drastic change from his typical, metronomic routine, the forced socialization, and the guards' capricious application of constantly changing rules, made it impossible for Bill to adjust and learn to pass his time there in a way that did not feel like torture.

On May 22, 2024, Bill was able to meet with U.S. counsel for the first time. Within three weeks, he had instructed his Portuguese lawyer to agree to his extradition so he could come to the U.S. and face the charges.

After his July 2024 arraignment, Bill was released on bail back to Lisbon on conditions that included a strict curfew and travel restrictions enforced by GPS monitoring. While happy to be out of jail and home with Sabrina, Bill spent the next year without work or a purpose, mulling that the last 13 years of his life had been wasted, that his business, together with the majority of his and Sabrina's savings, which were destroyed by legal fees, were gone, and, hardest of all, that he had hurt Sabrina and would not be able to protect her from the trouble he brought upon them.

In the nearly three months since his guilty plea, Bill has lived in his sister's basement in Brooklyn. He is grateful to her for its use, but it is not his home. Sabrina visits but she needs to return to Europe to care for their home and her parents, and while he reads and takes walks every

---

[29] *See also Unseen footage obtained by TVI attests to the profound degradation of the Lisbon Prison: "The prison is medieval"*, TVI NOTICIAS (Jul. 3, 2024), https://tinyurl.com/33arzmtv.

day on Shore road, with Sabrina joining him when she's there, he has been unable to find new

routines. He is lost.

## I.    Bill's Last Chapter

The letter writers were uniformly shocked to learn of Bill's indictment:

- For me, it is incomprehensible, as it does not align at all with the man I know. I always felt that Bill was a bit unique, in his own world, but he is undoubtedly a good person. Renaud Filbien (brother-in-law), Ex. D.12 at 1.

- My family was devastated to find out my brother and their uncle was arrested. A person we all admired for his hard work, tenacity, and integrity— we were stunned. Suzanne D'Emic (sister), Ex. D.2 at 2.

- I was shocked when, around mid-2024, William told me he had been arrested in connection with the case for which he is being sentenced, especially because Bill had always worked on Samourai Wallet openly and proudly, and had even sold it on Google's App store. Bertrand Latour (friend), Ex. D.15 at 1.

- The legal situation he is currently facing is a shock for me and our entire family. I struggle to comprehend how such a thing could have happened, as it is entirely inconsistent with the man I know. Nyna Abderrahim (niece), Ex. D.13 at 1.

- Bill Hill is my son-in-law, married to my daughter, Sabrina Kherbiche, since August 1991, which marks 34 years of marriage. He makes my daughter happy. That is why I was deeply shocked to learn about what has happened to him. Kadour Kherbiche (father-in-law), Ex. D.4 at 1.

To those who knew him, Bill was a mild-mannered, kind and introverted man. He loved

his wife and family, and enjoyed his simple life of the mind. They did not know the bitcoin

warrior, fighting furiously for his cause from behind his keyboard. Now, no one else ever will

again either.

Bill understands his mistakes. He has left bitcoin behind and realized that going forward,

even when he is most certain—indeed, especially when he is most certain—he needs to lean on

Sabrina for perspective. He understands that he has autism, he understands its role in his causing

so much pain to himself and those he loves, and he is adamant that he will never make the same mistakes again.

Looking ahead, Bill plans on a quiet retirement, returning to Sabrina and his home and routines in Lisbon, and publishing books (in French) as a not-for-profit project, occupying his mind with something he loves that cannot hurt him. *See* William Hill Ltr., Ex. C at 3.

## II.    THE COURT SHOULD IMPOSE A SENTENCE OF TIME SERVED, A PERIOD OF HOME CONFINEMENT, TREATMENT, AND COMMUNITY SERVICE

Title 18, Section 3553(a) requires that a sentence be "sufficient, but not greater than necessary" to satisfy the four permissible goals of sentencing: "just punishment, deterrence, the protection of the public, and rehabilitation." *Dean v. United States*, 581 U.S. 62, 67 (2017) (describing the "parsimony principle"). When fashioning an appropriate sentence, a court must consider "the nature and circumstances of the offense and the history and characteristics of the defendant," "the need for the sentence imposed" in light of the specified goals, "the kinds of sentences available," the relevant guidelines and policies promulgated by the United States Sentencing Commission, "the need to avoid unwarranted sentencing disparities among defendants with similar records who have been found guilty of similar conduct," and "the need to provide restitution to any victims of the offense."[30] 18 U.S.C. § 3553(a).

These factors all counsel in favor of leniency given Bill's acceptance of responsibility for his conduct, his sincere belief in the lawfulness of Samourai Wallet based on his understanding of the law, the significant role his autism played in the offense, the time he has already served

---

[30] As noted in the PSR, restitution is not applicable here. PSR ¶¶ 126-27. As part of his guilty plea, Bill and his codefendant have agreed to forfeit $237,832,360.05, to be satisfied by forfeiture of $6,367,139.66, representing the fees that Samourai Wallet earned from transactions that involved the proceeds of crime. Bill's agreement to repay these funds—not easily identified or seized—is a reflection of his remorse.

under horrific circumstances in Portugal, his one-year pretrial supervision, and the severity of the suffering he will experience as an autistic person in prison. It will also avoid disparity with crypto industry participants who have recently been pardoned. We therefore respectfully submit that Bill should be sentenced to time served, a term of supervised release, with a period of home confinement, mental health treatment and community service.

### A. The Nature and Circumstances of the Offense/History and Characteristics of the Defendant

Bill stands convicted of a single count of conspiracy to operate an unlicensed money transmitting business, in violation of 18 U.S.C. §§ 371 & 1960(b)(1)(C). At the time of his guilty plea, he admitted that he and his codefendant "agreed to operate a business called Samourai Wallet," which "allowed users to . . . transfer their Bitcoin from one address on the blockchain to another in a way that obscured its transaction history." Tr. 7/30/25, at 15:17-16:1. Bill further acknowledged that he knew and understood that "some of the Bitcoin that users were storing and transferring was derived from criminal activities," including "proceeds of hacks from various sites … sent through Samourai Wallet to obscure the origin." *Id.* at 16:8-23; *see also* PSR ¶¶ 53-54. At 67 years of age, he has no prior criminal history of any kind. PSR ¶¶ 66-72.

Bill's involvement in the offense was motivated not by personal gain, but because he believed sincerely in the need for privacy and fungibility when transacting in bitcoin, a well-recognized and legitimate concern. *See Van Loon v. Dep't of the Treasury*, 122 F.4th 549, 559 (5th Cir. 2024) ("Law abiding cryptocurrency users employ mixers to maintain anonymity concerning their net worth, spending habits, and donations to political causes" and "to thwart criminals that would use this information to identify potential victims or set up phishing schemes"). After learning about and considering the problem, Bill thought he could use his

coding skills to permit users to transact privately, without taking custody of their funds and thereby qualifying as a money transmitter subject to KYC and AML rules.

Bill was not the only one who thought that developers of non-custodial software did not qualify as money transmitters—in fact, at the time of his indictment, two sitting U.S. Senators from different parties protested this prosecution in particular as inconsistent with the government's own prior guidance. *See* Letter from Sen. Lummis & Sen. Wyden to U.S. Att'y General Garland, May 9, 2024, at 1 & n.1 (filed at ECF No. 32-1) (expressing "grave concerns" regarding the recently unsealed indictment). And on April 7, 2025, the Deputy Attorney General issued a memorandum entitled "Ending Regulation by Prosecution" directing prosecutors not to bring criminal charges against cryptocurrency "tumblers and mixers" for licensing violations or for the acts of their end users, leading to the dismissal of one of the charges against Bill. *See* Mem. from Deputy Attorney General to All Department Employees, Apr. 7, 2025.[31] A host of cryptocurrency industry participants, lawyers, and lawmakers believe—and continue to argue today—that a non-custodial software application like Samourai Wallet does not qualify as a money transmitter subject to KYC and AML requirements. *See, e.g.*, Letter from DeFi Education Fund to U.S. Senate Committee on Banking & U.S. Senate Committee on Agriculture, Aug. 27, 2025 (signed by over 110 cryptocurrency organizations and software developers).[32]

Bill's genuine belief in the lawfulness of his actions, though not a legal defense to his offense, tends to reduce his moral culpability. *Cf. United States v. Xu*, No. 14-CR-319 (N.D. Ill. Sept. 8, 2025), ECF 130 at 28:22—29:1—5 ("[Y]ou're not saying 'I didn't do [criminal

---

[31] *Available at* https://www.justice.gov/dag/media/1395781/dl?inline (last visited Oct. 23, 2025).

[32] *Available at* https://www.defieducationfund.org/post/def-110-partners-submit-coalition-letter-on-developer-protections-in-market-structure (last visited Oct. 23, 2025).

copyright infringement],' but you are recognizing at some point that [] you didn't understand the seriousness of it . . . I'm taking that into account."); *United States v. Fregoso-Bonilla*, No. 05-CR-325, 2007 WL 4358326, at *3 (E.D. Wis. Dec. 10, 2007) ("[I]gnorance was no defense to the charge…[b]ut it was relevant in assessing . . . moral culpability."); *United States v. Roberts*, No. 01-CR-410, 2005 WL 1153757, at *7 (S.D.N.Y. May 16, 2005) (defendant's mistaken belief in the legality of the drug product he was selling brought conduct "afield of the statute's 'heartland'" such that downward departure was warranted). Bill now sees now that he was mistaken and took things way too far, knowingly allowing his creation to be used for money laundering. At the time, however, he thought he was following the letter of the law, that the ends of liberty and personal privacy were important enough to justify what he was doing, and that while he may have been doing something controversial, he did not believe he was operating outside the law.

How Bill made this serious misjudgment and ended up in a medieval Portuguese jail as a senior citizen, after decades of leading a quiet, peaceful, law-abiding life revolving around books and computers, has everything to do with how his mind works. The letters from his family and friends attest to myriad examples of the traits associated with autism, a diagnosis confirmed earlier this year by Professor Simon Baron-Cohen, a leading autism expert at Cambridge. While not an excuse for his conduct, Bill's lifelong difficulties forming meaningful friendships, his inability to see nuance or the other side's perspective, his tunnel-vision and black-and-white thinking, limits on his ability to foresee the consequences of his actions, and his susceptibility as an autistic person on the internet show clearly how and why he recklessly came to put everything he cared about and built at risk, while remaining convinced he was doing everything right.

Bill's statements on social media and the internet must be understood in the context of his autism. While Bill portrayed himself as a rebel on the internet, for example posting a directory of sites on the dark web and taunting the authorities, he was nothing like that in real life. To the contrary, he was always peaceful, sober, careful, and morally upright.[33] As noted, Professor Baron-Cohen explains that autistic people frequently misunderstand social situations, which can lead to interactions that seem highly inappropriate to others—and the internet and social media pose particular challenges. Ex. A at 13. Given the prevalence of this type of online speech, it is no surprise that a person who exhibits black-and-white thinking and has difficulty understanding how he will be perceived would believe that this was just "guerilla" marketing.

Taking into consideration the nature of the offense and Bill's personal characteristics, including the absence of any prior criminal history and his autism, the court should afford him leniency and impose a non-custodial sentence. *See United States v. Huseth*, No. 18-20027-JAR, 2021 WL 4940915, at *7 (D. Kan. Oct. 22, 2021) (granting a non-custodial sentence on the basis that defendant's autism prevented him from fully understanding the wrongfulness of possessing child pornography); *United States v. Sarao*, 15 Cr. 75 (N.D. Ill. Jan. 29, 2020) ECF No. 121, Sent'g Tr., at 37:7-21 ("So, the difficulty here as the judge on this case is to not negate the *mens rea*, which says . . . I did [spoofing on the CME, which caused losses in excess of $9.5 million], because then, of course, we wouldn't be standing here at a sentencing hearing, but also to recognize the naivete that he exhibits from his autism with this curious flash of brilliance in the

---

[33] *See, e.g.*, Kadour Kherbiche (father-in-law), Ex. D.4 at 1 ("He does not drink alcohol, does not use drugs, does not smoke, and loves to cook."); Bertrand Latour (friend), Ex. D.15 ("I've never seen him be disdainful or arrogant toward anyone."); Enoch Solcitame (professional acquaintance), Ex. D.19 ("William has always been a person of high moral character, displaying honesty and truthfulness in all interactions. William has consistently shown respect for others, treating individuals from all walks of life with dignity and kindness.').

technical world that allows him to see these patterns. . . . I do think that that's a factor that's mitigating.").

Bill's autism also makes imprisonment an unduly harsh punishment. As Professor Baron-Cohen explains, autistic people frequently suffer from a decline in both mental and physical health in prison. Ex. A at 13. That was certainly the case for Bill during his 11-week imprisonment in Portugal. Bill also suffers from an eye condition—he has an epiretinal membrane (ERM) from a prior retinal tear, that must be closely monitored, something that will not happen within the Bureau of Prisons. Consistent with Section 3553(a)'s focus on tailoring sentences to individual defendants, a vulnerable defendant's subjective experience of incarceration should be taken into account when determining just punishment. *See, e.g.*, *United States v. Gonzalez*, 945 F.2d 525, 527 (2d Cir. 1991) ("prison conditions may be particularly oppressive to vulnerable individuals"); *United States v. Musgrave*, 647 F. App'x. 529, 538 (6th Cir. 2016) (affirming district court's sentence of one day of imprisonment considering, among other things, the inability of the prison system to adequately care for the defendant's medical condition); *United States v. Knott*, 638 F. Supp. 3d 1310, 1318 (M.D. Ala. 2022) (determining that a sentence of incarceration was not necessary in part because the defendant's autism would render him vulnerable to being taken advantage of or abused and would make it "highly difficult for him to understand rules and codes of conduct—especially unwritten ones—in the prison setting"); *United States v. Lawrence*, 254 F. Supp. 3d 441, 453 (E.D.N.Y. 2017) (approving significant downward departure from Guidelines sentence where defendant's existing mental illness would likely lead to self-harm given "extreme distress when he [was] away from his family for extended periods of time"); *United States v. D.W.*, 198 F. Supp. 3d 18, 136 (E.D.N.Y. 2016) ("[v]ulnerable individuals may experience particularly oppressive conditions in prison,

and [] this bears on the propriety of the sentence imposed."); *United States v. Huseth*, No. 18-20027-JAR, 2021 WL 4940915, at *2 (D. Kan. Oct. 22, 2021) ("Huseth's [autism] further renders him particularly vulnerable to bullying and worse injury in a prison environment").

### B.    Need for the Sentence Imposed

There is no need for a prison sentence to impress upon Bill that his actions have consequences. Bill's imprisonment in Portugal, under horrific, deplorable conditions for two-and-a-half months was excruciating for him. As a result of his arrest, he has also had to face that he failed in his life's work of over a decade—a tremendously meaningful loss for anyone, but even more so for Bill, for whom work is one of the two pillars upon which he built his life, his family being the other. Between forfeiture and legal fees, it has also meant he and Sabrina have lost most of their retirement savings. These severe consequences to Bill and his wife already constitute significant punishment. *Cf. United States v. Gaind*, 829 F. Supp.669, 671 (S.D.N.Y. 1993), *aff'd*, 31 F.3d 73 (2d Cir. 1994) (loss of defendant's business, assets, and income "constitutes a source of both individual and general deterrence"); *United States v. Nesbeth*, 188 F. Supp. 3d 179, 191-92 (E.D.N.Y. 2016) (collateral consequences, including a disruption in defendant's intended career path constituted severe punishment warranting downward variance).

Nor is there a need to imprison Bill to deter him from future crimes. Bill is 67 years old, has no prior criminal history, believed (wrongly) that his conduct was lawful, and the business is shuttered. In his letter to the Court, Bill's confirms the change in his mindset. He has accepted responsibility for his conduct, without making excuses. He is devastated by what he has done to his family, especially his wife. Away from the routine he counts on for his mental well-being, he has now lived for months in his sister and brother-in-law's basement in Brooklyn. He wants nothing more than to return to his quiet life revolving around books and daily routines. The risk of recidivism is zero. *See United States v. Emmenegger*, 329 F. Supp. 2d 416, 428 (S.D.N.Y.

2004) (no risk of recidivism where offense was "particularly adapted to [the defendant's] chosen career[,]" "[t]hat career is over, and his potential to commit this particular type of crime has been eliminated"); *United States v. Pisano*, No. 08-CR-76, 2009 WL 361953 at *2 (E.D.N.Y. Feb. 12, 2009) ("Specific deterrence is not required in light of the defendant's law-abiding background and the fact that he cannot apply for certain employment because of this felony conviction. It is unlikely that he will engage in further criminal activity in view of the three years supervised release."); *United States v. Johnson*, No. 16-CR-457-1, 2018 WL 1997975, at *5 (E.D.N.Y. Apr. 27, 2018) (no need for specific deterrence where it is "highly unlikely that [defendant] will work again in . . . the financial services industry.").

With respect to general deterrence, the severe, personal, professional and financial consequences Bill has already suffered as a result of his offense are on their own more than sufficient to deter others from committing similar crimes. This case has been heavily publicized in the cryptocurrency industry, with a number of major industry websites following each development and providing regular updates to their readers. Industry leaders have clamored for clarification of the law. The message has now been sent loud and clear: operating a digital wallet with the knowledge that criminals are using it to launder funds is illegal, and if you engage in it, you will go to jail, lose your company, and all its funds. In these circumstances, a non-custodial sentence will be sufficient to promote respect for the law. *See United States v. Warner*, 792 F.3d 847, 854 (7th Cir. 2015) (finding sentence of probation for billionaire convicted of multimillion dollar tax evasion scheme carrying a Guidelines range of 46 to 57 months substantively reasonable in light of the severe collateral effects of defendant's "highly publicized prosecution"); *United States v. Klein*, No. 11-CR-255, 2011 WL 6779309, at *3 (E.D.N.Y. Dec. 27, 2011) (determining a sentence of supervised release in a halfway house and home

confinement served general deterrence from embezzlement as a "substantial restraint on liberty").

### C.    Kinds of Sentences Available

A sentence of time served, with a period of supervised release, including home confinement and appropriate treatment, would meet all of the legitimate goals of sentencing here and be more appropriate than a prison sentence. Home confinement and strict supervision—in addition to all the direct and collateral consequences of this case that Bill has and will continue to suffer—represents substantial punishment. *Cf. United States v. Leitch*, No. 11-CR-609, 2013 WL 753445, at *12 (E.D.N.Y. Feb. 28, 2013) (a probationary sentence is "*significant* punishment") (emphasis in original); *see also United States v. Zimmerman*, No. 10-CR-598, 2012 WL 3779387, at *6 (E.D.N.Y. June 19, 2012) ("Imprisonment is not the only way we punish."). And it is uniquely suited to Bill, who can be properly punished, supervised and rehabilitated while on supervision. *See United States v. Huseth*, No. 18-20027-JAR, 2021 WL 4940915, at *2 (D. Kan. Oct. 22, 2021) ("[A] probation sentence with treatment and therapeutic conditions tailored to his ASD . . . constitutes a sentence that is sufficient but not greater than necessary to satisfy the statutory sentencing purposes set forth in 18 U.S.C. § 3553(a).").

In addition, the Court should require Bill to perform community service, potentially at a charitable organization for autistic children, whom Bill could mentor the same way he has mentored his nephew Liam. The Administrative Office of the United States Courts has observed, for example, that community service is "a flexible, personalized, and humane sanction, a way for the offender to repay or restore the community. It is practical, cost-effective, and fair—a 'win-win' proposition for everyone involved. . . . Community service addresses the traditional sentencing goals of punishment, reparation, restitution, and rehabilitation . . . . It restricts

offenders' personal liberty[,] . . . [and] allows offenders to atone."[34] As comes through clearly in the sentencing support letters, Bill's primary way of connecting with society is through knowledge sharing, and such an endeavor would not only be good for his integration back into society but for the kids who would benefit from his deep interest and expertise in technology.

### D.    Relevant Sentencing Guidelines

The Court must consider the advisory sentencing guidelines and any applicable policy statements, which in this case result in a total offense level of 35 and an absurd imprisonment range of 168-210 months—far exceeding the maximum sentence for the crime of conviction. The primary reason for the high advisory sentencing range is of course the use of the table in Section 2B1.1, which causes a 26-level increase in the offense level. PSR ¶ 56.

Where application of the loss enhancement generates a guidelines sentence that does not produce a just result, the Court should impose a non-guidelines sentence based on the other § 3553(a) factors. *See United States v. Algahaim*, 842 F.3d 796, 800 (2d Cir. 2016) ("Where the Commission has assigned a rather low base offense level to a crime and then increased it significantly by a loss enhancement, that combination of circumstances entitles a sentencing judge to consider a non-Guidelines sentence."); *United States v. Adelson*, 441 F. Supp. 2d 506, 515 (S.D.N.Y. 2006) (where the guidelines calculation produces an overly long sentencing range, "a Court is forced to place greater reliance on the more general considerations set forth in Section 3553(a), as carefully applied to the particular circumstances of the case and of the human being who will bear the consequences").

---

[34] Court & Community: An Information Series about U.S. Probation and Pretrial Services: Community Service, Office of Probation and Pretrial Services, Administrative Office of the U.S. Courts (2007), *available at* http://www.kywp.uscourts.gov/court_comm/ccmtmsvc.pdf.

Rather than impose the statutory maximum sentence, the Court should instead impose the sentence that fits both the offense and the specific person who committed it. In the words of Judge Garaufis,

> As far as this Court can tell, the Sentencing Commission's loss-enhancement numbers do not result from any reasoned determination of how the punishment can best fit the crime, nor any approximation of the moral seriousness of the crime … Given the feeble underpinnings of the loss enhancement, it is particularly galling that this factor is often more or less *solely* responsible for a white-collar offender's Guidelines sentence … That this situation continues unabated is a great shame for the many offenders sentenced under this Guideline who do not receive a sentence that makes any sense for the actual crime of conviction.

*United States v. Johnson*, No. 16-CR-547-1, 2018 WL 1997975, at *3-4 (E.D.N.Y. Apr. 27, 2018) (emphasis in original); *see also United States v. Corsey*, 723 F.3d 366, 378-79 & 380 (2d Cir. 2013) (Underhill, J., concurring) ("the loss guideline is fundamentally flawed, especially loss amounts climb … [and] [t]he widespread perception that [it] is broken leaves district judges without meaningful guidance in high-loss cases … The higher the loss amount, the more distorted is the guideline's advice to sentencing judges"); *United States v. Watt*, 707 F. Supp. 2d 149, 151 (D. Mass. 2010) (undue focus on loss amount renders guidelines of "no help"). Here, Congress did not see fit to impose any mandatory minimum sentence, and Bill's individual characteristics, including the time he has already served, make probation a more appropriate form of punishment.

### E.    Need to Avoid Unwarranted Sentencing Disparities

A sentence of probation, with a period of home confinement, would not result in unwarranted sentencing disparities. Courts will impose non-custodial sentences in serious cases, where the nature of the offense and the personal characteristics of the defendant indicate that imprisonment would represent unduly harsh and unnecessary punishment. *See, e.g.*, *United States v. Tsai*, 19-cr-675 (S.D.N.Y. Jan. 10, 2020) (imposing non-prison sentence for defendant

who participated in three different insider trading schemes); *United States v. Kelly*, 16-cr-00837 (S.D.N.Y. Dec. 19, 2016) (varying from 97 to 121 months Guidelines range and imposing non-custodial sentence for defendant who pled guilty to bribing a New York pension fund official to personally earn $200,000 from ill-gotten business).

Particularly in cryptocurrency cases, courts have frequently imposed non-custodial sentences, including in cases where the defendants' actions facilitated large-scale money laundering. *See, e.g.*, *United States v. Hayes et al.*, No. 20-cr-500 (S.D.N.Y. Nov. 18, 2022) (cryptocurrency derivatives exchange Bitmex's three executives and one employee sentenced to varying lengths of probation after pleading guilty to violating the Bank Secrecy Act for failing to implement money laundering controls on crypto platform, leading to $200 million in illicit transactions); *United States v. Legkodymov*, 23-CR-496 (E.D.N.Y. July 30, 2024) (founder of cryptocurrency exchange Bitzlato, which customers used to exchange more than $290 million worth of cryptocurrency with the dark web market HydraMarket, sentenced to time served for operating a money transmitting business involving the transmission of funds known to the defendant to have been derived from a criminal offense or intended to be used to support unlawful activity); *United States v. Aleksei Andriunin*, No. 24-cr-10190 (D. Mass. June 18, 2025) (defendant who pled guilty to conspiracy to commit market manipulation and wire fraud for providing volume creation services to numerous crypto tokens trading on exchanges and where the forfeiture amount was $23 million sentenced to time-served).[35]

---

[35] None of the mitigating circumstances in Bill's case were present in the Liberty Reserve case, in which the Court imposed prison sentences on defendants who ran a centralized digital currency service almost a decade ago. In that case, the founder Arthur Budovsky pleaded guilty to a money-laundering conspiracy, was a repeat offender, and attempted to evade prosecution by moving off-shore and renouncing his U.S. citizenship. *See "*Liberty Reserve Founder Sentenced to 20 Years For Laundering Hundreds of Millions of Dollars," May 6, 2016, *at*

The BitMex prosecutions are especially relevant to avoiding unwarranted sentencing disparities here. There, the defendants founded and operated a "purportedly 'off-shore' cryptocurrency derivatives exchange." *See* "Founders of Cryptocurrency Exchange Plead Guilty to Bank Secrecy Act Violations," Feb. 24, 2022, *at* https://www.justice.gov/usao-sdny/pr/founders-cryptocurrency-exchange-plead-guilty-bank-secrecy-act-violations (last visited Oct. 23, 2025). In fact, their claim to be operating solely outside of the United States was a "sham," they willfully operated without the required KYC and AML programs, and they knew their platform was facilitating money laundering and sanctions evasion. *Id*. Although they faced a maximum of five years in prison for their violations of the Bank Secrecy Act, they each received non-prison sentences, including home confinement, and they have since been pardoned.

Recent pardons of high-profile figures in the cryptocurrency world who were convicted of very serious offenses at a scale much larger than Bill only highlight that a prison sentence would be disproportionate in this case. Indeed, only yesterday the President pardoned Changpeng Zhou ("CZ"), the owner of the largest cryptocurrency exchange in the world, who had been convicted of knowingly failing to implement KYC and AML programs. *See* "Binance and CEO Plead Guilty to Federal Charges in \$4B Resolution," Nov. 21, 2023.[36] Earlier, Ross Ulbricht, also known as the "Dread Pirate Roberts," who created the dark market known as the Silk Road and was sentenced to life in prison, was also granted a full pardon. *See* "Ross Ulbricht, A/K/A

---

https://www.justice.gov/archives/opa/pr/liberty-reserve-founder-sentenced-20-years-laundering-hundreds-millions-dollars (last visited Oct. 23, 2025).

[36] *Available at* https://www.justice.gov/archives/opa/pr/binance-and-ceo-plead-guilty-federal-charges-4b-resolution (last visited Oct. 24, 2025).

'Dread Pirate Roberts,' Sentenced in Manhattan Federal Court To Life in Prison," May 29, 2015.[37]

Sending Bill to prison would produce an especially unwarranted and distinctly unfair disparity given the government's marked change in its approach to cryptocurrency prosecutions. By seeking prison time for Bill, while simultaneously pardoning a parade of crypto industry participants with close ties to the White House, the government sends an unmistakeable message—that leniency is reserved for those who lobby the President personally. Sentencing Bill to time served, with a period of supervised release, mental health treatment, and community service, avoids the appearance of that kind of justice.

## CONCLUSION

For the foregoing reasons, the Court should sentence Bill to time served and a period of supervised release, with a period of home confinement, appropriate treatment, and community service.

Date: October 24, 2025                    Respectfully submitted,

                                          */s/ Roger A. Burlingame*
                                          Roger A. Burlingame
                                          Matthew L. Mazur
                                          DECHERT LLP
                                          Three Bryant Park
                                          1095 Avenue of the Americas
                                          New York, NY 10036
                                          Tel: (212) 698-3500
                                          roger.burlingame@dechert.com
                                          matthew.mazur@dechert.com

                                          *Counsel for Defendant William Lonergan Hill*

---

[37] *Available at* https://www.justice.gov/usao-sdny/pr/ross-ulbricht-aka-dread-pirate-roberts-sentenced-manhattan-federal-court-life-prison (last visited Oct. 24, 2025).

# EXHIBIT A



**Simon Baron-Cohen**
Professor of Developmental Psychopathology
Trinity College

October 23rd 2025

Hon. Denise L. Cote
United States District Court
for the Southern District of New York
500 Pearl Street, Courtroom 18B
New York, New York 10007-1312
United States of America

**Re William Hill**

Dear Judge Cote:

Earlier this year, at the request of defence counsel, I clinically assessed William Hill to determine:

      a.  if he meets the criteria for an autism diagnosis, and if so,
      b.  how autism might have had a bearing on the charged conduct.

I understand that Mr. Hill, who goes by Bill, has now pleaded guilty to a charge of conspiring to operate an unlicensed money transmitting business, and I am providing this report in aid of the Court's determination of an appropriate sentence.

My conclusions are provided in detail below, but I can confirm in summary that in February 2025 I diagnosed Bill with autism, without accompanying intellectual or language impairment. (This is what used to be called 'Asperger syndrome,' a term that is no longer used.) Autism is marked by persistent deficits in social communication and interaction, as well as restrictive, repetitive, and obsessive patterns of behaviour, interests, and activities.

During my assessment, I found clear evidence that Bill has exhibited these traits since childhood and throughout his life.  He has difficulty reading social cues, which is a hallmark of autism, and sometimes referred to as difficulties in 'theory of mind', or imagining another person's perspective. In his adulthood, he has not developed close friendships, which either reflects a lack of motivation to form friendships, or a difficulty in forming and keeping friends, both common features of autism.  He follows a rigid daily routine, which is another diagnostic trait of autism, and he reads obsessively, spends entire days and nights computer coding, and has an all-consuming interest in Bitcoin. These deep, narrow interests are sometimes referred to as 'monotropism'. In addition to these social challenges and patterns of behaviours, autism also affects other members of Mr. Hill's family. This is consistent with the fact that autism is strongly genetic in origin.

In my opinion, Bill's autism played a role in the offense he committed. He is obviously an intelligent man, attracted to difficult problems that he can solve with computer code. This included the problem of how to ensure privacy when transacting in Bitcoin, without requiring a user to provide a 'private key,' which he understood would trigger various anti-money laundering and know-your-customer requirements under U.S. regulations. Because of his autism, Bill showed a tunnel-vision around the product he created. While he knew that his product could and sometimes did facilitate transfers of Bitcoin to conceal proceeds of crime, at the same time he believed that he was doing something useful and worthwhile. He was so confident that Samourai was a lawful product, not covered by the regulations as he understood them, that he did not believe he was taking any legal risk. He failed to appreciate how his public statements on the internet and social media marketing Samourai Wallet would be interpreted by others. This black and white thinking, and his social naivete, are both aspects of his autism.

Bill's autism should be considered when considering the appropriate punishment. Autistic people have difficulty in prison environments, which are highly social. The social demands of getting along with other prisoners and staff can lead to conflict and misunderstanding. Autistic people are also likely targets for being bullied in prison. In addition, Bill, like most autistic people, suffers from sensory hypersensitivity, which produces distress in prison environments because they are so loud. Research has shown that autistic people are at a significantly increased risk of mental and physical deterioration in prison, leading to an elevated number of suicide attempts compared with general prison populations.

**Summary of Qualifications**

I am a Professor in the Departments of Psychology and Psychiatry at the University of Cambridge and Fellow at Trinity College, Cambridge, where I serve as the Director of the Autism Research Centre (ARC), which I set up in 1997. I hold degrees in Human Sciences from New College, Oxford, a PhD in Psychology from University College London, and an MPhil in Clinical Psychology at the Institute of Psychiatry (now Kings College London).

I have written widely on autism, including three books that bring autism and related areas of psychology to a broad readership (e.g., *The Essential Difference*, *Zero Degrees of Empathy*, and *The Pattern Seekers*) and two academic books (*Mindblindness* and *Prenatal Testosterone in Mind*). I have also written books for parents and teachers, including *Autism and Asperger Syndrome: The Facts*, and authored the digital educational resources, *Mind Reading* and *The Transporters*, to help autistic people learn emotion recognition; both were nominated for BAFTA awards. I have published over 750 peer reviewed scientific articles that have made contributions to autism research, typical cognitive sex differences, and synaesthesia research.

Over the course of my career, I formulated three influential theories: the 'mindblindness' theory of autism, the 'prenatal sex steroid' theory of autism, and the 'empathising-systemising (E-S)' theory of typical sex differences. Among my scientific discoveries are:
- 'mindblindness' (or difficulties in theory of mind) in autism;
- that autism can be diagnosed at 18 months of age;
- the role of the amygdala in autism;

- genetic links between systemising and autism; and
- the causal role of prenatal sex steroids in autism.

I created the first UK clinic for adults with suspected Asperger Syndrome (now simply called autism) in 1999 and gave a keynote address to the United Nations in New York on Autism Awareness Day 2017 on the topic of *Autism and Human Rights*. I am scientific advisor to the company Auticon, which only employs autistic people.

I am a Fellow of many academies and professional bodies, such as the British Psychological Society, the British Academy, the Academy of Medical Sciences, the Royal Society of Medicine, and the American Psychological Association. I am also Vice-President of the National Autistic Society and was President of the International Society for Autism Research (INSAR). I am a former Chair of the NICE Guideline Development Group for Autism (Adults) and the Psychology Section of the British Academy.

I was founding Co-editor in Chief of the journal *Molecular Autism* and serve as a Senior Investigator for the National Institute of Health Research (NIHR), the Principal Investigator for both the Wellcome Trust-funded award investigating autistic people's health, and the Simons Foundation-funded award investigating the prenatal biology of sex differences in autism. I also lead various other projects investigating vulnerability in autistic people, including in the criminal justice system, employment, and suicidality. I have supervised 45 PhD students, many of whom are now professors around the globe.

I received a Knighthood in the New Year's Honours List 2021 for services to autism and was awarded the Medical Research Council (MRC) Millennium Medal 2023, which is the highest personal award for medical researchers in the UK, in recognition of my research into the prenatal sex steroid theory of autism, my establishment of the ARC at Cambridge, and my work in the public understanding of neurodiversity.

**What is Autism?**

Autism is neurological, meaning it affects brain structure and function. Autism is also developmental: its causes are prenatal, it manifests early in development and is lifelong, and it is partly genetic in origin. Throughout this report, I refer to Autism Spectrum Disorder (ASD) simply as 'autism' as this is less stigmatising.

Autism causes clinically significant disability in social, occupational and other important areas of functioning throughout the individual's life. Autism involves an unusually high number of autistic traits (which lie on a continuum throughout the population). Autism covers what was previously referred to as 'Asperger Syndrome', a term which is no longer used but refers to autistic individuals who have intelligence (IQ) in the average or above average range and no history of language delay in childhood. Approximately one-third of autistic individuals also have a learning disability (below average IQ).

Many autistic people have co-occurring conditions, such as mental health conditions (e.g., depression, anxiety, or OCD), other neurodevelopmental disabilities (e.g., ADHD, dyslexia, dyspraxia or language delay), or physical health conditions (e.g., gastrointestinal pain or

3

epilepsy). Two-thirds of autistic adults without learning disability have felt suicidal and one in four have planned or attempted suicide.

**Diagnostic Criteria of Autism**

Autism is diagnosed on the basis of social and communication difficulties, alongside unusually narrow interests and difficulties in adjusting to unexpected change. The specific criteria are those used in established international classification systems for autism, the DSM-5 (the *Diagnostic and Statistical Manual*, published by the American Psychiatric Association) and ICD-11 (the *International Classification of Diseases*, published by the World Health Organisation). The DSM-5 lists the criteria as follows:[1]

> **A. Persistent deficits in social communication and social interaction across multiple contexts, as manifested by the following, currently or by history.**
>
> **B. Restricted, repetitive patterns of behavior, interests, or activities, as manifested by at least two of the following, currently or by history.**
>
> **C. Symptoms must be present in the early developmental period** (but may not become fully manifest until social demands exceed limited capacities or may be masked by learned strategies in later life).
>
> **D. Symptoms cause clinically significant impairment in social, occupational, or other important areas of current functioning.**
>
> **E. These disturbances are not better explained by intellectual disability (intellectual developmental disorder) or global developmental delay. Intellectual disability and autism spectrum disorder frequently co-occur; to make comorbid diagnoses of autism spectrum disorder and intellectual disability, social communication should be below that expected for general developmental level.**

The scientific research, including my own, shows the following characteristics as especially relevant to a diagnosis of autism.

1. The social and communication difficulties include challenges in the ability to:
   a. make friends or have relationships,
   b. read social cues,
   c. understand other people's behaviour,
   d. fit into social conventions and expectations,
   e. take another person's perspective (also called difficulties in 'theory of mind' or 'cognitive empathy'),
   f. interpret another person's emotional expressions or body language,
   g. understand another person's intended meaning or their intentions, thoughts or beliefs,
   h. understand what another person might know or need to know,

---

[1] Appendix 1 includes the full DSM-5 criteria with additional commentary.

      i.   understand social norms (even though they may 'camouflage' or mask their autistic symptoms to be accepted),

      j.   be aware of the risks of being exploited or manipulated,

      k.   exercise safe social judgement,

      l.   be aware of their own vulnerability, and

      m.   be aware of the consequences of their actions.

2. The narrow interests and difficulties with adjusting to unexpected change mean that autistic people:

      a.   are strongly obsessional,

      b.   pursue their interests to extraordinary detail and lengths and in great depth,

      c.   have an aptitude in understanding systems, rules, or patterns, and have a strong drive to build systems (to 'systemise'), and tend to strictly adhere to the rules within the systems they learn or establish,

      d.   focus on local detail over global information (sometimes called 'weak central coherence'),

      e.   may develop 'tunnel vision' that prevents them from seeing the bigger picture in situations, including the repercussions of their actions,

      f.   often have excellent attention to detail and pattern recognition which can be a strength and a talent in some areas,

      g.   have deep, focused interests that can lead to them spending a huge amount of time on one topic or activity whilst neglecting other areas of their lives,

      h.   may collect objects or information on a specific topic,

      i.   may struggle with planning (also called 'executive dysfunction') because of their focus on seemingly irrelevant detail,

      j.   have a different way of processing information which reflects autism as an example of neurodiversity,

      k.   often prefer to do one thing at a time and may struggle to switch between tasks or activities,

      l.   prefer repetition and predictability and may become very stressed by unexpected change or lack of routine,

      m.   prefer systematic information and precision and exactness rather than approximation or ambiguity, which they may struggle with, and

      n.   may also experience sensory hyper-sensitivity.

**Diagnostic Procedure and Evidence of Autism**

<u>AQ</u>

As the initial step of my examination, Bill completed the Autism Spectrum Quotient (AQ). The AQ is a screening questionnaire designed to measure the number of autism traits an individual has, through self-assessment. My colleagues and I at the ARC published the AQ

in 2001, and it has since become a benchmark autism screening test.[2] It is not diagnostic but can be used to indicate if someone warrants a full clinical assessment for autism. It has also been recommended as a screening instrument in the NICE (National Institutes of Clinical Excellence) Guidelines and has been used worldwide in hundreds of research studies.

Bill scored 38 out of 50 on the AQ. Eighty percent of people with a diagnosis of autism score at or above 32 out of 50 on the AQ.  To give some context, most men in the population score 17 out of 50, and most women score 15 out of 50. This means that Bill's is a very high score, more than 5 standard deviations above the mean in the population, and consistent with his autism diagnosis.

<u>Clinical Interviews</u>

I interviewed Bill, his wife, and his sister in separate meetings, to analyse Bill's personal history and characteristics for evidence of the above diagnostic criteria. The purpose for meeting each of them separately was to gather independent information from each of them, to confirm the diagnosis not only from self-report but also from two other people who know him well, one all of his adult life, and the other all of his life. Bill was 66 years old at the time of my interview on February 7, 2025. The interview was by video call, and it lasted two hours. I interviewed his wife Sabrina and his sister Suzanne, separately, on the same day.

In the sections that follow, I present evidence that Bill demonstrates a longstanding, cross-context pattern of meeting the core domains of autism, as supported by information from my interviews with him, his wife, Sabrina, and his sister, Suzanne.

*(i)    Background information*

Across Bill's developmental history – his whole life – one can observe a consistent pattern of traits indicative of autism. Born and raised in Brooklyn in the 1970s by his father (a printer) and his mother (an English teacher). Bill had few friends a child and was bullied by his peers. Despite being intelligent and academically gifted, he chose not to go to college after high school. It is a common experience for autistic individuals, despite often possessing high levels of intelligence, to struggle with or lack interest in academics. Instead, Bill pursued self-directed learning, mostly in areas related to computer programming, which requires excellent attention to detail and pattern-recognition skills,

---

[2] The original AQ was published in 2001. *See* Baron-Cohen et al., The Autism-Spectrum Quotient (AQ): Evidence from Asperger Syndrome/High-Functioning autism, Males and Females, Scientists and Mathematicians, *Journal of Autism and Developmental Disorders*, Vol. 31 No. 1 (2001), https://s3.eu-west-1.amazonaws.com/docs.autismresearchcentre.com/papers/2001_BCetal_AQ.pdf;  Ruzich et al., Sex and STEM Occupation Predict Autism-Spectrum Quotient (AQ) Scores in Half a Million People, *PLoS One* (2015), https://s3.eu-west-1.amazonaws.com/docs.autismresearchcentre.com/papers/2015_Ruzich_etal_Sex-and-STEM-Predict.pdf;  Allison, et al, Toward Brief 'Red Flags' for Autism Screening: The Short Autism Spectrum Quotient and the Short Quantitative Checklist in 1,000 cases and 3,000 Controls, *Journal of the American Academy of Child & Adolescent Psychiatry*, Vol. 15 No. 2 (Feb. 2012), https://s3.eu-west-1.amazonaws.com/docs.autismresearchcentre.com/papers/2012_Allisonetal_JAACAP_RedFlags.pdf.

in which many autistic people excel. He moved to Paris in 1980, worked as a bartender at the American Embassy, and taught himself to code, and later programmed for the British Embassy. Bill married in 1990 and became Chief Technology Officer for Yellow Pages and Euro Pages in 1991. In 1997, he founded a technology consulting company during the early internet boom. Self-directed learning of this kind is a common feature of autism, as described in my book *The Pattern Seekers*.[3]

In 2011, Bill learnt about the invention of Bitcoin, and immediately immersed himself in trying to understand it deeply. His interest in this was 100%, reading everything he could on the subject. In 2013, he met the CEO of BlockChain.com, who offered him a job. From that point until his arrest, he reports receiving his salary exclusively in Bitcoin. He worked 14-hour days for 10 years, until 2023, including some intense periods of uninterrupted work for periods in excess of 36 hours. This pattern of being hyper-focused is highly characteristic of autistic people.[4]It was only after moving from Paris to Lisbon to begin retirement that Bill cut back on working to 8 hours a day.

Bill has one sister, Suzanne, four years younger than him. Their mother was an only child whose parents divorced in the 1930s. It is notable that divorce in the 1930s was quite rare, suggesting that Bill's grandparents themselves did not conform to social norms. Their grandfather was a guard at the Federal Reserve Bank until age 62. Of note was that he never dated or remarried but rather lived on the third floor of the family home, with Bill, and was very quiet and shy. It is not uncommon for the first- and second-degree relatives of autistic people to also have a high number of autistic traits, as demonstrated in our research.

Bill's sister Suzanne is a nurse working at St Vincent's Hospital in Manhattan. Her oldest daughter Caroline is a speech therapist who she describes as bright and creative. Suzanne reports similarities between her children, Emily and Liam, and Bill when he was a young child, all displaying total immersion in whatever has their interest.  Suzanne's daughter Emily has seen a psychologist for anxiety and slams door in the night because she is socially unaware of her large 'footprint'. Reduced social awareness is a recognised autistic trait. Suzanne's son Liam was diagnosed with autism at the age of two.

The picture that emerges is of a family where multiple individuals show a high number of autistic traits, some of whom have an autism diagnosis. This is highly consistent with the genetic causes of autism. It is now well-established that autism is 60-80% heritable, and that more than 100 rare genetic variants have been identified in association with autism, along with many common genetic variants.[5]

*(ii)    Assessment of Bill's approach to social relationships*

During my interviews with Bill, his wife, and his sister, I identified that Bill shows marked social communication difficulties that are indicative of autism. The social and communication difficulties associated with autism are documented in my books

---

[3] Baron-Cohen, *The Pattern Seekers* (2020).
[4] *Ibid.*
[5] *Ibid.*

*Mindblindness*[6] and *Zero Degrees of Empathy*.[7]  In summary, the evidence indicates that Bill (a) fails to understand other people's behaviour or social conventions and expectations, (b) has extreme discomfort in social groups, and (c) struggles to make friends. These traits leave Bill, like all autistic people, vulnerable to getting into trouble through social naivety and poor decision-making. I obtained many examples of this in my interviews, and in what follows I include some quotes that illustrate this, either from him or his sister or wife.

### a.  Failure to understand behaviour and social naivety

Bill explained his difficulty reading people and situations:
- 'I don't pick up on non-verbal communication.'
- 'I misread the signs. For example, I believe things have gone well and then it falls through.'
- 'I take people at their word and block out other aspects. I was cheated twice by people who weren't sincere.'

Consistent with this, his wife Sabrina reports: '[Bill] is too naïve. There's something very childish about him. I have to show him the reality.'

### b.  Extreme discomfort in social groups

Bill's sister Suzanne reported on his discomfort with social interactions, particularly group interactions, since childhood:
- 'Bill had 3 friends in childhood.'
- 'As children, Bill and his cousin Genie would play together and exclude everyone else.'
- 'Bill didn't want to go to Genie's birthday party and instead played chess with Uncle Alan.'
- 'Bill goes into his own world, even when he's visiting with me.'
- 'He is particular and doesn't put on a show or pretence.'
- 'When he was a child, he would refuse to come down to see visitors, which upset my mother. It seemed rude but was just a lack of interest. He wasn't comfortable with visitors.'

### c.  Failure to make friends and relationships

Bill explained he has always had difficulties with friendships and relationships more generally:
- 'I've had a few friends in Brooklyn, but I've only kept one.'
- 'I made no friends in Portugal.'
- 'I did not make a single close friend in France for 43 years.'
- 'I don't feel a connection with French people. I don't have the same values as them. My wife is Algerian and has French nationality. I identify as an American.'

---

[6] Baron-Cohen, *Mindblindness: An Essay on Autism and Theory of Mind* (1995).
[7] Baron-Cohen, *Zero Degrees of Empathy: A New Theory of Human Cruelty* (2011).

Bill's wife Sabrina also observed his difficulties in making friends, over the years:
- 'In Paris, for 43 years, Bill had no friends.'
- 'We never have dinner parties.'
- 'He is different and particular.'
- 'He is 66 but his colleagues are 20-30 and don't have families.'

Bill explained, 'I didn't want kids because I never thought I could be a good father, and I didn't want to be an absent father.' Sabrina also noted Bill's reluctance to talk about feelings, for example the death of his parents. She reported that Bill lost his father to cancer two years ago and soon after he lost his mother to old age, but he didn't want to talk about either of these losses.

*(iii)    Assessment of Bill's talents, interests and routines*

In the following paragraphs I summarise the evidence, typical of autistic people, that Bill (a) has unusual attention to detail and an extraordinary aptitude for understanding systems, rules or patterns, and demonstrates strict adherence to the rules of those systems (b) is strongly obsessional and pursues his interests in extraordinary depth, (c) prefers predictable routines and is distressed by change; and (d) is convinced of the truth and importance of his pursuits without reference to or consideration of others' views. His thinking is self-admittedly black-and-white:

a.    <u>Attention to detail and systemising, rule-based thinking</u>

Bill is obsessively systematic and detail oriented and is naturally drawn to subjects requiring rule-based thinking, such as coding and cryptocurrency, which benefit from these abilities. Sabrina discussed Bill's total absorption in his work and the meaning he derives from it, noting in one example his total happiness reading computing programming manuals when they were first married. She also observed:
- 'When he's interested in something he's very passionate.'
- 'He does lots of research, in a very thorough way, he makes lots of notes in books, noting page numbers, in an obsessive way.'

Bill said:
- 'I had a deep interest in software from 1984 onwards.'
- 'I would go to Barnes and Noble in Manhattan and bring [back to France] a suitcase full of books on programming.' (Bill talked with excitement about the joy of reading these dozens of coding manuals – a fact that Sabrina confirmed.)

b.    <u>Obsessiveness and narrow interests</u>

Bill has deep and narrow interests. As noted above, these are primarily, though not exclusively, subjects requiring rule-based thinking. Once something interests him, he rapidly becomes obsessive about it.

Bill agreed that he was obsessed with Bitcoin and software development. He further explained:
- 'As a child I was obsessed with basketball.'

9

- 'I was obsessed with the New York Knicks (short for Knickerbockers).  I know all the facts and figures of the team.'
- 'I have obsessional interests until they are saturated.'
- 'I became obsessed with GPS and learned all about it and developed software apps.'
- 'I become obsessed with authors.  I'll read every book and biographies and letters about the person, e.g., Dostoevsky.'

Sabrina and Suzanne both also observed this trait in Bill. Suzanne recalled a period her brother 'was obsessed with marathons in chess, and with wrestling.  Whatever he did he did 200%.  Sabrina reported:

- 'He said, 'If I don't have my job, then what will I do?' He was panicking.'
- 'He takes notes and notes and notes in his diaries. This is who he is.'
- 'He spends lots of money on books.'
- 'He used to spend all his time on the app, trying to improve it.  He believed in what he was doing.'

### c.  Strong preference for routine

Bill has a strong preference for routines and is distressed by changes to his routine. He summed up his life before his arrest as follows:

- 'Work was enjoyable. I had my favourite authors and my favourite food, and my routines. I just ignored everything else.'
- 'In the prison in Portugal I created my two routines of staying clean and staying healthy, so I exercised every day for my one hour outside the cell. I worked out that I could walk 2 km per day by calculating the length of the yard.'
- 'I only ever eat spicy food. In prison the food was very bland, and I struggled to eat while I was there.'[8]

Sabrina, his wife, accommodated Bill's needs. She explained how their marriage is centred around his rigid routines:

- 'We need structure in our day.'
- 'Every day we have fixed times to learn, have his walk, and allow time for his reading.'
- 'All meals are at the same time.'
- 'He insists on what he wants to eat and is clear about what he won't eat. We never skip meals.'

### (iv)  Assessment of Bill's patterns of thinking

Based on the interviews and the materials I reviewed, I conclude that Bill (i) displays binary/black-and-white thinking, and (ii) is tunnel-visioned and often fails to see the bigger picture. These are well-established characteristics of autism, sometimes referred to as 'weak central coherence' which makes it harder to foresee the repercussions of actions.[9]

---

[8] It is quite clear that he was distressed by the new environment. He reported having lost 10 kgs in 11 days.
[9] Frith, *Autism: Explaining the Enigma* (2003).

a. Binary/black-and-white thinking

Bill thinks in binary terms. Suzanne observed:
- 'My brother cannot be forced to do something he doesn't want to do.'
- 'When he makes up his mind you can't force him to change it.'

Bill's black-and-white thinking pattern is also reflected in his belief that he could not be violating the law because Samourai Wallet did not take custody of any Bitcoin and therefore was not engaged in money transmission. He also mentioned his certainty of his interpretation of the guidance, and it did not enter his mind there could be another interpretation.

b. Tunnel-vision

Sabrina reports:
- 'He is always in his own world.'
- 'He ignores all the daily problems of life.'
- 'He's like an eternal student, with no adult responsibilities.'
- 'He doesn't grasp the practical things in life.'

When describing Samourai Wallet, Bill explained:
- 'Samourai Wallet never held funds, as per the FinCEN guidance, so we did not have to conduct KYCAML (Know Your Customer Anti Money Laundering).'
- 'We were never custodians. Our software is non-custodial. We never held the keys.'
- 'Nor did we ever have any intent to launder.'
- 'We didn't ask our users what they used their Bitcoin for.'

A number of times in the interview Bill mentioned he was adamant that his interpretation of the FinCEN guidance was the only possible one, despite his arrest.

*(v)    Genetics related to Bill's diagnosis*

As noted above, autism is partly but strongly genetic in origin. Bill is not the only one in his family who has autism. Bill's nephew Liam has also been diagnosed with autism. Suzanne reported:
- 'My son Liam is 23 and autistic.'
- 'He enjoyed *The Transporters DVD* that Cambridge created to teach autistic children to recognise emotions.'
- 'Liam had therapy at 17 months after being diagnosed at 12 months old by the paediatrician. He tried ABA but didn't like it.'
- 'He had speech therapy and occupational therapy.'
- 'He was asked to leave kindergarten.'
- 'Liam went to the Learning School in Manhattan. He had the NEST program at Hunter College, for students on the spectrum.'
- 'He graduated in May 2025 in Computer Networking and is doing an internship twice a week.'

11

- 'Our grandfather (Bill's and Suzanne's) was very reclusive and mostly only saw his own immediate family to socialise.'
- 'My daughter is socially unaware of how she comes across to other people.'

Both Suzanne and Sabrina commented on the similarities between Bill and Liam.

**Relevance of Bill's Autism to the Alleged Misconduct**

In my book *The Pattern Seekers*, I explain how for many autistic people, their obsessive interest in a system is towards modifying and fine-tuning it, which can result in invention. At the time of the conduct, Bill was intensely focused on improving Bitcoin as a currency, specifically by making it fungible so it would be more like cash. He was very proud of what he had created, emphasizing that in operating Samourai Wallet, they 'followed the FinCEN Guidance/Law to the letter.'

Solving a difficult problem in accordance with a set of rules or regulations is a very common autistic trait. However, this is often done whilst failing to understand or appreciate the risks. This is part of the 'theory of mind' disability in autism, as described in my book *Mindblindness.* Bill's autism made him socially naïve, to the point where he was blind to the legal risks of operating Samourai Wallet. Having researched the law, he believed that money laundering was simply not his concern, and he became so obsessed with proving the superiority of Samourai Wallet over competing products that he failed to appreciate that his public statements could be interpreted as not only tolerating but actively encouraging money laundering. His autism meant he had a tunnel vision where he was immersed in the details of Samourai Wallet and had difficulties in seeing the bigger picture (also called contextual processing).[10]

My own research has also shown that autistic people may make subtly different moral judgments than non-autistic people. In particular, autistic people and those with systemizing minds seem to be concerned with liberty and fairness, to a higher degree than are non-autistic individuals. Autistic people tend to prioritise these over other foundational moral concepts, (care, loyalty, sanctity).[11] Such findings help to explain both Bill's belief at the time of the conduct that the benefits of absolute financial privacy provided by Samourai Wallet outweighed the associated societal risks, as well as his attraction to libertarian ideology more generally. My research has shown that individuals who exhibit a systemising cognitive style, such as autistic people, are more likely to hold libertarian political ideologies.[12]

Among the communication difficulties people with autism experience, communication via the internet is particularly challenging. In fact, data shows that people with autism are

---

[10] *Ibid.*

[11] Greenberg, et al., 'Moral Foundations in Autistic People and People with Systemizing Minds,' *Molecular Autism* 15:20 (2024), https://molecularautism.biomedcentral.com/articles/10.1186/s13229-024-00591-8.

[12] *Ibid.*

disproportionately prone to both victimization, and offensive conduct on the internet as a consequence of their lack of social discernment[13].

**Impact of Detention on Autistic People**

Bill's autism should be taken into consideration when deciding on the appropriate sentence. Autistic people often struggle in social situations, and a prison is a highly social environment that make many autistic people very anxious and unable to cope. It is well established that autistic people are at greater risk of poor mental health, as reported in research from our own group.[14] There is also recent research showing that people with a high number of autistic traits, including those with an autism diagnosis, are at higher risk of anxiety, depression and self-harm when in detention, relative to non-autistic (or neurotypical) prisoners.[15]

Autism may make it difficult for Bill to navigate the social demands of sharing a prison cell or getting on with other prisoners and risk the person getting into conflict due to misunderstandings or inflexibility, which are both part of the disability of autism.[16] Prisons are also very loud places which are highly aversive for autistic people because of their sensory hyper-sensitivity. Sensory hypersensitivity in autism is well established, including by research from our own group.[17]

For an autistic person, anxiety and depression may worsen if they do not have their routines or family contact, as autistic people have a strong need for both. Suicide attempts are sadly much more common in autistic people than in the general population. 1 in 4 autistic people have planned or attempted suicide. There is a lot of research into this risk, including by our own group.[18] Autistic people also have increased risk of physical health conditions.[19]

---

[13] Cohen, Candio, Autism, Online Offending, Aand Victimization, *Autism Spectrum News*, (Jul. 5, 2023), https://autismspectrumnews.org/autism-online-offending-and-victimization/.

[14] Griffiths et al, The Vulnerability Experiences Quotient (VEQ): A Study of Vulnerability, Mental Health and Life Satisfaction in Autistic Adults, *Autism Research*, (Jul. 5, 2019), https://pubmed.ncbi.nlm.nih.gov/31274233/.

[15] Chaplin et al., Self-harm and Mental Health Characteristics of Prisoners with elevated rates of autistic traits, *Research in Developmental Disabilities* (May 15, 2021), https://pubmed.ncbi.nlm.nih.gov/34004498/.

[16] Slavny-Cross, et al, Are autistic people disadvantaged by the criminal justice system? A case comparison, *Autism* (Dec. 21, 2022), https://pubmed.ncbi.nlm.nih.gov/36544404/.

[17] Tavassoli, et al, The Sensory Perception Quotient (SPQ): development and validation of a new sensory questionnaire for adults with and without autism, *Molecular Autism* 24:5:29 (Apr. 2014), https://pubmed.ncbi.nlm.nih.gov/24791196/.

[18] Cassidy et al., Autism and autistic traits in those who died by suicide in England, *The British Journal of Psychiatry* (Feb. 15, 2022), https://www.cambridge.org/core/journals/the-british-journal-of-psychiatry/article/autism-and-autistic-traits-in-those-who-died-by-suicide-in-england/04367C4DD9D8B4B3375A0D25C4764A54; Cassidy et al., Suicidal ideation and suicide plans or attempts in adults with Asperger's syndrome attending a specialist diagnostic clinic: A clinical cohort study, *Lancet Psychiatry* (2014), https://psycnet.apa.org/record/2015-57506-028.

[19] Ward, et al, Increased rates of chronic physical health conditions across all organ systems in autistic adolescents and adults, *Molecular Autism* 14:35 (Sept. 20, 2023), https://molecularautism.biomedcentral.com/articles/10.1186/s13229-023-00565-2.

**Conclusion**

I confirm Bill's diagnosis of autism. He demonstrates clear characteristics of autism, namely social and communication difficulties alongside unusually narrow interests and a strong preference for predictability and structure. His autism clearly played a role in the offense he committed, most notably in his obsessive focus on the technical problem he was trying to solve, his inappropriate remarks while marketing Samourai on the internet, his blindness to the risks, and his certainty in his own interpretation of the law. If sentenced to prison, Bill will likely experience significant distress, as well as a potential decline in mental and physical health, because of his autism.

Yours sincerely,

Simon Baron-Cohen

**Appendix 1: DSM-5 Autism Diagnostic Criteria**

**A. Persistent deficits in social communication and social interaction across multiple contexts, as manifested by the following, currently or by history** (examples are illustrative, not exhaustive, see text):

1. Deficits in social-emotional reciprocity, ranging, for example, from abnormal social approach and failure of normal back-and-forth conversation; to reduced sharing of interests, emotions, or affect; to failure to initiate or respond to social interactions.
2. Deficits in nonverbal communicative behaviors used for social interaction, ranging, for example, from poorly integrated verbal and nonverbal communication; to abnormalities in eye contact and body language or deficits in understanding and use of gestures; to a total lack of facial expressions and nonverbal communication.
3. Deficits in developing, maintaining, and understanding relationships, ranging, for example, from difficulties adjusting behavior to suit various social contexts; to difficulties in sharing imaginative play or in making friends; to absence of interest in peers.

*Specify* current severity: Severity is based on social communication impairments and restricted repetitive patterns of behavior. (See table below.)

**B. Restricted, repetitive patterns of behavior, interests, or activities, as manifested by at least two of the following, currently or by history** (examples are illustrative, not exhaustive; see text):

1. Stereotyped or repetitive motor movements, use of objects, or speech (e.g., simple motor stereotypies, lining up toys or flipping objects, echolalia, idiosyncratic phrases).
2. Insistence on sameness, inflexible adherence to routines, or ritualised patterns or verbal nonverbal behavior (e.g., extreme distress at small changes, difficulties with transitions, rigid thinking patterns, greeting rituals, need to take same route or eat food every day).
3. Highly restricted, fixated interests that are abnormal in intensity or focus (e.g, strong attachment to or preoccupation with unusual objects, excessively circumscribed or perseverative interest).
4. Hyper- or hyporeactivity to sensory input or unusual interests in sensory aspects of the environment (e.g., apparent indifference to pain/temperature, adverse response to specific sounds or textures, excessive smelling or touching of objects, visual fascination with lights or movement).

*Specify* current severity: Severity is based on social communication impairments and restricted, repetitive patterns of behavior. (See table below.)

**C. Symptoms must be present in the early developmental period** (but may not become fully manifest until social demands exceed limited capacities or may be masked by learned strategies in later life).

**D. Symptoms cause clinically significant impairment in social, occupational, or other important areas of current functioning.**

**E. These disturbances are not better explained by intellectual disability (intellectual developmental disorder) or global developmental delay. Intellectual disability and autism spectrum disorder frequently co-occur; to make comorbid diagnoses of autism spectrum disorder and intellectual disability, social communication should be below that expected for general developmental level.**

Note: Individuals with a well-established DSM-IV diagnosis of autistic disorder, Asperger's disorder, or pervasive developmental disorder not otherwise specified should be given the diagnosis of autism spectrum disorder. Individuals who have marked deficits in social communication, but whose symptoms do not otherwise meet criteria for autism spectrum disorder, should be evaluated for social (pragmatic) communication disorder.

Specify if:

- **With or without accompanying intellectual impairment**
- **With or without accompanying language impairment**
  - o (Coding note: Use additional code to identify the associated medical or genetic condition.)
- **Associated with another neurodevelopmental, mental, or behavioral disorder**
  - o (Coding note: Use additional code[s] to identify the associated neurodevelopmental, mental, or behavioral disorder[s].)
- **With catatonia**
- **Associated with a known medical or genetic condition or environmental factor**

| Severity level | Social communication | Restricted, repetitive behaviors |
|---|---|---|
| Level 3 "Requiring very substantial support' | Severe deficits in verbal and nonverbal social communication skills cause severe impairments in functioning, very limited initiation of social interactions, and minimal response to social overtures from others. For example, a person with few words of intelligible speech who rarely initiates interaction and, when he or she does, makes unusual approaches to meet needs only and responds to only very direct social approaches | Inflexibility of behavior, extreme difficulty coping with change, or other restricted/repetitive behaviors markedly interfere with functioning in all spheres. Great distress/difficulty changing focus or action. |
| Level 2 'Requiring substantial support" | Marked deficits in verbal and nonverbal social communication skills; social impairments apparent even with supports in place; limited | Inflexibility of behavior, difficulty coping with change, or other restricted/repetitive behaviors appear frequently enough to be obvious to the |

16

| Severity level | Social communication | Restricted, repetitive behaviors |
|---|---|---|
| | initiation of social interactions; and reduced or abnormal responses to social overtures from others. For example, a person who speaks simple sentences, whose interaction is limited to narrow special interests, and how has markedly odd nonverbal communication. | casual observer and interfere with functioning in a variety of contexts. Distress and/or difficulty changing focus or action. |
| Level 1 "Requiring support" | Without supports in place, deficits in social communication cause noticeable impairments. Difficulty initiating social interactions, and clear examples of atypical or unsuccessful response to social overtures of others. May appear to have decreased interest in social interactions. For example, a person who is able to speak in full sentences and engages in communication but whose to- and-from conversation with others fails, and whose attempts to make friends are odd and typically unsuccessful. | Inflexibility of behavior causes significant interference with functioning in one or more contexts. Difficulty switching between activities. Problems of organization and planning hamper independence. |

# EXHIBIT B

## STATEMENT OF PROFESSOR DAVID L. YERMACK

October 22, 2025

The Honorable Denise L. Cote
United States District Court
Southern District of New York
Daniel Paatrick Moynihan Courthouse
500 Pearl Street, Courtroom 18B
New York, NY 10007

Re:    United States *v.* William Lonergan Hill
         Case 1:24 Cr. 82

Dear Judge Cote,

I am a professor at New York University's Stern School of Business specializing in finance, including FinTech and cryptocurrency. I am providing this statement to the Court on behalf of the defendant William Lonergan Hill at the request of counsel, as you consider the appropriate sentence for his conduct in connection with Samourai Wallet.

Based on my familiarity with the history and technology of cryptocurrencies, and after reviewing materials related to this litigation, I conclude that the stated motivations and actions of Mr. Hill were closely aligned with those of a technology community that began working in the 1980s to create a more robust type of money in the form of "digital cash," a project that has yielded significant innovations in the financial world that continue today to grow in importance. This community, informally known as the "Cypherpunks," were broadly concerned about the instability of "fiat" – i.e., government issued – currency as well as the threats to personal privacy created by rapid progress in information technology. Bitcoin and many other cryptocurrency projects attracted developers and promoters from, and later to, this movement. These individuals articulated goals similar to those of Mr. Hill and the Samourai Wallet team, whose stated ambition for their business was to build infrastructure that would support the fungibility and

1

privacy of cryptographic payment systems.  In seeking to protect personal privacy, the Cypherpunk community, including its modern-day adherents, are responding to perceived threats to personal freedom in the computer age that have been articulated in politics and literature from the mid-20th century onwards.

This document includes subsections on (A) my credentials and expertise, (B) my scope of work and the materials I reviewed for this case, (C) the Cypherpunk movement to develop cryptocurrency, (D) the importance of privacy for cryptocurrency, (E) fungibility of currency and its importance for privacy, (F) innovations addressing privacy and fungibility of cryptocurrency, and (G) a summary and conclusions.

### A.  Credentials and Expertise

I am a faculty member at the New York University (NYU) Stern School of Business, where I hold the Albert Fingerhut Professorship in Finance and Business Transformation and also have an adjunct appointment on the faculty of the NYU School of Law.  I have been a tenure-track and tenured professor at NYU Stern since 1994, when I completed my Ph.D. in Business Economics at Harvard University.  I also hold a Bachelor's degree in Economics (1985), JD (1991), MBA (1991), and Master's degree in Business Economics (1993), all from Harvard.  At NYU Stern my appointment is in the Finance department, which I led as the department Chair from 2015-2023, and I have been appointed as a Faculty Research Associate of the National Bureau of Economic Research, a Visiting Scholar at the U.S. Federal Reserve Bank, and a visiting professor at 16 universities and research institutes around the world.  My credentials are described more fully in the curriculum vitae which is attached to this letter.  I have published approximately 40 papers in professional journals and monographs on topics in

Finance, Economics, Law, and Accounting, and these papers have been cited more than 34,000 times in other scholarly work, making me one of the leading Finance research faculty in higher education.

I have taught a graduate course in digital currency and blockchains at NYU since 2014 in collaboration with faculty colleagues from NYU Law School.  The course, which simultaneously enrolls both business school and law school students in an interdisciplinary format, was the first university course in the world on this subject when we developed it 11 years ago.  We have taught the course continuously since 2014, sometimes twice a year, and it has been taken by approximately 2,000 students.  The course has been the basis of feature stories in publications such as *The New York Times* and *The Financial Times*, and its success led NYU Stern to launch a full curriculum and graduate degree in the new area of FinTech.  In addition to teaching a graduate course in cryptocurrency, I have published some of the earliest and most widely read academic papers on the topic in peer-reviewed journals, and I frequently speak on cryptocurrency in invited university seminars and public lectures.  I have consulted with numerous government agencies and NGOs in the U.S. and around the world about the evolving regulation of digital assets.

### B.  Scope of Work and Materials Reviewed

William Hill's defense counsel retained me as a consultant and possible expert witness in September 2024.  I was asked by counsel to provide advice about why cryptocurrencies were developed, how privacy emerged as a concern of cryptocurrency users, and why these users might desire to use a non-custodial wallet with privacy features.  After Mr. Hill decided to enter

a guilty plea in this case, counsel requested that I draft this letter to present a summary of my knowledge and conclusions about these issues.

While acting as a consultant in this case, I have reviewed a number of litigation materials which are enumerated in the Appendix at the end of this letter. I have been paid at my normal hourly rate for expert witness work.

### C.  The "Cypherpunk" Movement to Develop Cryptocurrency

Mr. Hill's participation in the Samourai Wallet venture fits squarely within the strategic priorities and intellectual history of cryptocurrency pioneers, who have been working in this area for more than 40 years. When Bitcoin was launched in 2009 by its pseudonymous creator, Satoshi Nakamoto, it represented the culmination of more than two decades of work by computer scientists and economists who were concerned about the integrity of sovereign governments' fiat currency, such as the U.S. dollar.

In seeking to develop a private digital currency, often referred to as "digital cash," these technology researchers from the academic and commercial spheres sought to reproduce in electronic form certain desirable properties of hard currency, namely its fungibility, censorship resistance, and privacy. These efforts have continued up to this day, as thousands of digital currencies and applications have been created by others, comprising a field that has come to be known as "decentralized finance" or DeFi. Some of these assets and applications have become quite valuable, as the market value of all cryptocurrencies currently stands above $4 trillion, and successful cryptocurrency companies such as Coinbase and Circle have gone public on the major U.S. stock exchanges with valuations in the tens of billions.

The early developers of cryptocurrency, who are often referred to as the Cypherpunks, began meeting and working together in the early 1980s, mostly around Silicon Valley in California.  Their concern about the integrity of government currency arose from the tendency of central banks in many countries to expand the money supply without sufficient discipline and control, causing price inflation and diluting the real value of money.  Central banks are typically led by professional economists who rely on their judgment and expertise to make decisions about monetary policy, while cryptocurrency relies instead on a fixed algorithm that expands the supply of money deterministically, according to transparent mathematical rules that are disclosed in advance to the community of users.  A longstanding research controversy in monetary economics, often referred to as the "rules vs. discretion" debate, has focused on the relative merits of these two approaches to central banking.  Numerous prominent economists, including Nobel Prize winners such as Milton Friedman, John Nash, and Edward Prescott, have written critically about the integrity of central bank money and have proposed that currency issued by a mathematical or computer algorithm at an agreed upon rate would cause money to function as a better store of value.

In promoting Bitcoin as an alternative to fiat government currency, Satoshi Nakamoto wrote that "the central bank must be trusted not to debase the currency, but the history of fiat currencies is full of breaches of that trust . . . [Banks] must be trusted to hold our money and transfer it electronically, but they lend it out in waves of credit bubbles with barely a fraction in reserve."  Part of Bitcoin's early popularity via word-of-mouth was no doubt due to its appearance in January 2009, when much of the world economy was gripped by a banking crisis that has been attributed to runaway subprime mortgage lending by financial institutions in the U.S. and elsewhere.

Bitcoin and other cryptocurrencies are currently spent millions of times a day in retail consumption or investment transactions.  At the heart of each cryptocurrency system is a "peer-to-peer" network of digital wallets, in which cryptocurrency owners possess balances of coins and send them to one another over a global computer network.  The accuracy of cryptocurrency systems is maintained on a novel public ledger known as a blockchain using a competitive process known as "consensus," under which network members can elect to function as "nodes" and earn rewards for timely and accurate record-keeping.

The critical difference between digital currency and government fiat currency is the absence of any "trusted third party" that mediates and keeps track of these payments.  In the mainstream economy, these trusted third parties include banks, credit card companies, "shadow banks" such as Venmo and PayPal, and money transfer services such as Western Union, all supported by an infrastructure of clearinghouses that centralize transaction data according to government regulations, as well as auditors that inspect all parts of the system for accuracy. These entities collect personal data about account holders, and they have the discretion to "censor," or reverse, transactions that they find unsuitable.

Bitcoin and its successor currencies, in contrast, were designed to function without trusted third parties, so that each member of the network could send payments unconditionally to any other member without fear of reversal, censorship, or surveillance.  Creating a system of digital cash that did not rely on a trusted third party was the heart of the mission pursued by Satoshi Nakamoto and the early adherents of the Cypherpunk movement.  The first significant milestone in this project is generally regarded as DigiCash, a proposal for electronic money in a peer-to-peer network of digital wallets that was introduced in a 1983 Ph.D. dissertation by David Chaum, "Blind Signatures for Untraceable Payments," at the University of California at

Berkeley.  Important successor projects included Nick Szabo's proposal for BitGold (1998) and Adam Back's HashCash (2001).  These and other Cypherpunk projects provided many of the building blocks used by Satoshi Nakamoto to launch Bitcoin.

### D.  __The Importance of Privacy for Cryptocurrency__

Using cryptography to protect personal privacy, for communications, financial transactions and other aspects of an individual's life, was the central goal of the Cypherpunk movement and led directly to the group's desire for a peer-to-peer algorithmic currency, secured by cryptography rather than by political institutions.

By the early 1970s, exponential growth of computing power, and the increasing application of computers to digital systems for payments and communication, created a fear that government surveillance could become universal and threaten personal liberty.  These themes were anticipated in mid-20th century fiction written by novelists such as George Orwell and Thomas Pynchon, as well as by Libertarian political movements and social philosophers such as the Nobel Prize winning economist Friedrich Hayek.  The end result, as articulated by these sources, could be a police state in which the norms and legal guarantees of privacy would disappear and personal freedom would be regulated by a system of "social scores" based on the government's evaluation of each citizen's digital stream of data.  Such concerns aptly predicted the way that authoritarian governments have implemented widespread digital surveillance to collect information that is used to restrict the opportunities of citizens to travel, study, work, and worship as they choose.

In response to these concerns, the Cypherpunks sought to protect the privacy of personal communication, and these efforts encompassed protection of not only written and verbal

communication, but also of an individual's history of payments and financial transactions. For the Cypherpunks, a person's financial footprint represented an important expression of their identity and personality, and it deserved the same privacy protections as other forms of communication. Eric Hughes, one of the most prominent Cypherpunks, provided a useful definition of privacy in 1993, writing, "Privacy is the power to selectively reveal oneself to the world." Referencing the goal of developing digital cash, he continued, "Privacy in an open society requires anonymous transaction systems. Until now, cash has been the primary such system."

It is important to recognize that while privacy can be viewed in its own right as an important aspect of a free society, it also has numerous practical applications. Celebrities and wealthy people rely upon privacy to ensure their personal safety from kidnapping and extortion; donors to controversial charities or political movements rely on privacy to avoid harassment; business owners rely on privacy to protect proprietary information that may be essential to their profitability; lottery winners rely on privacy to avoid requests for money from friends and relatives, and so forth. In a financial transaction, one party may value privacy in order to provide a defense against malfeasance or negligence by the counter-party, who may exploit information gained in a financial contact to engage in hacking, identity theft, fraud, extortion, or other activities that could victimize the first party.

The importance of financial privacy has long been recognized in policy papers circulated by prominent authorities. For example, Peter van Valkenburgh, currently the director of the Coin Center research institute in Washington, D.C., published an essay in 2015 titled, "Bitcoin: Our Best Tool for Privacy and Identity on the Internet." In the Abstract, the author writes that "Poor security and poor privacy have costs: identity theft, merchant compliance costs, chilling

effects on speech, and cloaking costs from user self-help."  A scholarly paper with similar themes, "Payment Systems and Privacy," was published in 2018 in the *Federal Reserve Bank of St. Louis Review* by Charles M. Kahn, a retired professor from the University of Illinois then working as a Research Fellow at the St. Louis Federal Reserve Bank.  Prof. Kahn wrote that "Privacy in payments is desired not just for illegal transactions, but also for protection from malfeasance or negligence by counterparties or by the payments system provider itself. Proposals to abolish cash take inadequate account of these legitimate demands for privacy."

Satoshi Nakamoto believed that Bitcoin's pseudonymous network of digital wallets, in which each holder of coins is identified only by a cryptographic "public key," would protect the privacy of individual users by concealing their identities unless and until each user chose to disclose their identity to others.  Moreover, the pseudonymity of the wallets was intended to ensure that bitcoins were fungible, meaning that all coins were perfect substitutes for one another and couldn't be differentiated based upon their prior use or ownership.  In this respect, Nakamoto appears to have been badly overconfident.  Blockchain forensics companies such as Chainalysis have emerged to map the history of Bitcoin network transactions and to use aspects of transaction histories to identify, with high probability, the owners of individual wallets.  The increasing effectiveness of blockchain forensics, in turn, has been a catalyst for the development of tools and protocols to enhance the privacy of cryptocurrencies.

### E.   Fungibility and its Contribution to Privacy

Physical cash, or hard currency, has long been viewed as the most private way to make a payment, because cash payments occur on a direct, peer-to-peer basis without any need for a trusted third party.  Moreover, the transaction history associated with any piece of currency, such

as the passage through various hands of an individual $100 bill, is impossible to reconstruct due to the fungibility of physical cash. Fungibility of currency implies that no central authority can censor or reverse financial transactions made in cash.

The idea that fungibility is essential to a well-functioning currency dates back centuries. For example, in *Crawfurd v. Royal Bank*, a case from 1749, a Scottish court held that money "cannot be vindicated from the bona fide possessor, however clear the proof [of] theft may be." The plaintiff in the case, Mr. Crawford, was prevented by the court from recovering from the Royal Bank certain specific banknotes that he had lost and whose serial numbers he had recorded. When these banknotes were presented at the bank for deposit several months later by a holder who had obtained them in the routine stream of commerce, the court ruled that the banknotes should remain the property of the depositor and should not be returned to the plaintiff despite his proof that he had once owned and possessed them. If banknotes accepted in good faith could be confiscated and reassigned, the court reasoned, then merchants would not be able to accept paper money without detailed evidence of its provenance, thus creating prohibitive transaction costs that would destroy its usefulness.

Today, the ability to trace transactions involving a Bitcoin strips it of its fungibility, creating classes of "tainted" and "untainted" Bitcoin, and undermining Bitcoin's original purpose as a decentralized, trustless alternative to fiat currency. So, for instance, Coinbase and other cryptocurrency custodians will "blacklist" any bitcoins that were stolen or used in illegal commerce at any point in a chain of transactions, regardless of the bona fide status of its current possessor.

### F. **Innovations Addressing Privacy and Fungibility**

Because Bitcoin and other digital currencies failed to achieve the degree of fungibility intended by their creators, they turned out not to provide the hoped-for amount of privacy and utility. Many of the goals of the Cypherpunks would no longer be met if Bitcoin transactions could be traced: cryptocurrency would no longer function as a good store of value, and transactions would no longer be censorship resistant, if coins lost their fungibility and third parties could place restrictions on the transfer of individual coins.

Numerous innovations have therefore attempted to remedy this problem and restore the fungibility and privacy of cryptocurrency in line with the intentions of the Cypherpunks, part of a widespread project to allow cryptocurrency to fulfill its promise. These innovations have variously occurred within Bitcoin itself, via the opportunity for users to make Bitcoin Improvement Proposals to the community; within the broader family of cryptocurrencies via cryptography innovations such as zero-knowledge proofs; and in the form of enhancements to blockchain infrastructure such as Samourai Wallet.

These innovations were anticipated in the essay by Prof. Kahn, who writes that "we should expect an increase in the number of systems that enact a marketing strategy that emphasizes their privacy advantages," while stressing the importance of privacy-related private sector innovation in the payments space. As described in the white paper titled "ZeroLink: The Bitcoin Fungibility Framework," Samourai Wallet's Whirlpool feature is based on the concept of Chaumian CoinJoin, named after the Cypherpunk cryptographer David Chaum who introduced DigiCash in 1983.[1] This algorithm allows multiple users to combine their transactions into one, making it difficult to conduct a sequential analysis of each user's history. In addition to privacy-

---

[1] Adam Fiscor, TDevD, *Zerolink: The Bitcoin Fungibility Framework*, Github, 2017, available at https://github.com/nopara73/ZeroLink?tab=MIT-1-ov-file.

enhanced wallets such as Samourai, other well-known ventures have included, at various times, privacy-focused currencies such as Z-Cash and Monero, and mixing software such as Tornado Cash.

Some view mixers, tumblers and other privacy-enhancing facilities as reinforcing the fungibility and privacy features essential to the vision of decentralized digital currencies like Bitcoin. At the same time, others view them as tools for criminals to carry on activities such as money laundering, tax evasion, and sanctions busting. This divergence of viewpoints has been reflected in the efforts of two cohorts of promoters who have become active in the cryptocurrency space since Bitcoin became widely known to the public in the early 2010s. In one camp, a group of entrepreneurs has sought to bring cryptocurrency into much wider use by creating brokerages, exchanges, and regulated investment products that resemble those that exist in the mainstream securities industry. Companies such as Coinbase, Digital Currency Group, and Gemini fit squarely within this community, alongside important Wall Street companies such as BlackRock, Fidelity Investments and JPMorgan Chase that have invested aggressively in co-opting digital assets into their product offerings. All of these firms engage with regulators from FINRA, the SEC, and the Treasury Department, although significant disagreements have often characterized their views of whether and how cryptocurrency should be regulated.

The second cohort of industry promoters, which include Mr. Hill and Samourai Wallet, view cryptocurrency not as a potential extension of the legacy financial system, but rather as a disruptive innovation that represents a significant leap forward, solving longstanding problems in the financial markets related to the security, transparency, verifiability, prompt settlement, and finality of transactions. This community leans heavily on Libertarian arguments that stress the importance of personal responsibility and autonomy, rather than government oversight, as the

foundation of secure financial markets.  It is heavily populated by "true believers," libertarians, and wildcat risk-takers who have colorful nicknames and communicate in hyperbolic language. These promoters often rail against government regulation, believing that it does not anticipate or address issues that are relevant to cryptocurrency technology, due its novel peer-to-peer, decentralized architecture.

Understanding the motivations of Mr. Hill and others in this area would seem to be essential for determining their degree of culpability.  And while mixers, tumblers, and coinjoins can be used to facilitate illegal activity, they also have numerous benign uses related to improving individual privacy, protecting against identity theft and other forms of fraud, and ensuring the confidentiality of business methods and customer identities.

When promoters like Mr. Hill who develop privacy-enhancing tools for cryptocurrency have looked to regulatory authorities for guidance, they have often found controversy and confusion over how regulations apply to their innovations, if they apply at all.  At numerous points prior to and during the development of Samourai Wallet, guidance from the U.S. Treasury's Financial Crime Enforcement Network (FinCEN) indicated that *non-custodial* wallet software developers such as Samourai did not qualify as money transmitters, since wallet providers who did not take custody of cryptocurrency assets lacked possession and control of those assets.  This guidance appeared to be upended with the U.S. Treasury Office of Foreign Assets Control's (OFAC) sanctioning of Blender.io in May 2022 and Tornado Cash in August 2022, but the Tornado Cash sanctions were then disallowed by the Fifth Circuit U.S. Court of Appeals in November 2024.

A recent speech by SEC Commissioner Hester Peirce acknowledged the continuing uncertainties:

[N]ew technology can serve as a catalyst to rethink our financial surveillance regime in the United States. A diversity of voices inside and outside government are calling for fresh thinking on the third-party doctrine, generally, and the BSA, specifically. . . Justice Sonia Sotomayor, for example, has said that "the premise that an individual has no reasonable expectation of privacy in information voluntarily disclosed to third parties . . . is ill suited to the digital age, in which people reveal a great deal of information about themselves to third parties in the course of carrying out mundane tasks." . . . Earlier this summer, Deputy Secretary of the Treasury Michael Faulkender, in discussing guiding principles of BSA modernization reforms, highlighted the Administration's focus on finding the "optimal fulcrum for balancing the somewhat opposing forces of costs and benefits." In line with this commitment, the Department of Treasury recently announced its intention to delay the effective date and "revisit the substance" of a recently adopted anti-money laundering rule for investment advisers.[2]

In the materials that I have reviewed, Samourai Wallet's focus on assuring the fungibility and privacy of its customers' digital assets represents a dominant theme, that is squarely aligned with the history and objectives of the Cypherpunk movement dating back more than 40 years. The company's 2019 Business Plan directly captures this, stating that "We are building a full service, non-custodial, bitcoin key and transaction management platform with an emphasis on surveillance resistance and transactional privacy for consumers and businesses."[3] A 2020 Samourai marketing presentation states that the company is motivated by the fact that "The relative economic freedom that many of us take for granted today is rapidly disappearing. Digital cash provides great promise for the individual to reclaim these eroding liberties, but also present [*sic*] new challenges if not handled with care."[4]

Another example appears in a 2015 Samourai investor presentation, which begins with a banner headline stating, "We create products that allow our users to interact with the bitcoin network in a way that preserves their privacy and anonymity." It goes on to refer to "the

---

[2] Commissioner Hester M Peirce, Remarks to the Science of Blockchain Conference at the University of California at Berkeley, August 4, 2025, available at https://www.sec.gov/newsroom/speeches-statements/peirce-remarks-blockchain-conference-080425.
[3] USAO_00009469
[4] USAO_00009680

incredible value proposition of censorship free transactions," and to state that mixers provide "a huge boost in fungibility to the user and is a highly desired feature."[5]

An additional 2016 marketing presentation characterizes Samourai as "an opportunity in privacy," and explains that "there is no mobile wallet that allows users to easily interact with the digital economy without sacrificing their identity and privacy to do so."  This presentation describes the Samourai leadership team, including Mr. Hill, as "ideologically married to bitcoin and privacy," and it highlights news coverage from mainstream media sources such as *Forbes*, which cited Samourai's goals of "keep[ing] transactions private, a user's identity masked, and funds secure."[6]

Commentary in a 2019 company memo, "The Week in Samourai Twitter," includes a discussion of the importance of privacy in the context of the government's surveillance capabilities, using language that appears to echo the philosophy of the Cypherpunk movement: "If you have nothing to hide, what's the problem?  The problem is the deceit and overreaching tactics that governments have and will always use against the public.  The tools and the community of Samourai Wallet group are here now to help . . . The idea that this lack of privacy in finance is normal is absurd . . . Until the Privacy Wars are settled, know that there are tools available now to help."[7]

### G.  Summary and Conclusions

The introduction of cryptocurrency in 2009, and the subsequent development of supporting infrastructure such as Samourai Wallet, emerged from a technologist movement

---

[5] USAO_WH_00000024
[6] USAO_00009674
[7] USAO_00011610

known as the Cypherpunks that became active in the early 1980s. This community had deep concerns about threats to personal privacy stemming from centralized government computer systems that were rapidly advancing in speed and capacity.

In a direct line of succession from an intellectual tradition that included writers such as George Orwell and economists such as Milton Friedman and Friedrich Hayek, the Cypherpunks saw the personal use of cryptography as an opportunity to overcome the potential threats of a data-driven surveillance state and preserve privacy and freedom. Developing a decentralized currency secured by personal cryptography became a central goal of this idealistic movement.

Once the first cryptocurrency, Bitcoin, was launched in 2009, forensic experts became skilled at tracing its transactions and wallets in ways that undermined Bitcoin's promise of financial privacy. In response, an industry began to emerge of exchanges, custodians, mixers, and other services that offered tools to buttress and enhance the privacy of cryptographic transactions. William Hill's development and promotion of the Samourai Wallet fit squarely within the work of this community.

The functionality of Samourai's products, and the ways in which these products were marketed to investors and customers, stressed the importance of protecting the fungibility and censorship resistance of cryptocurrency to help assure personal privacy in electronic payments. By offering a non-custodial coinjoin, Samourai was part of a significant group of software developers who could forcefully argue that they operated safely within the emerging regulatory guidance from government agencies and decisions in the Federal courts with respect to the nascent technology of cryptographic assets. Indeed, Congress, the courts, and government agencies continue to this day to debate and refine the legal rules that apply to decentralized digital assets.

Respectfully submitted,

David L. Yermack

**Appendix**
Qualifications and Materials Consulted

| **Bates No.** | **Description** | **Date** |
|---|---|---|
| N.A. | David Yermack Curiculum Vitae | Current |
| USAO_WH_00000024 | Investor presentation | 2015 |
| USAO_00009674 | *Samourai is a Swiss bank account in your pocket* | 2016 |
| N.A. | *Zerolink: The Bitcoin Fungibility Framework*, available at https://github.com/nopara73/Zero Link?tab=MIT-1-ov-file. | 2017 |
| USAO_WH_00000114 | *Samourai Wallet 2019 Annual Report* | 2019 |
| USAO_00009469 | *Samourai Wallet 2019 Business Plan* | 2019 |
| USAO_00011610 | *This Week in Samourai Twitter* | March 2019 |
| N.A. | Stephan Livera Podcast, *Samourai Wallet-Welcome to the Dojo*, *available at* https://stephanlivera.com /episode/78/ | June 10, 2019 |
| N.A. | Monero Space, *Samourai Wallet Chats with Monero Space,* available *at* https://www.youtube.com/watch?v=_xk2Iy6f2VA | August 31, 2020 |
| USAO_00009680 | *Samourai Wallet: Building a Digital Safe Haven* | 2020 |
| N.A. | Monero Space, *Samourai Wallet: Building a Digital Safe Haven*, *available at* https://www. youtube.com/watch?v=6EzFEF9USN0 | October 2020 |
| USAO_00009392 | *Samourai Wallet 2021/2022 Business Plan* | 2021 |
| USAO_00019118 | *Bitcoin Fungibility: The Absolute State of It* | June 26, 2021 |

Bates No.: *NOT APPLICABLE*

David Yermack Curriculum Vitae

**DAVID L. YERMACK**
Department of Finance
Stern School of Business, New York University
44 West Fourth St., Suite 9-190
New York, NY  10012-1126
Phone: (212) 998-0357  Fax: (212) 995-4220
E-mail: dyermack@stern.nyu.edu

**Education**

Harvard University, Cambridge, MA
- Ph.D. in Business Economics, June 1994.
- A.M. in Business Economics, June 1993.
- J.D. *cum laude*, June 1991.
- M.B.A. with High Distinction (Baker Scholar), June 1991.
- A.B. *magna cum laude* in Economics, June 1985.
  Managing Editor of *The Harvard Crimson*, 1984-85.

**Research Areas**

Corporate finance, executive compensation, corporate governance, and cryptocurrency.

**Academic Appointments**

New York University Stern School of Business: 1994-present
- Albert Fingerhut Professor of Finance and Business Transformation, 2009-present.
  Previously Professor of Finance (2006-09), Associate Professor (1998-2006), and Assistant Professor (1994-98).  Voted tenure in 1999, effective in 2001.
- Chair, Finance Department, 2015-2023.
- Director, NYU Pollack Center for Law and Business, 2013-present.
- Paduano Fellow in Business Ethics, 2007-10.
- Adjunct Professor of Law, NYU School of Law, 1995-present.

National Bureau of Economic Research
- Research Associate, Program on Law and Economics, 2011-2025.

European Corporate Governance Institute
- Research Member, 2018-present.

**Editorial Boards**

*Journal of Financial and Quantitative Analysis*, Associate Editor (2001 - present).
*Journal of Corporate Finance*, Associate Editor (2001-17).
*Financial Markets and Portfolio Management*, Associate Editor (2005 - present).
*Journal of Financial Economics*, Associate Editor (2008-21).
*Multinational Finance Journal*, Associate Editor (2011 - present).
*Digital Finance*, Associate Editor (2015 - 2023).

*Journal of Law, Finance, and Accounting*, Executive Editor (2017 - 2020).
*Journal of Financial Research*, Associate Editor (2024 - present).


**Visiting Academic Appointments**
University of Amsterdam:  Visiting Professor, Summers 2017-24.
University of Basel:  Visiting Professor, Summers 2001-02, 2004-26.
Center for Financial Studies (Frankfurt):  Doctoral summer school instructor, 2007;
        Visiting Professor, Summers 2011-12.
Erasmus University Rotterdam:  Visiting Professor, Summers 2008-11, 2013-22.
Free University of Berlin:  Deutsche Bundesbank Visiting Professor, Summers 2003, 2007.
Freiburg University:  Visiting Professor, Summer 2008.
London Business School:  Visiting Professor, Summers 2006-08.
University of Lugano:  Visiting Professor, Summer 2013.
Mannheim Business School: Visiting Professor, Summers 2009-15, Winters 2012, 2016.
Moscow New Economic School:  Visiting Professor, Summer 2009.
University of St. Gallen:  Visiting Professor, Summers 2006, 2009.
Stockholm School of Economics:  guest instructor, Fall 2005.
Swedish House of Finance:  Hans Dalborg Visiting Professor, Fall 2005;
        Visiting Professor, May 2018.
Technical University Munich:  Visiting Professor, Summer 2016.
University of Western Australia Business School:  Stan and Jean Perron Visiting Fellow, 2009;
        Visiting Professor, Summers 2010-11, 2014-19, 2023; Winters 2013, 2025.
University of Zurich:  Visiting Professor, Summers 2008, 2016.


**Academic Publications**
"Show Me Your Hand: An Examination of Voting Methods at Annual General Meetings," Pacific Basin Finance Journal 88, 102576 (December 2024) (co-authored with Raymond da Silva Rosa, Martin Bugeja, and Yaowen Shan).

"How Do Private Digital Currencies Affect Government Policy?" *Journal of Financial Stability* 73, 101281 (August 2024) (co-authored with Max Raskin and Fahad Saleh).

 "Lower Defeat Thresholds for Minority Shareholders and Corporate Governance: Evidence from the Australian 'Two-strikes' Rule," *The Accounting Review* 98, 61-96 (November 2023) (co-authored with Raymond da Silva Rosa, Martin Bugeja, Yaowen Shan and Terry Walter).

"Ambiguity and the Tradeoff Theory of Capital Structure," *Management Science* 68, 4090-4111 (June 2022) (co-authored with Yehuda Izhakian and Jaime F. Zender).

 "Initial Coin Offerings: Financing Growth with Cryptocurrency Sales," *Review of Financial Studies* 33, 3925-3974 (September 2020) (co-authored with Sabrina Howell and Marina Niessner).

"Does Price Fixing Benefit Corporate Managers?" *Management Science* 65, 4813-4840 (October

2019) (co-authored with Tanja Artiga Gonzalez and Markus Schmid)**.**

"Digital Currencies, Decentralized Ledgers, and the Future of Central Banking," in Peter Conti-Brown and Rosa Lastra eds., *Research Handbook of Central Banking* (Edward Elgar, 2018) (co-authored with Max Raskin).

"Donor Governance and Financial Management in Prominent U.S. Art Museums," *Journal of Cultural Economics* 41, 215-235 (August 2017).

"Risk, Ambiguity, and the Exercise of Executive Stock Options," *Journal of Financial Economics* 124, 65-86 (April 2017) (co-authored with Yehuda Izhakian).

"Corporate Governance and Blockchains," *Review of Finance* 21, 7-31 (March 2017).

"Evasive Shareholder Meetings," *Journal of Corporate Finance* 38, 318-334 (June 2016) (co-authored with Yuanzhi Li).

"Is Bitcoin a Real Currency?" in David K.C. Lee ed., *The Handbook of Digital Currency* (Elsevier, 2015), 31-44.

**"**Evaluating Creeping Acquisitions," *Sydney Law Review* 37, 37-67 (March 2015) (co-authored with Raymond da Silva Rosa and Michael Kingsbury).

"Tailspotting: Identifying and Profiting from CEO Vacation Trips," *Journal of Financial Economics* 113, 252-269 (August 2014).

"Where Are the Shareholders' Mansions?  CEOs' Home Purchases, Stock Sales, and Subsequent Company Performance" in Sabri Boubaker, Bang Dang Nguyen and Duc Khuong Nguyen eds., *Corporate Governance: Recent Developments and New Trends* (Springer-Verlag, 2012) (co-authored with Crocker Liu).

"How Much of the Diversification Discount Can Be Explained By Poor Corporate Governance?" *Journal of Financial Economics* 103, 41-60 (January 2012) (co-authored with Daniel Hoechle, Markus Schmid, and Ingo Walter).

"Investor Reactions to CEOs' Inside Debt Incentives," *Review of Financial Studies* 24, 3813-3840 (November 2011) (co-authored with Chenyang Wei).

"Negative Hedging: Performance Sensitive Debt and CEOs' Equity Incentives," *Journal of Financial and Quantitative Analysis* 46, 657-686 (June 2011) (co-authored with Alexei Tchistyi and Hayong Yun).

"Shareholder Voting and Corporate Governance," *Annual Review of Financial Economics* 2, 103-125 (December 2010).

"Is a Higher Calling Enough?  Incentive Compensation in the Church," *Journal of Labor*

*Economics* 28, 509-540 (July 2010) (co-authored with Jay Hartzell and Christopher Parsons).

"Deductio *Ad Absurdum*: CEOs Donating Their Own Stock to Their Own Family Foundations," *Journal of Financial Economics* 94, 107-123 (October 2009).

"You Can't Take It With You: Sunset Provisions for Equity Compensation When Managers Retire, Resign, or Die," *Journal of Corporate Finance* 14, 499-511 (December 2008) (co-authored with Sandeep Dahiya).

"Pay Me Later: Inside Debt and Its Role in Managerial Compensation," *Journal of Finance* 62, 1551-1588 (August 2007) (co-authored with Rangarajan Sundaram).

"Golden Handshakes: Separation Pay for Retired and Dismissed CEOs," *Journal of Accounting and Economics* 41, 237-256 (September 2006).

"Flights of Fancy: Corporate Jets, CEO Perquisites, and Inferior Shareholder Returns," *Journal of Financial Economics* 80, 211-242 (April 2006).

"Board Members and Company Value," *Financial Markets and Portfolio Management* 20, 33-47 (April 2006).

"On Rescissions in Executive Stock Options," *Journal of Business* 78, 1809-1835 (September 2005) (co-authored with Menachem Brenner and Rangarajan Sundaram).

"Remuneration, Retention, and Reputation Incentives for Outside Directors," *Journal of Finance* 59, 2281-2308 (October 2004).

"What's In It For Me?  CEOs Whose Firms Are Acquired," *Review of Financial Studies* 17, 37-61 (Spring 2004) (co-authored with Jay Hartzell and Eli Ofek).

"Litigation Exposure, Capital Structure, and Shareholder Value: The Case of Brooke Group," *Journal of Corporate Finance* 9, 271-294 (June 2003) (co-authored with Sandeep Dahiya).

"Altering the Terms of Executive Stock Options," *Journal of Financial Economics* 57, 103 -128 (July 2000) (co-authored with Menachem Brenner and Rangarajan Sundaram).

"Taking Stock: Equity-Based Compensation and the Evolution of Managerial Ownership," *Journal of Finance* 55, 1367-1384 (June 2000) (co-authored with Eli Ofek).

"CEO Involvement in the Selection of New Board Members: An Empirical Analysis," *Journal of Finance* 54, 1829-1853 (October 1999) (co-authored with Anil Shivdasani).

"CEO Ownership, Leasing and Debt Financing," *Financial Management* 28:2, 5-14 (Summer 1999) (co-authored with Hamid Mehran and Robert Taggart).

"Investment Opportunities and the Design of Debt Securities," *Journal of Law, Economics and*

*Organizations* 14, 136-151 (April 1998) (co-authored with Marcel Kahan).

"Companies' Modest Claims About the Value of CEO Stock Option Awards," *Review of Quantitative Finance and Accounting* 10, 207-226 (March 1998)*.*

"Managerial Entrenchment and Capital Structure Decisions," *Journal of Finance* 52, 1411-1438 (September 1997) (co-authored with Philip G. Berger and Eli Ofek). Reprinted in Michael J. Brennan, ed., *Empirical Corporate Finance* (Edward Elgar Publishing, 2000).

"Good Timing: CEO Stock Option Awards and Company News Announcements," *Journal of Finance* 52*,* 449-476 (June 1997).

"Higher Market Valuation of Companies with a Small Board of Directors," *Journal of Financial Economics* 40, 185-212 (February 1996). Reprinted in Diane Denis and John McConnell, eds., *Governance: An International Perspective* (Edward Elgar Publishing, 2005).

"Do Corporations Award CEO Stock Options Effectively?" *Journal of Financial Economics* 39, 237-269 (October 1995). Reprinted in Kevin F. Hallock and Kevin J. Murphy, eds., *The Economics of Executive Compensation, Volume 1* (Edward Elgar Publishing, 1999).

## Current working papers

"Partisan Politics and Annual Shareholder Meetings," March 2025 (co-authored with Yuanzhi Li). Available at ssrn.com/abstract=4888023.

"Bitcoin Mining Meets Wall Street: A Study of Publicly Traded Crypto Mining Companies," January 2024 (co-authored with Hanna Halaburda). Available at ssrn.com/abstract=4340013.

 "Investment Returns and Distribution Policies of Non-Profit Endowment Funds," April 2021 (co-authored with Sandeep Dahiya). Available at ssrn.com/abstract=3291117.

## Inactive working papers
"FinTech in Sub-Saharan Africa: What Has Worked Well, and What Hasn't," August 2018. Available at ssrn.com/abstract=3240899.

"Credit Default Swaps, Agency Problems, and Management Incentives," June 2018 (co-authored with Jongsub Lee and Junho Oh). Available at ssrn.com/abstract=3073488.

 "The Michelle Markup: The First Lady's Impact on Stock Prices of Fashion Companies," May 2012. Available at ssrn.com/abstract=1601129**.**

"Major League Baseball Contracts: An Empirical Investigation of the Properties of Real Options," September 2001 (co-authored with Matthew Clayton).

"Dilution from Stock-Based Compensation," August 2001 (co-authored with Jennifer N. Carpenter).

"Compensation and Top Management Turnover," November 1997 (co-authored with Hamid Mehran).


**Other Publications**
"The Potential of Digital Currency and Blockchains," *NBER Reporter* 2018:1, 14-17 (March 2018).

"Smart Contracts and Corporate Governance," *Proceedings of the 44th Economics Conference of the Oesterreichische Nationalbank*, 2017, 94-99.

"The Future of Digital Currencies". In: Credit Suisse Research Institute, *The Future of Monetary Policy*, 2017, 29-31.

"Comment to Shan and Walter: 'Towards a Set of Design Principles for Executive Compensation Contracts,'" Abacus 52, 757-761 (December 2016).

 "Preparing for a World Without Cash," *The Wall Street Journal*, August 5, 2016 (co-authored with Max Raskin).

"Does the ASX's Blockchain Initiative Ignore the Best Aspects of the Technology?" *TABB Forum*, August 5, 2016.

"Bitcoin Economics," *MIT Technology Review*, March/April 2014.

"How This First Lady Moves Markets," *Harvard Business Review*, November 2010.

"Keeping the Executive Pay Police at Bay," *The Wall Street Journal*, November 15, 2009.

"Just Say No to Detroit," *The Wall Street Journal*, October 10, 2008.

"A Pound of Cure: How the British Are Reforming Executive Compensation," *D&O Advisor*, Fall 2004 (co-authored with Arthur Rosenbloom).
"Flights of Fancy," *SternBusiness*, Fall/Winter 2004, 30-35.

"The Dark Side of Executive Stock Options," *SternBusiness*, Fall 1998, 22-25.

"Why CEOs Use Insufficient Debt," *Financial Times*, May 23, 1997 (co-authored with Philip Berger and Eli Ofek).

**Books**

*The Infrastructure Finance Challenge* (Cambridge, UK: Open Book Publishers, 2016) (co-authored with 12 colleagues at NYU Stern School of Business, comprising a working group on infrastructure finance chaired by Ingo Walter).

*Executive Compensation and Shareholder Value* (Kluwer, 1998) (conference proceedings volume co-edited with Jennifer N. Carpenter).

**Academic Conferences** (partial list)

*Paper Presentations:*  American Finance Association (1996, 1998, 1999, 2004-06, 2008, 2016, 2019); Western Finance Association (1999, 2009); UCLA Blockchain and Law Workshop (2019); Journal of Investment Management Conference on FinTech, Boston (2018); National Bureau of Economic Research (1995, 2004, 2005, 2009); Imperial College FinTech Conference (2016); Gerzensee European Summer Symposium in Financial Markets (2006, 2008); London Business School Corporate Governance Conference (2007); Drexel University Corporate Governance Conference (2013); Universidade Nova de Lisboa Executive Compensation Conference (2011); Erasmus University Rotterdam Corporate Governance Conference (2010, 2012, 2014, 2016, 2018, 2025); Oxford Private Equity Research Conference (2019); Austrian Central Bank Annual Research Conference (2017); BI Norwegian Business School Corporate Governance Conference (2015, 2017), Madrid Finance Workshop (2011); Financial Management Association (1997); Tuck/JFE Corporate Governance Conference (2000); Duke-North Carolina Corporate Finance Conference (2004); IDC/Arison Finance Conference (2005); Utah Winter Finance Conference (1996); American Law and Economics Association (1996, 2009); Conference on Empirical Legal Studies (2009); Midwest Finance Association (1996).

*Paper Discussions:*  American Finance Association (1998, 2000, 2004, 2006, 2008, 2010-13, 2017, 2021); American Economic Association (2004, 2008, 2016); BI Norwegian Business School Corporate Governance Conference (2019); *RFS* FinTech Conference (2018); Washington University St. Louis Corporate Finance and Accounting Conference (2017); FIRN PhD Symposium (2020); National Bureau of Economic Research (2016, 2018); Swedish Institute for Financial Research (2007); Gerzensee European Summer Symposium in Financial Markets (2007); Western Finance Association (1996); Federal Reserve Bank of New York Conference on Bank Mergers (2001); London Business School Corporate Governance Conference (2004), Utah Winter Finance Conference (2025), NBER Law & Economics Meeting (2018, 2020, 2025).

*Panelist:* Federal Reserve Technology-Enabled Disruption Conference (2022); UCLA Finance Conference (2022); Festival of Economics, Trento, Italy (2022). Consensus (2019); American Finance Association (2018, 2019, 2022); Eastern Finance Association (2017); Cambridge University Centre for Alternative Finance (2016); Jesus College Rustat Conference, Cambridge University (2016); London Business School FinTech Conference (2016); International Monetary Fund / World Bank (2016); Stanford Law School conferences on Corporate Governance in the 21st Century (2008) and the SEC's Regulation of Executive Compensation Disclosure (2006); National Forum on Corporate Finance (2001); Financial Management Association (1999, 2010).

*Keynote Addresses and Invited Lectures:*

2025
- Review of Corporate Finance / European Corporate Governance Institute Conference
- University of Basel
- University of Luxembourg FinTech Academic Conference
- University of Vienna Theatricality of Global Markets: Art and Crypto
- Florida State University Truist Beach Conference
- University of Luxembourg FinTech Academic Conference

2024
- Swiss Finance Institute Annual Meeting
- University of Central Florida FinTech Summit
- University of Florida Law School Public Interest Environmental Conference
- Cornell Tech (Zoom)

2023
- Danish Finance Institute
- Deakin University (Zoom)
- NYU Stern Ross Institute / Volatility and Risk Institute

2022
- Cornell Tech
- University of Central Florida Inaugural FinTech Summit
- British Accounting and Finance Association (Zoom)
- International FinTech Research Conference, Milan
- CUNY / University of Haifa Workshop on Transatlantic Blockchain Law
- Thailand SEC / Chulalongkorn University Sasin School of Management
- Council of Chief Judges of the State Courts of Appeal

2021
- NYU Stern Ross Institute / Volatility and Risk Institute (Zoom)
- University of Western Australia Blockchain Conference (Zoom)
- Financial Management Association overview and research ideas lecture
- European Finance Association Doctoral Workshop (Zoom)
- Southern Denmark University Finance Workshop (Zoom)

2020
- Sung Kyun Kwan University and Korean Finance Association, Seoul (Zoom)
- University of Western Australia Blockchain Conference (Zoom)
- International FinTech, InsurTech & Blockchain Forum, Zurich (Zoom)

2019
- University of Western Australia Blockchain Conference
- Federal Reserve Bank of Atlanta Financial Markets Conference
- London Business School Centre for Corporate Governance
- USC Conference on Emerging Technologies in Accounting and Financial Economics
- Claremont McKenna College Athenaeum
- University of North Carolina Future of FinTech Conference

2018

- Humboldt University Berlin Crypto-Currency Conference
- Singapore Monetary Authority Digital Currency Policy Workshop
- St. John's University FinTech Conference
- University of Chicago Polsky Center for Entrepreneurship
- SUNY Albany Symposium on Blockchain and FinTech
- Journal of Investment Management Conference on FinTech, MIT
- University of Western Australia FinTech Conference
- Max Planck Institute for Innovation and Competition, Munich
- Erasmus Rotterdam University Corporate Governance Conference
- African Economic Research Consortium, Mauritius
- Amsterdam Institute of Finance Ingo Walter Address
- OECD Workshop on Digital Currencies, Paris
- Blockchain and its Applications in Financial Areas, Seoul
- Seoul International Finance Forum
- L'Expo Legal Innovation Conference, Amsterdam
- Drexel University Corporate Governance Conference
- Harvard Business School Blockchain Conference
- United Nations Department of Economic and Social Affairs Development Policy Seminar
- Hanken School of Economics, Helsinki
- Ono Academic College Think FinTech Conference, Tel Aviv

2017
- Securities and Financial Markets Conference, Taiwan
- Office of Financial Research FinTech and Financial Stability Conference
- PCAOB Institute on Audit Regulation
- Indian School of Management and Entrepreneurship, Mumbai
- International Risk Management Conference, Florence
- European Retail Investment Conference, Stuttgart
- Mississippi State University Magnolia Finance Conference
- Macquarie University Risk Conference, Sydney
- University of Chicago Stigler Center for the Study of the Economy and the State

2016
- Concordia University Ashby Lecture, Montreal
- University of Amsterdam Center for Corporate Finance
- Center for International Finance Research, Sydney
- FIRN Corporate Finance Annual Meeting, Sydney
- Melbourne Business School Corporate Governance Conference

2015
- Edinburgh Forum on Emerging Markets

2013
- Southern Finance Association, Puerto Rico
- New York Accounting and Finance Forum
- University of Bath Conference on Corporate Governance
- Erasmus University Rotterdam Erasmus Lecture
- Stavanger University Empirical Corporate Finance Conference

- German Academic Association of Business Research, Wurzburg
- University of Auckland

2012
- National Taiwan University International Conference on Finance
- Multinational Finance Society, Krakow

2010
- Cardiff Business School Conference on Executive Compensation
- California Corporate Finance Conference
- Lingnan University, Hong Kong

2005
- Swedish Institute for Financial Research Corporate Governance Conference

2001
- TIAA-CREF Corporate Governance Forum


## Honors and Awards

*Research*
- Corporate Governance Research Honorand, Drexel University, 2018.
- Pagano-Zechner best paper award, *Review of Finance*, 2017.
- Distinguished Scholar Award, Southern Finance Association, 2013.
- Best Paper Award, Drexel University Corporate Governance Conference, 2013.
- Bettis Distinguished Scholar Award, Arizona State University, 2012.
- Visiting Scholar, Federal Reserve Bank of New York, 2003-11.
- Visiting Scholar, Federal Reserve Bank of Philadelphia, 2011-12.
- Fellow, Center for Corporate Governance, Drexel University, 2008 - present.
- Research Fellow, Cornell Compensation Initiative, 2009 - present.
- Yamaichi Faculty Fellowship, 2004-2009, and Ira Rennert Faculty Fellowship, 2001-2004, from NYU Stern School in recognition of research productivity.
- Paduano Faculty Fellowship, 2007-2009, from NYU Stern School to support interdisciplinary research in business ethics.
- Four-time nominee for Smith Breeden or Brattle Prize for outstanding paper published in the *Journal of Finance*: "Good Timing: CEO Stock Option Awards and Company News Announcements," 1997; "CEO Involvement in the Selection of New Board Members: An Empirical Analysis," 1999 (co-authored with Anil Shivdasani); "Remuneration, Retention, and Reputation Incentives for Outside Directors," 2004; "Pay Me Later: Inside Debt and Its Role in Managerial Compensation," 2007 (co-authored with Rangarajan Sundaram).
- Two "All Star Paper" citations in 2002 from *Journal of Financial Economics* for high citation counts achieved by "Higher Market Valuation of Companies with a Small Board of Directors," 1996, and "Do Corporations Award CEO Stock Options Effectively?", 1995.
- Four Glucksman Institute Research Awards for best finance research paper by NYU Stern School faculty: "Managerial Entrenchment and Capital Structure Decisions," 1997-98 (co-authored with Philip G. Berger and Eli Ofek) (first place); "Altering the Terms of Executive Stock Options," 1999-2000 (co-authored with Menachem Brenner and Rangarajan Sundaram) (first place); "Remuneration, Retention, and Reputation Incentives

for Outside Directors," 2002-03 (first place); "Deductio ad Absurdum: CEOs Donating Their Own Stock to Their Own Family Foundations," 2008-09 (second place).

*Teaching*

- NYU Stern Undergraduate Honors Program Faculty Service Award, 2021.
- Finalist (1996-97) and nominee (1995-96) for Teacher of the Year (undergraduate college); finalist (2000-01, 2003-04, 2011-12), and nominee (1996-97, 1997-98, 2012-13, 2014-15) for Professor of the Year (MBA program), Stern School of Business, NYU.
- Allyn Young Teaching Prize as outstanding teaching fellow (from group of 36) in undergraduate "Principles of Economics" survey course, Harvard College, 1991.
- Two Certificates of Distinguished Teaching from Harvard Faculty of Arts and Sciences, 1990-91.
- Three-time nominee for Levinson Award as outstanding teaching fellow in Harvard Faculty of Arts and Sciences, 1990-91.

*Service*

- NYU Stern School of Business Faculty Leadership Award, 2017.

*Graduate School -- Academic*

- Dean's Doctoral Fellowship, Harvard Business School, 1991-94; won in competition with Harvard MBA graduates for PhD support.
- Baker Scholar, Harvard Business School, 1991, for graduating in top five percent of MBA class.  First-Year MBA Honors, 1988.

*College -- Academic*

- Dean's List during all eight semesters.
- Harvard College Scholarship and John Harvard Scholarship for academic achievement.

**Teaching Experience**

(does not include executive programs or courses taught as a visitor)
*NYU Stern PhD:*

- Corporate Restructuring and Reorganization, 2012 and 2015.
- Agency and Executive Compensation, 2004, 2008, 2010, 2012, and 2016.
- Corporate Governance, 2006, 2008, 2010, and 2013.

*NYU Stern MBA:*

- Blockchains, Digital Currencies, and the Future of Financial Services, joint with NYU Law School, 2014-2026.
- Foundations of FinTech, Spring 2018, Fall 2023-25.
- Restructuring Firms and Industries, joint with NYU Law School, 1996-2025.
- Corporate Finance, 1995-2002 (various).
- Legal Foundations of Applied Finance, 2001-2002.

*NYU Stern undergraduate:*

- Foundations of FinTech, Fall 2017.
- Corporate Finance, 1995-2002 (various).
- Financial Management, 1994-97.

*NYU Law School:*

- Blockchains, Digital Currencies, and the Future of Financial Services, jointly with NYU Stern, 2014-24.

- Restructuring Firms and Industries, joint with NYU Stern, 1996-2024.
- Seminar: Economic Analysis of Developing Issues in Corporate Theory, 1995.

*Teaching Fellow:*
- Principles of Economics, Harvard College, 1989-91.

## Work Experience

*Management Consulting:*
- JSA International, Cambridge, MA, 1989-91.
- Premier/USTravel, San Francisco, CA, 1988-99.
- Bain & Co., Boston, MA, 1985-87.

*Legal:*
- Admitted to the Massachusetts bar, 1991 (Inactive status).
- Skadden, Arps, Slate, Meagher and Flom, Boston, MA, Summer Associate, 1990.

*Journalism:*
- *Pittsburgh Post-Gazette*, Pittsburgh, PA, summer 1985.
- *The Wall Street Journal*, Philadelphia, PA, summer 1984.

## Professional Appointments and Affiliations

- American Finance Association
- Financial Management Association (Board of Directors, 2009-11, 2019-21)
- Turnaround Management Association (Academic Advisory Board)
- Indian Institute of Management Calcutta (Advisory Board)

## Invited Seminars

University of Adelaide (9)
University of Alabama
University of Alberta
University of Amsterdam (2)
University of Arizona (2)
Arizona State University (2)
Australian National University (2)
Bank of England
Bank for International Settlements
Baruch College (3)
University of Basel (3)
University of Bath
Binghamton University
Bocconi University
Boston College
University of Bristol
Univeristy of California at Santa Barbara
Cambridge University
Cardiff Business School

Universidad Carlos III de Madrid
Case Western Reserve University
University of Cassino
Catholic University of Milan
Center for Financial Studies (Frankfurt) (2)
Chinese University Hong Kong (3)
City University Hong Kong
Concordia University (2)
Copenhagen Business School
Cornell Law School
Edith Cowan University
Cyprus University of Technology
Deakin University (3)
University of Delaware (2)
Deutsche Bundesbank (2)
Drexel University
Dublin City University
Duke University
EDHEC Nice

University of Edinburgh
Emory University (2)
Erasmus University Rotterdam (5)
ESMT Berlin
University of Exeter
Federal Reserve Bank of New York (5)
University of Florida
Florida State University (2)
Fordham University School of Law (3)
Free University of Amsterdam
Free University of Berlin
Georgetown University
University of Georgia
Georgia State University
Goethe University Frankfurt (2)
Harvard Business School (2)
Harvard Law School
Hebrew University
Helsinki School of Economics (3)
Hong Kong Polytechnic University
Hong Kong UST
Humboldt University
IESEG Paris
University of Illinois
Imperial College London
INSEAD
Indiana University
University of Iowa
King's College London
La Trobe University
University of Lausanne
Lehigh University
London Business School (2)
London School of Economics
Louisiana State University
University of Lugano
Maastricht University (2)
University of Manchester (2)
Mannheim University (3)
University of Maryland
George Mason University
McGill University
University of Melbourne (5)
University of Miami
University of Michigan
Michigan State University (2)

University of Minnesota
University of Mississippi
University of Missouri
University of Moliese
Monash University (2)
Nanyang Technology University
New Economic School, Moscow
University of New South Wales (3)
New York University (numerous)
University of North Carolina
Northwestern University Law School
University of Notre Dame (2)
Norwegian School of Business (BI Oslo)
Ohio State University
University of Oklahoma
University of Oregon (2)
Oxford University (2)
Paris School of Business
University of Pennsylvania (2)
University of Perugia
U.S. Public Co. Accounting Oversight Board
Purdue University (2)
Queens University
Queensland University (3)
Reserve Bank of India CAFRAL
Rice University (2)
Rutgers University (2)
University of St. Gallen
Securities and Exchange Commission (2)
University of South Australia
University of Southern California (2)
Southern Methodist University
Stockholm School of Economics (2)
Swedish Institute for Financial Research (2)
Swedish Riksbank
Swiss National Bank
Syracuse University
Temple University
University of Texas (2)
Texas A&M University
Texas Christian University
University of Tennessee
Tilburg University
Tulane University (2)
University of Utah
Vanderbilt University

University of California at Los Angeles
University of Technology Sydney
University of Virginia Darden School
University of Virginia School of Law
Virginia Polytechnic Institute
Warwick Business School
University of Washington
University of Western Australia (5)
Yale Law School (2)
Yeshiva University
University of Zurich (2)

# EXHIBIT C

Hon. Denise L. Cote
Daniel Patrick Moynihan U.S. Courthouse
500 Pearl Street
New York, New York 10007

Dear Judge Cote,

I am writing to you to provide context for my actions as I face sentencing for operating a money transmission business without a license. I pled guilty to this crime because I am guilty, and I hope to convey my perspective, my regrets, and my intentions moving forward.

I grew up in Bay Ridge in a typical middle-class family.  I was a lazy student, coasting through high school on minimal effort, graduating with an 88 average and scoring well enough on my SATs to be accepted to Pace University. When I enrolled, nothing in particular stimulated me intellectually, so I dropped out and took on various office jobs in Manhattan. The monotony of this work soon pushed me to seek out a larger and more long-term endeavor. After much thought, I decided that full immersion in a foreign language could provide the kind of pursuit that would keep me motivated, and I signed up for a linguistic studies program in Paris.

I stayed in Paris after the program ended, and while working at the U.S. Embassy there, I was 'promoted' from bartender to clerk in the embassy's Commercial Section.  It was there that I used a desktop computer for the first time. Immediately taken by the possibilities offered by the office tech, I wrote scripts to automate the formatting of correspondence for the typing pool. From that point on, I have treated the French language and computer programming as open-ended learning endeavors.

By 1995, I'd started my own consulting company and was building websites. In 1996, I began pioneering the use of PGP e-mail privacy software in France. In 2000, I started developing GPS software, and I spent the next decade creating mobile applications (both before and during the iPhone and Android era). Miniaturization advanced increasingly fast, and with it, the opportunities for app developers who took the time to study the tools and imagine the new possibilities on offer. I dived into the development of chat apps, dating apps, and anything with a veneer of geolocation. The feeling of being on the avant-garde of software development pushed me forward.

In 2012, I encountered Bitcoin.  It captivated me not as a financial investment, but as a revolutionary technology. I saw Bitcoin as a game-changer, a "digital cash" as it was described in its defining white paper, and set out to explore its possibilities. Bitcoin was multi-disciplinary – cryptographic messaging, cryptographic signatures, and the wallet design necessary to translate the tech for layman use.  It offered an open-ended learning curve.

Bitcoin's potential to enable private, sovereign financial management also resonated deeply with me.  This can partly be explained by my having lived in Paris for 30 years when I first encountered it.  As much as I found my residency there to be an intellectually stimulating, continuous learning experience, I quickly became disenchanted with most of my Continental European contemporaries and their mores. I found the culture to be conformist, and in many ways oppressive.  The paradox being that the longer I remained outside the United States, the more American I came to feel.

Restrictions on the use of cash have always been very strict in France, with even small expenditures and bank withdrawals requiring justification. I had bumped up against roadblocks such as not being able to purchase an up-market laptop computer with cash, and I found this lack of financial independence frustrating. I quickly saw in Bitcoin the ability to manage some of my finances without having to explain my routine choices, everyday behavior, and modest expenditures to ever-

inquisitive Parisian bank clerks. The feeling of financial sovereignty was refreshing. Bitcoin offered the promise of reclaiming various forms of sovereignty within a larger French society that I considered to be overbearing and intrusive.

But the more I learned about Bitcoin, the more I realized that despite mainstream narratives, it was not inherently private. For it to serve its function as digital cash, it needed to ensure the same anonymity as physical currency. I devoted myself to trying to fix Bitcoin's privacy flaw, and in doing so, believed that I was playing an important and positive role in its advancement, continuing the work of those who came before me. I was taking the thoughts and open-source software development of people like Phil Zimmerman, Adam Back, Nick Szabo, and Satoshi – and posing my layers of work upon theirs, brick after brick. Building on the shoulders of giants, so to speak.

In 2015, I co-founded a software company to develop tools that could provide the anonymity necessary to make Bitcoin work as intended. I made it clear that I was stepping back from the general direction taken by the larger space at the time: Bitcoin as a short-term investment vehicle; get-rich-quick schemes; and various other financial-scam behaviors. I focused on Bitcoin as digital cash and all that encompassed with regards to personal independence. Specifically, I designed a non-custodial wallet to encourage users to earn, spend, and think in Bitcoin, free from the dollar-value hype dominating the space. Working with like-minded developers was immensely satisfying; a dynamic exchange of learning, teaching, and creating tools that users found valuable in a fast-paced, innovative environment.

I prioritised work on Bitcoin privacy and fungibility because I felt that the advantages provided by Bitcoin as true digital cash, in terms of personal financial privacy, protection from political persecution, protection from physical attack, all outweighed the negative effects from Bitcoin being used for illegal and nefarious activity.

I was also convinced that our work was legal. I studied the FinCEN guidance and commentary around it and designed our app's functionality to avoid our being considered a money transmitting business. I understood that this meant the company was legal, and while I knew that there was a risk the law could change and the company would become illegal, I did not think we were breaking the law because we never took custody of any funds. My understanding was further cemented when retained counsel provided the same advice in 2020.

In hindsight, I regret my naivety in navigating the regulatory landscape. I wish I had thought more broadly about the risks and sought more sophisticated legal counsel. My belief that we could operate free of legal restrictions because our software was non-custodial was a grave mistake, as it failed to account for the bigger picture.

When I learned in late 2023 that approximately 2% of our platform's volume was linked to illegal activities, I rationalized continuing operations, still believing our non-custodial design and legal guidance insulated us. This was both a moral and practical error. I naively underestimated the risks and failed to fully grasp the stakes. I was overly focused on the technical challenges and potential of our work, and I deeply regret not pausing to reassess and mitigate the misuse of our tools. I adopted a reasoning akin to '*caveat emptor,*' dictating that the users should be aware and responsible for their own actions and that if society made a different choice, the law could change. And although I have never used drugs, owned weapons, or engaged in any violence, my actions— including creating a directory that would allow people to find these things—were unacceptable. I believe deeply in the idea of liberty and freedom from government overreach, and rationalized my actions as promoting these ideas. I recognize now that this was a very flawed way of looking at the world.

2

Since my arrest, I have been able to look back at my software's increasing usage and reflect upon the accusations made in the indictment and I fully understand that the responsibility should have started with myself. I deliberately unleashed software tools knowing that they could be misused, and upon learning how they were in fact misused, I looked the other way and buried my head in the sands of further software development, refusing to study the larger usage landscape. This was a mistake on my part and one that I deeply regret now that I have stopped to appreciate the real-life negative consequences of my efforts.

I also regret our approach to marketing the service. In the face of aggressive attacks from our competitors and believing that we were insulated from accusations of wrongdoing due to our architecture, we crossed the line beyond what we thought to be 'guerilla marketing.' I set out to promote the service on darknet markets with the intention of recruiting those who had to move funds for political reasons or to obtain medical remedies that were not reimbursed by their health insurance or lack thereof. But I again turned a blind eye to the other obvious audiences, as naivety and a desire to beat our competitors clouded my judgment, and our marketing suggesting that computer hackers and other criminals should use Samourai instead of our main competitor's wallet spiraled well beyond acceptable limits.

My actions have caused my wife, Sabrina, immense pain, which weighs heavily on me. My 11-week detention in Lisbon while awaiting extradition to the United States was grueling for her. In our 34 years of marriage, we had never been apart for that long. I could see that visiting me was brutal for her; she could not bear seeing me detained in such harsh conditions. Our current stay in the basement of my sister's home in Brooklyn is adding further strain. Sabrina has always put great efforts into making and maintaining our home, be it in Paris, London, or Lisbon. We value our time spent together. Despite the generosity of my sister and my brother-in-law, we are not at home here in Brooklyn and must make do with the little we have while living in somebody else's home. Establishing new routines in such an environment is extremely difficult. We do our best to fill in the blanks by taking long walks together along Shore Road. Despite these hardships, Sabrina remains unwaveringly supportive. I am profoundly sorry for failing to provide her the peaceful retirement we envisioned. I await the moment when I will be able to make up for this and resume a normal life with her.

Looking ahead, I consider myself retired and look forward to a modest life with Sabrina, free from legal entanglements. I would like to return to book publishing in retirement, an endeavor I pursued from 2003 to 2005. With new opportunities in digital and paper publishing, I intend to engage in this intellectually fulfilling work, collaborating with writers and aiming to break even financially, driven by passion and a desire to remain active during retirement rather than any profit motive.

I never intended personal enrichment; my lifestyle has remained modest and free of luxuries throughout my career. My intent was to advance financial privacy, not to facilitate harm. I deeply regret the misuse of my tools and the distress caused to my wife Sabrina as well as to both our families.

I respectfully ask for your consideration of my lack of prior criminal history, my sincere remorse, and my commitment to a law-abiding future as you determine my sentence.

Respectfully submitted,


William Hill

# EXHIBIT D

# EXHIBIT D.1

Hon. Denise L. Cote
Daniel Patrick Moynihan U.S. Courthouse
500 Pearl Street
New York, New York 10007

Brooklyn, New York

22 August 2025

The Honorable Denise L. Cote,


My name is Sabrina Kherbiche Hill. I am 60 years old. Holder of
a master's degree in English, I have worked  as a
French/English/Arabic translator and an English teacher. I am
also the author of three novels. Your Honor, I am writing this
letter to you, on the eve of celebrating the 34 years of marriage
that bind me to William Hill.

We met in 1990 at the British Embassy in Paris, where I had just
been transferred from Algiers, the city where I was born to an
Algerian father and a French mother. William held the position of
IT manager there. A pure self-taught individual, he continued to
educate himself through evening classes.

If I had to describe the way we met, I would say that we found
each other: me, trapped in my anorexia, and him, comfortably
settled in his own bubble, opening it just enough to function
professionally. And so began our long walks through Paris.
Unlike other young couples, we didn't make plans, content to
continue what we were already doing individually: reading,

learning, staying curious, enthusiastic. All in simplicity. For it is a simple story I am telling you, Your Honor.

There was the wedding ceremony in Algeria a few months after we met, when William willingly embraced our rites and traditions, and then, a year later, the forced exile of my parents from Algeria, leaving behind everything they owned—a painful episode when William, barely knowing them, was of invaluable help. He offered to host them in our small apartment, helped them find work, and later acted as a guarantor for a place of their own.

My husband is a true workaholic: his work defines him. It is the framework he has tirelessly strengthened over the years, training in the evenings and on weekends. I look back to the computer classes after work and a lot of money spent on books that were hard to find in France. No vacations, no days off. He has the ambition to perfect himself, but not to please others. This brings me to what makes him such an unusual person—no pretense, an attitude often perceived as closed-off, and little inclination to communicate in social situations: family dinners were often cut short due to his impatience. His detached attitude and his naïve perception of human nature (he lost an important position he held in the late '90s, believing his employer's clearly false promises despite my warnings, but too late; a few years later, when he created his first company, he hired a former co-worker who took advantage of him, not showing up for days, taking numerous sick leaves and lying about potential contracts) often led to endless conversations between us where I tried to give him a more realistic reading of the world around us.

Without realising it, I started looking after him in ways that went beyond typical spousal relationships. Gradually, this fostered great anxiety: every incident, from the smallest—like the time, six months after moving into an apartment he used as an office, I discovered that, apart from a table and a chair, he hadn't arranged for lighting or heating (seeing my reaction, he replied, "The computer keeps me warm and gives me light...")—to the more troubling, like in the early 2000s, when the blogosphere was in vogue, and he started a blog where he dissected French politics in a provocative tone. Reading his posts and the comments they elicited became for me a constant source of worry. He responded to attacks that often targeted his country of origin, leading to a downward spiral that radicalized his positions. When I urged him to stop this verbal jousting, he would tirelessly respond, "We are at war" or "Always hit back twice as hard"—the same words he would use 15 years later about the detractors and competitors of Samurai when, appalled, I was reading his Twitter posts and asking him to stop. Locked in his convictions and his "battles," the reality of everyday life became even more an abstract concept to him.

I would like to also tell you about the other world he escapes to, the world of books. I have never seen my husband without a book: at a bus stop, in the metro, in a waiting room . . . everywhere, all the time. When I visited him in the Lisbon prison where he spent three months awaiting extradition, I had to plead with the administration, not about the conditions of his incarceration, but to allow me to bring him books, as he was sinking into depression without them. I have spoken to you, Your Honor, about William, the man who has been by my side for 34 years, whom I have strived to protect from

the excesses of his uncompromising nature, and I realize, in light of what has happened, that I have clearly failed.

I love my husband. People would sometimes define him as "peculiar"; I would say, "special." I love him the way he is, for who he is. I know it may seem paradoxical, but he is my rock; his kindness towards me is precious and essential to my well-being. Of course, lately, I've been mad at him, but my reaction might surprise you: I have scolded him as one would scold a child. For William has taken this ordeal very hard. He is completely disoriented: over ten years of work has been wiped out and confiscated. He doesn't talk much and when he does, it is to tell me how sorry he is to see me so sad. And then he does what he has always done: take refuge in facts and go back to why Samurai was created: to allow bitcoin to behave like digital cash, something that was described and declared in bitcoin's defining document but proved to be vastly overstated and still required much work.

He has mentioned how terrible it would have been for his parents, who recently passed away, to have seen their name vilified and sullied. He had a good relationship with them. He visited them yearly since 1981 and kept in close touch by phone. From 2016 on, when their health had started to decline, he visited more frequently, stopping by New York when traveling for work.

These last 18 months have reinforced a feeling we both share and might even constitute the core of our bond: There is in each of us a bit of the hero from Albert Camus's novel, *The Stranger*: a feeling of not belonging and of often being estranged from the world around us.

I would like to believe, Your Honor, that in light of your long and impressive career, you will see in William someone who is sincere and passionate, certainly lacking in judgment, but by no means someone with bad intentions.

Thank you very much for devoting some of your time to read my letter.

Respectfully submitted,

Sabrina Kherbiche Hill

# EXHIBIT D.2

Hon. Denise L. Cote
Daniel Patrick Moynihan U.S. Courthouse
500 Pearl Street
New York, New York
10007

To The Honorable Judge Denise L. Cote,

My name is Suzanne D'Emic, and I am William (Bill) Hill's younger sister.  I graduated from
Saint Vincent's Hospital School of Nursing in 1984 and was a registered nurse first on a
medical/surgical floor, then Obstetrics/Gynecology where I happily made a career until the
hospital closed its doors in April 2010.  I finished my career working as a school nurse for
children with emotional and behavioral difficulties, and profound disabilities.  I married my
wonderful husband William D'Emic in 1985 and we stayed busy with a good life, welcoming
three beautiful children who quickly grew up!  My husband was a firefighter for the New York
City Fire Department and had a long career dedicated to the people of NYC; from serving as a
first responder in the 1993 and 2001 World Trade Center attacks, to working in dangerous
conditions during Hurricane Sandy, to countless other stories he has and has not told us. He is
my hero.  Today, he serves as a fire safety educator across NYC.

When I think of my brother Bill and growing up in Brooklyn, I think of our family unit and
values, and most importantly my grandfather.  My brother and son share a middle name,
Lonergan, after our grandpa Edward Francis Lonergan.  My grandfather was from Terryville CT,
a bedroom community of Hartford Ct.  He was a devout Catholic.  When my parents bought their
home on 71st Street in Brooklyn in 1966, our grandpa Lonergan came to live with us.  He shared
the third floor with Bill, each having a room on opposite ends of the floor.  It was always the five
of us for many years.  Alma, Roy, Suzanne, Bill and grandpa Lonergan.  We had hardworking,
loving parents and our kind grandfather. I think these years laid the groundwork for our values in
life. Our grandfather was a major influence on my brother. When our parents were not home, he
was our caretaker. He frequently attended mass and shared the teachings of the Gospel with us.

My brother was smart and worked hard at his passions growing up. He loved a challenge—he
was an avid chess player, and was much happier to play for hours than to socialize at a party. A
loyal New York sports fan, he went to Knicks games with our dad, and followed wrestling
closely. He had a silkscreen business and would help neighborhood businesses with local
advertising.  He also worked at a local butcher's shop. When he was in college, he decided to do
a French language immersion course and, the way I remember it, he moved to France to live
there permanently in the early 1980s. Initially, my brother took courses at Sorbonne University in
Paris, and I believe my parents helped him out a bit.  But my brother worked hard to support
himself and create a life in Paris.  He always called home and visited every Christmas, which

was very exciting for all of us.  In 1991, my brother married his beautiful wife, Sabrina.  Finally, Bill's hard work had paid off; he found family with Sabrina in Paris, and he found success in a career that he built from the ground up.

Billy was always generous with his time. He spent it engaging my children in their shared interests.  Whether showing my daughters, Emily and Caroline, around France and giving Emily French books to bolster her practice of the language, or engaging my son, Liam, who was diagnosed with autism at 2 years old, in long and detailed conversations about computer technology, he always found time to humor their interests despite not having much experience with children himself.  Since my son graduated from college after years of working hard and overcoming the challenges of autism and managing the bureaucracy of school as a person with a neurodivergence, Billy has been a mentor to him.  He has connected with my son in a way we are so appreciative of.  Billy and he share an understanding of communication style, and a deep, niche interest in technology that my husband and I could never recreate ourselves.

In retrospect, a lot of Billy's interests and quirks relate closely to the qualities we notice in our son. From casting a small net socially, to intense areas of interests, to difficulty relating to peers and adults in school—if Bill were in a classroom in 2025 and were identified as neurodivergent, I would not have been surprised. However, in the 60s, kids like him were left to figure out how to navigate the world on their own. And he did—he immersed himself in his own world of technology, finding like-minded people to collaborate with. His path could have gone many ways, and he was somehow successful in finding a career and a wife to share his life with.

My family was devastated to find out my brother and their uncle was arrested—a person we all admired for his hard work, tenacity, and integrity. We were stunned. My daughter had just been married days before, only to return to chaos when she got back from her honeymoon. Our family has not been the same since then. We cannot imagine how his wife, Sabrina, felt and still feels today. We have done everything we can to support them during this stressful time in their lives.

Ultimately, though most people would have been in it for the wealth, I believe Bill was not—if he was some greedy person seeking to find every penny, we would have seen the evidence of wealth. Instead, he wears the same three tee shirts on rotation every week, and lived in the same shoe box apartment in France for decades. He was obsessed with the business and the coding. If he believed he was doing something illegal, I know that he would have halted his actions immediately, not caring if he made or lost money.

I know your time is valuable, and I appreciate any time you spend reading this letter.  I love my brother, and I hope this has contributed to your understanding of who he is: a hardworking, focused man dedicated to his family.  I hope this is taken into consideration moving forward. Again, thank you so much for your time.

Respectfully submitted,

Suzanne D'Emic

# EXHIBIT D.3

William D'Emic

▬▬▬▬

Brooklyn, N.Y. 11209

Hon. Denise L. Cote
Daniel Patrick Moynihan U.S. Courthouse
500 Pearl Street
New York, New York
10007

To The Honorable Judge Denise L. Cote,

My name is Bill D'Emic. I am Bill Hill's brother-in-law. I have been married to his sister for 40 years. I am a former New York City Police Officer and a retired Lieutenant with The New York City Fire Department.

I have known Bill since about 1981. I know him to be a very intelligent, serious-minded and quiet person who loves his family and cherishes his wife. When Bill is interested in something he has an intense focus to learn as much as he can and master it. He has always worked hard to accomplish whatever he started.

Bill cares deeply for his family. Our son Liam was diagnosed with Autism at the age of two. That was very upsetting. Bill has always been very supportive of us and the decisions we made for our son.

Liam progressed as he got older and became interested in computers and technology. Whatever Liam's interests were as he grew, Bill was there with advice, encouragement and books on the subject, from robotics to coding language to building internet networks. Bill always made sure that Liam had him as someone he could reach out to for support. This was great because Liam's knowledge surpassed anything I could help him with.

I feel Bill saw a lot of himself in Liam. Social and communication difficulties that come with High Functioning Autism are a challenge for people on the Autistic Spectrum. Bill is always purposefully engaging Liam in conversation about technology to get him to practice social interaction.

Liam has graduated from PACE University with a B.S. in Information Technology. He is now getting different certifications that he needs for employment. Without Bill's continued encouragement and attention, Liam, with his different struggles, may not have come so far. I will always remember what Bill did for us and our son.

Respectfully,

William D'Emic

# EXHIBIT D.4

Hon. Denise L. Cote
Daniel Patrick Moynihan U.S. Courthouse
500 Pearl Street
New York, New York 10007

Paris, August 20, 2025

Dear Judge Cote,

My name is Mr. Kadour Kherbiche. I am of French nationality but of Algerian origin. I am 90 years old and reside in Paris. Bill Hill is my son-in-law, married to my daughter, Sabrina Kherbiche, since August 1991, which marks 34 years of marriage. He makes my daughter happy. That is why I was deeply shocked to learn about what has happened to him.

In all the time I have known my son-in-law, I have never had an altercation with him. Our family relations have always been warm and courteous—never a raised voice. Our conversations have always been open and sincere, and his kindness and respect have been ever-present and impeccable. When we were forced to leave our home in Algiers due to the dark decade that the country endured, and our lives were threatened, my wife, being French, led us to emigrate to France. Not knowing where to go, it was my daughter and son-in-law who opened the doors of their home to us. We were welcomed with open arms for a long time to help us find our bearings. He was there, helping us regain life when we were on the brink of despair, having lost all our possessions. He welcomed us, shared his one-bedroom apartment, provided food and shelter, helped us search for housing, supported us financially, and looked for job opportunities to help us get back on our feet. This speaks to the kind of person he is—brave and welcoming, without expecting anything in return.

It is true that Bill can be somewhat stern in character, but over time, one gets used to it. He is also a very solitary person; he does not enjoy the company of many people, gets bored quickly, dislikes family gatherings, and tires easily in our presence. This is all part of his character and does not detract from the man he is—always present when called upon. He is who he needs to be, but what matters most is that he is a good, faithful husband with no bad associations. He does not drink alcohol, does not use drugs, does not smoke, and loves to cook. Above all, he loves reading all kinds of novels, as he has a very sharp intelligence. Discussions with him are always fruitful; he has answers to every subject, is knowledgeable about literary authors, and is passionate about art and culture.

I believe that every human being, at some point in their life, makes a mistake or does something they should not have done. No one is ever perfect, and that is when we ask the authorities and the law for forgiveness.

That is why, Your Honor, I am writing to you. Thank you.

Kadour Kherbiche

# EXHIBIT D.5

Hon. Denise L. Cote
Daniel Patrick Moynihan U.S. Courthouse
500 Pearl Street
New York, New York 10007

Paris, August 20, 2025

Your Honor,

I take the liberty of introducing myself. I am French, 85 years old, and I have been living in Paris since 1994. My name is Mrs. Kherbiche, née Christiane Renard.  Bill Hill has been my son-in-law for 34 years. I lived most of my life in Algiers, Algeria, where my husband is originally from, and I was posted at an embassy. When our daughter left for a position at the British Embassy in Paris, she met Bill, who was also working at the embassy. They fell in love immediately and decided to marry. They traveled to Algiers to be introduced to the entire family, who immediately appreciated him for his education and great politeness.

I was very happy that my daughter had married a caring and attentive man. I love reading immensely, and Bill has always advised me on which authors to choose. Bill is very reserved, even shy, with us, but over time, this did not bother us. However, during family gatherings, such as Christmas or other celebrations, his solitary nature would take over, and he would become quiet, showing signs of impatience to leave. I often understood him.

Due to the tragic events of a dark decade in Algeria, I had to return to Paris hastily, against my will and at the peril of my life. I had no place to go in Paris. Bill took responsibility for our entire settlement and accommodation. He was always there to take care of us as if we were his own parents, and their life together was happy.

My other daughter was already settled with her small family in Portugal. In 2023, Bill and Sabrina decided to settle there as well. I was very sad to see them leave, but it was their choice. They gradually adapted to their new life until the fateful day when, for us, his in-laws, we suffered a blow to the heart that left us stunned. Your Honor, I suffered in my heart as a mother, worrying that at his age (67 years), he would not be able to endure further trials. I am sad, Your Honor. Our entire family hopes to see him again soon. I have always seen in him the son I never had. The pain is great, and given his age and shyness, he will not be able to bear it.

Your Honor, I thank you from the bottom of my heart for taking the time to read me.

Respectfully submitted,

Christiane Kherbiche

# EXHIBIT D.6

Hon. Denise L. Cote
Daniel Patrick Moynihan U.S. Courthouse
500 Pearl Street
New York, New York 10007

To the Honorable Judge Denise L. Cote,

My name is Mark David Bakacs, and I am writing this character reference in support of Bill Hill. I first met Bill in July 2024 when he joined me in Hall F of the EPL prison in Lisbon, where I was being held on suspicion of fraud and money laundering, charges for which I was acquitted at trial.  I am a strategic advisor specializing in digital assets and blockchain regulation, with a legal background that includes practice at Magic Circle and white shoe law firms including Linklaters in London, Paris, and Tokyo, as well as Sidley Austin and Maples in the Cayman Islands.  Over the past two decades, I have worked at the intersection of international finance and emerging technologies, advising governments, financial institutions, and family offices on digital asset strategy and regulatory compliance.  I am admitted to practice in England & Wales, New South Wales (Australia), and the Cayman Islands.

During the month Bill and I spent together at EPL before my release on July 5, 2024, and through our continued weekly meetings every Friday at 11 a.m. in a Lisbon cafeteria until my relocation to Switzerland in April 2025, I had the unique opportunity to observe Bill's character in the most challenging and extraordinary circumstances.  We remain in regular contact, speaking roughly weekly, and I have witnessed his unwavering principles and genuine nature throughout nearly a year of friendship.

From our very first conversations in prison, what struck me most about Bill was his absolute commitment to doing the right thing, even when it defied practical wisdom.  I recall making our daily coffee together — I would create something resembling espresso by whipping ground instant coffee with a plastic fork in a plastic cup to create foam, then adding hot water from the kettle.  During these coffee sessions, Bill would insist on scheduling our meetings for specific times like 3 p.m. or 4 p.m., even though prison days had no real structure and we had nowhere else to be.  This wasn't mere preference.  It was his way of bringing order and respect to our interactions, treating our friendship with the same seriousness he would any professional appointment.

Bill's dedication to routine extended beyond our meetings.  Every day, he would walk the same path up and down the hall for precisely an hour, maintaining this schedule regardless of the weather or his mood.  He spent his free time reading, including *The Economist*.  Between copies my father sent me and those his wife brought him, we had extensive material for discussion.  Bill would carefully handwrite lists for me of French books I should read and topics he thought I should research once I had internet access again.  His attention to detail in these recommendations was remarkable.  Each suggestion came with specific reasons why he thought it would interest me, demonstrating both his thoughtfulness and his systematic approach to sharing knowledge.

Our shared experience living in Paris created an immediate bond, and Bill's passion for French literature led him to take me to several French bookstores in Lisbon after our releases.  He enthusiastically shared his favorite classics and explained why each author mattered to him.  His knowledge was encyclopedic, but more importantly, his desire to share this passion was generous and genuine.

However, it was an incident involving another inmate that most clearly revealed Bill's character and his particular way of seeing the world.  Bill had befriended a Portuguese inmate known as "Frances," who had lived in France and French-speaking Switzerland and could communicate in French.  Frances worked occasionally in the prison bar and promised to help Bill obtain hot sauce, which Bill had been patiently waiting for the bar to restock for weeks without success.

This was entirely within the rules — Bill simply wanted to purchase something that should have been available but wasn't being restocked.  Despite Frances' questionable reputation among other inmates — something I recognized but Bill seemed oblivious to — Bill trusted his promise completely.  When the favor inevitably failed to materialize, Bill was genuinely shocked and upset. He could not comprehend how someone would make a promise and not follow through.  The concept appeared completely foreign to him, and this reaction taught me something profound about Bill's worldview: he operates from a foundation of absolute honesty and expects the same from others, even when experience might suggest otherwise.

This way of thinking extended to our many discussions about cryptocurrency regulation.  Bill would recount detailed stories from his work on Samurai Wallet, describing how he had carefully read and re-read FinCEN guidance about money transmission.  He was absolutely convinced that his adherence to the letter of the law provided complete protection.

As someone who had just experienced firsthand how laws can be interpreted in unexpected ways — even though I was eventually acquitted, I spent months in preventative custody for charges I knew I hadn't committed — I found Bill's confidence both admirable and concerning. When I would gently suggest that regulatory interpretation could shift, or that external factors might influence legal outcomes, Bill would become genuinely frustrated.  To him, if the guidance said something was permissible, then persecution for that activity was not just unlikely but impossible — because it would be unjust.

This rigid adherence to rules and patterns affected our interactions in subtle ways.  Bill had difficulty with the typical social flow of conversation.  He would often seem not to engage in the friendly manner I might expect given our shared backgrounds and experiences.  Initially, I attributed this to the shock of our unusual environment, but I came to recognize it as part of his authentic way of being.  He required predictable structure.  Our Sunday coffee meetings worked best because there were no possible interruptions from lawyers or visitors, which would leave him distracted and preoccupied, unable to engage fully until whatever he was waiting for had resolved.

I should note that my fiancé, Guilherme Henrique Firmiano Capello Pina, has ADHD, and through our three-year engagement, I have gained significant experience understanding neurodivergent behavior and learning to interpret it within a neurotypical context.  This perspective helped me recognize that Bill's interactions, while sometimes appearing awkward or abrupt, came from a place of genuine care and absolute sincerity.

When Bill eventually mentioned that he was undertaking an autism assessment and asked my opinion about whether I thought he was autistic, I told him that in my experience, many early cryptocurrency advocates showed traits of neurodivergence.  They believed deeply in the mathematical precision and decentralized vision of the technology, often possessing the systematic thinking that attracts engineers and developers to complex technical challenges.

What makes Bill exceptional is not just his rule-following nature, but the moral conviction that drives it.  In our discussions about politics and current events, certain outcomes that seemed statistically likely to me were simply "out of the question" to Bill because they would violate his sense of justice or logical order.  While this occasionally made him seem naive about how the world actually operates, it also revealed someone whose moral compass is unshakeable.

Throughout all our conversations about the evolving regulatory landscape and the challenges he faced, Bill never wavered in his conviction that he had acted correctly, legally, and ethically.  Having spent my career navigating the gray areas between law and interpretation, and having experienced firsthand how even innocent actions can be misconstrued, I can say with certainty that Bill genuinely believed his actions were not only legally justified but morally right.

While his black-and-white thinking sometimes left him unprepared for the moral ambiguity that others might exploit, it also ensured that he would never exploit such ambiguity himself.

I have observed Bill navigate both the structured environment of prison and the freedom of civilian life with the same unwavering integrity.  His limitations in social interaction stem not from indifference but from a different way of processing the world — one that prioritizes consistency, honesty, and logical order above social convention.  These are not flaws, but simply the characteristics of someone whose mind works with exceptional precision and moral clarity.

Without hesitation, I would employ Bill in any project requiring someone of unquestionable integrity and systematic thinking.  We have even discussed this possibility should he be released and available for work.  His deep understanding of blockchain technology  would be invaluable in any organization navigating the complex digital asset landscape.  More importantly, his fundamental honesty and reliability make him someone I would trust completely.

Regardless of circumstances, I will keep up my side of our friendship and remain a loyal friend, helping Bill in any way that I can as a small way to show my appreciation for the care and kindness he showed me during my most difficult hours.  In prison, when everything felt uncertain

and the future seemed bleak, Bill's consistent presence and genuine friendship provided stability and hope.

That kind of loyalty and compassion, freely given during someone else's darkest moment, reveals character that no legal proceeding can diminish.

Respectfully submitted,

Mark David Bakacs
Digital Asset Strategic Advisor
Admitted to practice in England & Wales, New South Wales (Australia), and the Cayman Islands
Switzerland, August 31, 2025

# EXHIBIT D.7

Hon. Denise L. Cote
Daniel Patrick Moynihan U.S. Courthouse
500 Pearl Street
New York, New York 10007

Dear Hon. Denise Cote,

I am writing to you on behalf of William Hill, who I understand has pled guilty before you in court.

My name is Stephen Rossi.  I previously worked as a developer on the OXT platform, and I met Bill online in 2019 after publishing research from my use of the platform.  OXT was a bitcoin data explorer and forensic tool owned and operated by Samourai Wallet.  It offered open access to all the data on the entire bitcoin blockchain to the general public for free.

We often used the OXT platform to help bitcoin users with asset recovery following a theft.  In the overwhelming majority of cases, we would use the platform to help a user with recovery efforts on a pro-bono basis.

Cryptocurrency asset recovery is a thankless task with a very low success rate.  It can be demoralizing for forensic investigators who repeatedly encounter victims that have lost their life savings with little hope of recovery.

Despite low success rates and the great cost of maintaining the OXT platform, Bill was adamant that OXT be used as a public good for the benefit of all bitcoin users.  Bill always encouraged me to use the platform to help the victims of theft to the best of my abilities.  Had it not been for Bill's encouragement and his support for the platform it would have been easy to give up these efforts.

My online interactions with Bill were usually professional and brief.  He always struck me as introverted.  My conversations with him at our annual retreats were similarly brief and matter-of-fact.  During these group retreats, while most of the team was taking some time off from work, I witnessed Bill rising early, looking for a quiet place to work, which I thought showed remarkable work ethic.

Although Bill is a man of few words, his actions demonstrate that he clearly understands theft is wrong.  His goals for me were also clear, that we should use our abilities and any tools we have at our disposal to help victims of theft because it is the right thing to do.

Thank you for your time and I hope my reflections on Bill's character will be considered during his sentencing.

Respectfully submitted,
Stephen Rossi

# EXHIBIT D.8

Hon. Denise L. Cote
Daniel Patrick Moynihan U.S. Courthouse
500 Pearl Street
New York, New York 10007

August 15, 2025

The Honorable Denise L. Cote,

I am a semi-retired business executive and would like to share my insight into Bill Hill, who I have known for more than 30 years.

Bill and I met whilst working for an international editor in Paris in the early 90's. He was responsible for everything "electronic" and I was responsible for everything "commercial." At first our relationship was very operational. Bill was very shy and into his work, not really venturing out in terms of people or situations as he just wanted to do his thing. I was intrigued by this person who was constantly reading the latest Economist, Financial Times and other journals (Bill is and has always been a voracious reader) and thought that I might be able to use his knowledge to help with the company business. I found that if I went to Bill to ask specific questions and shaped them in a way that was related to his part of the business he could provide important insight.  One case that stands out in my mind relates to a company that I was soliciting to purchase our products (CD-ROMS with data) at the time and also looking into using/selling their products (CD-ROMS with data). I went to Bill for advice on whether they were a legitimate operation and he told me the company's product suite was high quality and that they compiled it following a Supreme Court ruling on data, a ruling that argued that "facts" could not be copyrighted in paper directories, only creative content. His insight put me at ease and helped me close a deal that I would have otherwise steered clear of out of worry.

Over the years, I worked in five other industries, but I always stayed in touch with Bill, seeking him out for lunches in Paris, London, or Portugal.  He rarely calls or texts, but he is always there when I reach out and ask to meet to share a meal and discuss the latest events in the world or ask for advice on a business decision.

Feverishly erudite, I cherish the fact that Bill is able to maintain a very pragmatic approach to the subjects he addresses. I have found through the years that I can count on him being the balance to my commercial side that "wants" a solution; he is always deeply researched on the factual side of the argument.  Blunt to the core, I know that I can count on his advice and that if I scratch the surface with questions, he will back it up with data and facts.

I sincerely thank you for your time and am at your disposition,


Floyd Murray Widener
Oeiras, Portugal

# EXHIBIT D.9

Hon. Denise L. Cote
Daniel Patrick Moynihan U.S. Courthouse
500 Pearl Street
New York, New York 10007

20 August 2025, Paris

Dear Judge Cote,

I am Karina Kherbiche Filbien, born on ███████ 1967, in Bernay in the Eure, France. I am 58 years old and reside in Limeil-Brévannes (Val-de-Marne, France).

I am currently the fitness director of a large fitness club in the 15th arrondissement of Paris, where I have worked for 34 years. I am also a Nike ambassador; I have created two fitness concepts in Pilates and mobility, and I train the new generation of coaches in this field.

I am the younger sister of Sabrina Hill, Bill Hill's wife; Bill is my brother-in-law, and I have called him "Uncle Bill" since the day I met him.

I met Bill during a very difficult period in my life, when my sister was ill. For me, he was like a savior, a true crutch. We were in France, far from our family, and I was carrying the weight of her illness alone—the terrible ordeal that is anorexia. Then Bill entered her life. With his kindness, his generosity, his listening, and all the love he gave her, he knew how to take over. Thanks to him, my sister was able to stop working to focus on her treatment. She even found the strength to write a book, which was later published, allowing her to put her distress into words.

Bill is a simple, luminous being, with a very particular sense of humor and a laugh that one doesn't forget. He has this precious gift: the ability to see beyond appearances and extend a hand without expecting anything in return. His presence was an anchor, a strength, a breath of love in moments when everything was wavering.

Bill is a deeply good man whose tenderness and listening transformed my sister's life, and touched mine, forever. For my sister, he was love. For me, he was a savior.

My sister and Bill live modestly—in a small, rented apartment, without trips or great extravagances. We didn't see each other very often, but at every family gathering, Bill brought his simple and reassuring presence. He worked a lot, always in training, always learning. I called him "the ace of informatics"—probably because I knew nothing about it. He sometimes talked to me about this new currency that he was convinced would become important. I listened with curiosity, even though I admit it went over my head.

My sister and I established a ritual: three times a week, on Monday, Wednesday, and Friday, we would call each other between 11 a.m. and 12 p.m. It had become a precious thread between us. But on Wednesday, April 24, 2024, when I called, there was no answer. I already knew there was a problem because my sister is impeccably punctual. Yet, I was not prepared to hear the heart-wrenching words that flowed when Sabrina picked up the phone: "They took my husband away

from me... they took my husband." Everything that followed was a true nightmare. A succession of incomprehensible, unbearable events. Bill is a good man, passionate about his profession, a developer at heart, always ahead of his time, but living modestly.

He has this natural kindness, these tender gestures toward my sister that deeply touched me. He is protective, loving and attentive. It is unimaginable that such a man would go through such an ordeal. This ordeal is testing us; it has broken my sister, her life, and our family. My parents are devastated; we cry often; we do what we can to help them. This heavy trial strengthens our bonds and reminds us of the essentials: to be there, together, for my sister and for Bill.

Bill has always had his own way of being in the world. Sometimes, during family holidays, he would start unexpected conversations that seemed to come out of nowhere. It made us smile, and it was his unique way of reminding us that he was there, in his own way.

He often lived in his own universe, an inner space that belonged to him. But despite this apparent distance, he was very much with us. Present, in his fashion. His words, his looks, even his silences, were threads that connected us to him.

I think back with tenderness to those moments. And I would give a lot to relive them soon: those slightly offbeat but so true moments, where Bill, even apart, was fully part of us. Because my brother-in-law is above all a simple man who is profoundly benevolent.

Bill is a passionate developer, a brilliant mind, but above all a man of heart. He is a devoted husband, a brother in heart, a loved family member. A man faithful to his wife and to those he loves, whose dignity and goodness speak for themselves.

And it is for this reason that we will continue to stand united around them and bring them all our love and support.

Done to serve and stand as evidence of the truth in Limeil-Brévannes, France, on August 21, 2025.

Karina Kherbiche Filbien

# EXHIBIT D.10

Hon. Denise L. Cote
Daniel Patrick Moynihan U.S. Courthouse
500 Pearl Street
New York, New York
10007

To The Honorable Judge Denise L. Cote,

My name is Caroline D'Emic, and I am William (Billy) Hill's niece. I was born and raised in Brooklyn and now work as a speech therapist. I am lucky enough to remain close to my family as I start my own family with my husband. Billy is my mom's (Suzanne) only sibling. I have, of course, known him since I was born, and he and his wife are a part of my earliest and most precious childhood memories. Although my Uncle Billy and Aunt Sabrina lived in France, where my aunt and her family resided, they visited every year for the holidays to spend time with our family, most especially my grandparents who have both since passed.

I have always known Uncle Billy to be a hardworking and highly intelligent person. He would recommend French books to my sister, while she was studying the language in school. He took us all over Paris when my sister and I were finally able to visit as teenagers. When my brother took an interest in computers, he offered advice and was able to have detailed conversations about the logistics of software and hardware that I am not competent enough to describe. Billy sometimes comes across as shy, but if there is a shared interest, he can talk for hours. He has these niche, intense areas of focus that I do not myself have, but always admired and found interesting to be on the periphery of.

I was always impressed by Billy's move to Paris as a young man and his ability to become so fluent in French that his Brooklyn accent is undetectable to even native speakers. That is where he met my Aunt Sabrina. I have been witness to years of his dedication to her, and their mutual love and respect for each other. He would never do anything to jeopardize his time with her, as that is truly what he values most. One will not find my uncle to be a fashion icon, sporting the latest and greatest watches or jewelry—he is not materialistic, to a fault. He lives a simple life because what he values is spending time in peace with his wife. I have never seen him want for anything more, nor has his lifestyle indicated that he wants for anything more. Second only to time with his wife has been time with my family and her family, which is why despite the ocean between us, he has been an active son to my grandparents, brother to my mother, and uncle to my siblings and me.

Thank you for your time. I know it is valuable, and I am sure many letters come across your chambers just like this one. I hope I have been able to provide insight to the side of my uncle that I see as his niece.

Respectfully,
Caroline D'Emic

# EXHIBIT D.11

Liam D'Emic

Brooklyn, N.Y. 11209

Hon. Denise L. Cote
Daniel Patrick Moynihan U.S. Courthouse
500 Pearl Street
New York, N.Y. 10007

Your Honor,

My name is Liam D'Emic.  I am the nephew and Godson of William Hill.  I graduated from college last year with a degree in Information Technology.  I am currently looking for a job while studying for technical certifications.  I was diagnosed with autism at the age of two.

I was born on ▮▮▮▮▮▮▮ 2001.  My parents chose my Uncle Bill to be my Godfather.  He took this role in my life seriously.

Bill knows that I have always taken an interest in technology.  He cares about this fact, which is why he has gifted me numerous items relevant to my interest.  He gifted me an Arduino Uno, a micro controller used in many D.I.Y. projects.  He has also gifted me a Raspberry Pi 4, a small computer that can be used for many IT-related projects.

Through the years he has given me numerous books related to programming and AI.  These books include those for Python, a programming language used in many areas, and C++, a language used for applications that need to take advantage of computer horsepower.  These books have been very helpful for my IT career.

Although I didn't get to see Uncle Bill regularly because he lives in Europe with my Aunt Sabrina, whenever he called my mother, he would always take time to answer any questions I had and encourage me to keep moving forward with my education no matter how challenging it was.

My Uncle Bill and I share so many interests.  He always took time for me and seemed to understand the struggles I have living with A.S.D.

Bill may not have any children of his own, but he absolutely cares for this family.  Despite his busy schedule, he takes the time to visit when needed and is considerate of the needs and desires of this family.  He can be somewhat insensitive, but he means well, and his actions show that.  I will always be grateful to him for what he has done for me.

Thank you,

Liam L. D'Emic

# EXHIBIT D.12

Hon. Denise L. Cote
Daniel Patrick Moynihan U.S. Courthouse
500 Pearl Street
New York, New York 10007

In Limeil-Brévannes, August 24, 2025

I am Renaud Filbien, born on ███████ 1975, in Corbeil-Essonnes, France, aged 51 years, residing in Limeil-Brévannes (Val-de-Marne, France). I work as the manager of a sports association within a hospital center in Créteil, as well as a teacher of physical activity for private clinics and healthcare networks. I am the husband of Karina Filbien, sister of Sabrina Hill, which makes Bill my brother-in-law.

I met Bill shortly before our marriage. He was a reserved man, but always approachable, deeply kind, and protective toward Sabrina and the entire family. Passionate about computers, he had an impressive knowledge of new technologies. A visionary, he always saw a bit further than others. He had advised me to invest in Bitcoin, but since I didn't understand much about it, I didn't follow through, which is now a great regret.

Bill and Sabrina live simply. What always struck me was the incredible number of books that filled their apartment, a testament to his curiosity and love of learning. Our family gatherings were precious moments, as I particularly enjoyed discussing the global economy and current events with him. In these conversations, he revealed his clear vision, free of superficiality, always focused on the essentials.

Bill led life without seeking luxury or caring about appearances. He didn't go on vacations despite my repeated suggestions, because it wasn't his priority. What mattered to him was knowledge and the sharing of it. He often spoke to me about the training courses he wanted to take, always in pursuit of growth and learning.

The situation he is going through today is chaotic and has caused a real shock for our family. For me, it is incomprehensible, as it does not align at all with the man I know. I always felt that Bill was a bit unique, in his own world, but he is undoubtedly a good person.

Despite the challenges he faces today, I want to reaffirm all my trust and support for him. I stand by his side, convinced that the man I know retains all his worth and dignity.

Done to serve and be valid as needed.

Respectfully submitted,

Renaud Filbien

# EXHIBIT D.13

Hon. Denise L. Cote
Daniel Patrick Moynihan U.S. Courthouse
500 Pearl Street
New York, New York 10007

Colombes, France - August 19, 2025

I, the undersigned, Nyna ABDERRAHIM, born on ███ 1994, in Ivry-sur-Seine, aged 31 years, residing in Colombes (Hauts-de-Seine, France), work as a commercial engineer in the audiovisual field.

I am the daughter of Karina Filbien, sister of Sabrina Hill. Bill Hill is my uncle.

My uncle is a simple, honest, and deeply loving man. I have always known him to lead a balanced, peaceful, and moderate life, which he shares with my aunt. Their daily life is built on modest and genuine pleasures: he enjoys eating a pizza, reading, watching movies, walking, and wearing the same pair of his favorite sneakers for many, many years before buying new ones.

Detached from material things, he prefers to devote his time to simple, enriching activities that align with his values. He is perennially curious and shares the knowledge he acquires with passion.

My uncle is particularly passionate about technology. He is often ahead of his time—on many occasions, he introduced us to technologies still unknown to the general public in France. While many spoke in abstract terms, he knew how to explain, share, and spark our interest.

I have shared many family moments with him, particularly during Christmas celebrations, during which I've witnessed his generosity and warmth. His behavior has always been marked by respect, thoughtfulness and genuine kindness, both toward me and my grandparents, who are his in-laws.

Out of love for my aunt, he agreed to marry in Algeria, far from his culture and comfort zone. There, he was nicknamed "Bilal," a name he embraced with affection and which I chose to continue callinghim as part of our family bond. This nickname remains a small family inside joke and still makes me smile when he signs his birthday cards or messages with it.

The legal situation he is currently facing is a shock for me and our entire family. I struggle to comprehend how such a thing could have happened, as it is entirely inconsistent with the man I know. This is a difficult and incomprehensible ordeal for him and all of us. Nevertheless, we remain united and supportive by his side, as well as by my aunt Sabrina's side, waiting and hoping for a just resolution and light at the end of this long tunnel.

Bill is a naturally reserved person. He values tranquility, his routines, and sometimes needs moments to himself in his own world. Deeply attached to his habits and a calm life, he may seem detached or somewhat aloof. But this trait does not indicate any issue; on the contrary, he is profoundly sincere, attentive, and loyal to those he loves. His kindness, integrity, and devotion to

his loved ones has never been in question.

I wish to affirm that my uncle is a kind, simple, and honest man, deeply committed to a sober, stable, and respectful life. His values, lifestyle, and personality reflect someone who is upright, passionate, and devoted to his wife and family.

I hope this testimony can help shed light on the true person he is.

Done to serve and be used as needed.

Nyna ABDERRAHIM

# EXHIBIT D.14

Hon. Denise L. Cote
Daniel Patrick Moynihan U.S. Courthouse
500 Pearl Street
New York, New York 10007
Dear Judge Cote,

My name is Mats Holmberg, married to Maria Holmberg. We have five children and live in Stockholm.

I got to know William Hill in 1992 when he was working at Euredit, a company that was an association of European telecommunications companies. William's work was highly IT-related, and we were clients of Euredit through my own company, Mediaförlaget. When William left Euredit, he bought into a small company I owned, and he built up a line of business that became very successful in tracking hunting dogs (via GPS positioning). This company was sold in 2000, and William moved on to new assignments in his company, Lonergan Digital. We continued to keep in touch; over the years, I purchased a great many hours of William's IT services.

As I work in security at Transfer Group AB, which is listed on the Stockholm Stock Exchange, and in my role as Group CEO deliver security solutions to all airports in Sweden and Norway (we deliver and build security checkpoints), to the Government, Parliament, the Royal Family, the entire Prison and Probation Service, and the nuclear power sector, etc., it is of the utmost importance that those I associate with are beyond reproach. William Hill is beyond reproach; he is an honest person whom I trust completely.


Stockholm, September 9, 2025

Mats Holmberg

# EXHIBIT D.15

Hon. Denise L. Cote
Daniel Patrick Moynihan U.S. Courthouse
500 Pearl Street
New York, New York 10007

Paris, France – September 1, 2025

I am a French author and screenplay writer living in Paris.

When I met William Hill in 2003 or 2004, it was the golden age of blogs.  He ran a blog, half-serious, half-satirical, that discussed the socio-political situation in the USA and France (since he lived in France).  If my memory serves me well, we began exchanging messages through his blog's comments section, then directly via email, and eventually met in person.

What immediately struck me about William was, first, that he is American, and shared my love for the American authors Hemingway, Fitzgerald, Chandler, Salinger, Steinbeck, Faulkner, Himes, Bukowski, Fante, Highsmith, Carver, Baldwin and Roth.  Finally, and no less important, William and I share the same perspective on many issues, a perspective, which, despite its flaws, leads us to respect people who are often despised or misjudged by today's society: from Churchill, De Gaulle, Reagan and Thatcher to Milton Friedman, Thomas Sowell, Larry Elder and Allen West. "Bill" and I got into the habit of meeting once or twice a year over a beer.

When William started a small publishing house—Underbahn—he asked me to write the preface for the first Vietnamese-language edition of Orwell's *1984* that he had decided to publish.  Unfortunately, Underbahn quickly shut down.  While the project was driven by passion and sincerity, it was also undertaken with limited resources and in a very "artisanal" manner.  Indeed, Underbahn probably sold a grand total of 50 copies of *1984* with my preface.

The honorable but short-lived adventure of Underbahn says a lot about William.  On one hand, it shows that he is a man of passion and conviction, ready to commit to his ideas.  On the other, it demonstrates that he supported my crazy endeavor to break through in literature.  William is one of the few people who ever believed I had talent.  I will always be grateful to him for that.

I don't recall exactly when William became interested in Bitcoin.  Our discussions on the subject were always brief, as despite his efforts to explain the how and why of cryptocurrencies, I— like 90% of people—never understood any of it.  Naturally, I was shocked when, around mid-2024, William told me he had been arrested in connection with the case for which he is being sentenced, especially because Bill had always worked on Samourai Wallet openly and proudly, and had even sold it on Google's App Store.  I was very surprised to hear that U.S. authorities had determined it was illegal.

William is, in my view, a man of principles, sometimes to the point of rigidity, which is both a significant flaw and a rare quality.  As a result, William is, in my humble opinion, an honest and reliable person: he values his word, something I've observed firsthand on numerous occasions.

It also follows that his absolute loyalty to his moral or relational principles has sometimes worked against him, making him appear "radical" in the eyes of others.  "Radical," stubborn, and combative, but I've never seen him be disdainful or arrogant toward anyone.  The Native American chief Tecumseh said, "Show respect to all people and grovel to no one," a maxim that, to me, sums up William quite well.

This is what I wanted to share with you.  It's what I believe in my heart and conscience. I hope that this letter will shed light on William. I respectfully offer, Your Honor, my best regards.

Respectfully submitted,

Bertrand Latour

# EXHIBIT D.16

Hon. Denise L. Cote
Daniel Patrick Moynihan U.S. Courthouse
300 Pearl Street
New York, New York 10007
USA

August 20, 2025

Your Honor,

I first became acquainted with Mr. William Lonergan Hill at the beginning of the century—I would say in about 2003 or 2004—in Paris, where he was living with his loving wife.

As a (then) unpublished writer, I went from publishing house to publishing house in the French capital with a manuscript that nobody would accept. I knew Bill from regular meetings between expatriates (of all nations, not just Americans) and French people at Parisian cafés, and when I told him about the difficulties foreigners face getting their books accepted by French editors, to my utter surprise (and delight), he decided to found a publishing house, something in which he had no experience whatsoever.

When he gave me the news at a café in Paris, I nearly fell out of my seat. My book, *La Bannière Étalée*, was duly (and finally) published in 2005 by his brand-new company, Éditions Underbahn.

But Bill's publishing endeavors did not end there.  Éditions Underbahn would publish close to a dozen books over the next few years, not only by unknowns such as myself, but also more renowned authors, such as Pierre Rigoulot (the French historian is the author of some 20 books), Guy Millière (the author of three dozen books, including *Houdna*, is now a professor and a research fellow at the Gatestone Institute in Nevada), and Maurice Dantec, whose novels are the recipients of several international awards, one of which — *Babylon Babies* — was made into a movie (*Babylon A.D.*).

Then Bill did the unthinkable: He republished *Le Désespéré* by Léon Bloy (1846–1917), a French novel from the 1880s.  Who knows how on earth a New Yorker born and raised in Brooklyn had heard of this little-known 19th century French author.  The book had been out of print for decades, if not an entire century, before Bill brought it back to life.

Among the most important books that Bill's Underbahn published were two books that were not in French, or rather, not primarily in French. First of all was the poems of the Wall Street Poet, penned after the 9/11 attacks (and referenced in lengthy articles in *The New York Times* and *The Wall Street Journal*). Not only was Underbahn the only publishing house to collect all of Eugene Schlanger's poetry in one volume, but Bill had them translated into French, so that each poem was in the original English on the left-hand page while its French translation was on the right-hand page.

Second, after Bill printed the autobiography, *A Vietnamese Refuge*, in French (*MO*), he learned that the classic book *1984* had never been translated into Vietnamese. He immediately contacted Dang Phu'o'ng-Nghi for a second book, asking her this time to function as a translator and to provide the Vietnamese translation of the novel in its full length.

I think that I can speak for all of the authors of Éditions Underbahn that in all our interactions with our editor (Bill), we have always been treated with the utmost fairness and openness. His ledger and accounting books were always open to all of us, and as far as I know, he never failed to pay our earnings on time.

Respectfully submitted,

Erik Svane

# EXHIBIT D.17

September 7, 2025


Hon. Denise L.  Cote
Daniel Patrick Moynihan U.S Courthouse
500 Pearl St.
New York, NY 10007

Your Honor:


My name is Thomas Grommell.  I am retired from a career as an insurance broker with Aon
in New York City.  I previously served as a Cryptologic Technician in the US Navy, where I
had a top-secret security clearance.


I've known William Lonergan Hill (Bill Hill) for about 50 years, from when we were teenagers
in Bay Ridge, Brooklyn.  Even when I was serving in faraway places in the Navy, we kept in
touch. He has always been interested in computer/ internet technology and in languages.


I've always known Bill to be honest. I remember, for instance, when in 1975 I was working
as a cashier at the Sunnydale Farms grocery store. Bill had purchased a few items, and I
gave him change for $20. But he pointed out that he had only given me $10 in the first
place, handing back the overpayment. This is the Bill Hill  that I am proud to know.


Thomas P Grommell

███████████████

███████████

# EXHIBIT D.18

Hon. Denise L. Cote
Daniel Patrick Moynihan U.S. Courthouse
500 Pearl Street
New York, New York 10007


Your Honor:

My name is Kenneth Lorentzen.  I am retired from a career in construction management, where I worked as a field superintendent.  I've been working part-time at Home Depot for the past four years.

I met Bill Hill in high school, in the early 1970s.  We've remained close since then, even during the years he was living in Europe.  I think that he has high personal character, and he's somebody that I am proud to call a friend.


Respectfully yours,


Kenneth Lorentzen

███████████████, East Brunswick NJ 08816 ██████████████
███████████

# EXHIBIT D.19

Enoch Solcitame
1910 21st Avenue South
Nashville, TN 37212

October 10, 2025

To the Honorable Judge Denise L. Cote
United States District Court, Southern District of New York
500 Pearl Street
New York, New York 10007

Re: Character Reference for William Hill in *United States v. Keonne Rodriguez & William Hill*, No. 24 Cr. 82 (DLC)

Dear Judge Cote,

I am writing to provide a character reference for William Hill, whom I initially met online and whom I have known for more than five years, having spent time with him in-person on multiple occasions at industry conferences . I am aware of the charges brought against William and the upcoming sentencing, and I believe it is important to share my perspective on his character and conduct. I have had the privilege of witnessing William demonstrate unwavering integrity, compassion, and responsibility throughout our acquaintance—like the time he stood with me until my cab driver arrived so that I didn't have to wait alone in the dark of night. William has always been a person of high moral character, displaying honesty and truthfulness in all interactions. William has consistently shown respect for others, treating individuals from all walks of life with dignity and kindness.

Furthermore, I have observed William fulfill responsibilities with diligence and dedication. Whether it was in a professional capacity or personal commitments, William has consistently displayed a strong work ethic and a commitment to excellence, which shows in his innovative work in software development that aimed to promote individual freedoms. William is known for going above and beyond expectations, exhibiting reliability and dependability in his pursuits. Based on my knowledge of William, I firmly believe that the actions alleged in the charges against him are uncharacteristic of his true nature. I genuinely believe that William is a person of integrity who thought Samourai Wallet was operating within the limits of the law, and is deeply remorseful for any negative consequences it has caused. I kindly request the court's consideration of William's overall character and previous contributions to society. I am confident that with appropriate guidance and support, he will continue to positively contribute to the community. I firmly believe that William deserves an opportunity for redemption and rehabilitation. Thank you for taking the time to review this character reference letter. Should you require any additional information or further clarification, please do not hesitate to contact me at the provided address.

Respectfully submitted,
Enoch Solcitame
Co-Founder 256 Foundation

# EXHIBIT D.20

August 29, 2025

The Honorable Denise L. Cote

Daniel Patrick Moynihan U.S. Courthouse

500 Pearl Street

New York, New York 10007

Re: United States v. Keonne Rodriguez & William Hill, No. 24 Cr. 82 (DLC)

Your Honor,

My name is Laurent Salat.  I am a 52-year-old French citizen.  I have been a software engineer for 27 years and have devoted the entirety of the last 12 years to projects related to the Bitcoin protocol, digital identity projects, and "blockchain" projects within the banking world.

I met William Hill in the fall of 2016.  Our relationship could be described as professional in nature, but I like to believe that a more personal bond has woven itself over time, and I consider him today a person of great value.  That is why I am respectfully addressing this letter in his support.

My first encounter with William in 2016 took place through a mutual acquaintance, a cybersecurity consultant living in the United States.  We were introduced due to our shared interest in privacy protection in Bitcoin.  William and Keonne had already laid the initial foundations for a mobile Bitcoin wallet aimed at addressing this issue.  I had been working for two years on the development of a Bitcoin blockchain analysis platform, known as OXT.  Simply put, OXT was quite similar to the tools used today in investigations involving a cryptocurrency component, but with a particular focus on the privacy risks arising from the Bitcoin protocol.

I would summarize the first impression William made on me, a Frenchman, with the term "remarkable Anglo-Saxon politeness"—a unique term, but one that in fact designates a patchwork of subtle details demonstrating the attention and respect he shows others.

For any Frenchman who has met William, the most striking detail of his personality is very certainly his attachment to the formal "vous" pronoun form at a time when France, aligning more and more with a global culture, has gradually shifted toward near-systematic use of the informal "tu" pronoun, especially in the workplace.  This is characteristic of the scrupulous attention he pays to the particularities of the language of the country that welcomed him.  Before writing this letter, I reread the emails that William and I exchanged over these years, and I couldn't help but smile at one of his messages in which he apologizes for writing me a text without accented characters, because it was typed on a QWERTY keyboard.  Young French people no longer even bother to write all the letters supposed to make up the words in their messages.

But beyond these very local and generational observations, what immediately struck me about William was a sense of natural reserve, a kind of modesty that is increasingly rare in our time.  I have no recollection of ever hearing him speak about himself unless invited to do so or unless it naturally flowed into the conversation.  Throughout my life, I have crossed paths with people from diverse cultural backgrounds, including quite a few Anglo-Saxons, but I must say that I have never

found in any of them the depth of this "Anglo-Saxon politeness" observed in him, which leads me to believe that it is more the result of an excellent education received in his youth, or a distinctive mark of his character, than a simple consequence of his cultural origins.

On a purely professional level, I would say that what struck me most about William is his engineering pedigree and the conception he seems to have of the profession. It is clear that William's interest in engineering is not motivated by the pursuit of social status.  In my entire professional life, I have never met a person who seems so disinterested in the matter.  I also believe I can assert that financial motivation has never been his main driver.  I have never observed William display wealth in any way, nor even show any signs of interest in it.  It also seems important to note that, given his professional experience, it would have been extremely easy for him to financially profit from the multiple cycles of "hype" ("ICOs," "altcoins," "blockchain," etc.) that have led private and institutional investors to pour hundreds of millions of dollars into ephemeral crypto projects over the last ten years.  His motivation for this activity rests first and foremost on his passion for new technologies and on what has always been one of the driving forces of craftsmanship and engineering: the satisfaction derived from creating tools that find immediate utility in people's lives by addressing concrete needs. The best example of this is obviously his interest in the Bitcoin protocol, to which he has dedicated the entirety of the last 13 or 14 years. An engineer has only a limited number of significant projects in their career. They will therefore not dedicate 10 years of their life to a technology or project they do not consider to be major. To conclude these purely professional observations, I would say that at no time did I discern in William any intent to develop a business outside the existing legal framework. Quite the contrary, I recall professional exchanges during which potential technical choices were rejected because of the possible legal risks they could pose to Samourai Wallet.

After I began contributing to some of the projects maintained by Samourai Wallet, I began to discover other facets of William's personality. He seems to have a rare ability to blend factual data with an intuitive understanding of the dynamics of the system being analyzed in order to anticipate, accurately, the evolution of that system in the medium or long term.  Of course, he sometimes gets it wrong, but the fact is that I can no longer count the number of times when I've had to admit that one of his predictions had once again proven correct.  Whether regarding the difficulties that a new technical solution would encounter, the ultimate failure of another, or the evolution of demand on the Bitcoin network, his "intuitions," often in opposition to the general opinion, have almost always turned out to be correct.

I fear this letter is far too long, but also surely far too short to account for the richness of a person whom time has taught me to esteem.  I hope these few pages will be useful to you in your appreciation of the man that William Hill is.


Please accept, Dear Judge, the expression of my sentiments.

/s/ Laurent Salat

Laurent Salat

29 août 2025

À l'honorable Denise L. Cote
Daniel Patrick Moynihan U.S. Courthouse
500 Pearl Street
New York, New York 10007

**Objet : United States v. Keonne Rodriguez & William Hill, No. 24 Cr. 82 (DLC)**

Madame la Juge,

Je m'appelle Laurent Salat. Je suis un citoyen français de 52 ans. Je suis ingénieur en développement logiciel depuis 27 ans et j'ai consacré l'intégralité des 12 dernières années à des projets liés au protocole Bitcoin, à des projets d'identité numérique et à des projets « blockchain » dans le monde bancaire.

J'ai rencontré William Hill à l'automne 2016. Notre relation pourrait être qualifiée de professionnelle, mais j'aime à penser qu'un lien plus personnel s'est tissé au fil du temps, et je le considère aujourd'hui comme une personne de grande valeur. C'est pourquoi je me permets respectueusement de vous adresser cette lettre en sa faveur.

Ma première rencontre avec William, en 2016, s'est faite par l'entremise d'une connaissance commune, un consultant en cybersécurité vivant aux États-Unis. Nous avons été mis en relation en raison de notre intérêt partagé pour la protection de la vie privée dans Bitcoin. William et Keonne avaient déjà posé les premières bases d'un portefeuille Bitcoin mobile destiné à répondre à cette problématique. De mon côté, je travaillais depuis deux ans au développement d'une plateforme d'analyse de la blockchain Bitcoin, connue sous le nom d'OXT. En termes simples, OXT ressemblait assez aux outils aujourd'hui utilisés dans des enquêtes comportant une composante cryptomonnaie, mais avec un accent particulier sur les risques de confidentialité découlant du protocole Bitcoin.

Je résumerais la première impression qu'a faite William au Français que je suis, par l'expression « remarquable politesse anglo-saxonne » — une formule singulière, mais qui désigne en réalité un patchwork de détails subtils révélant l'attention et le respect qu'il porte aux autres. Pour tout Français ayant rencontré William, le trait le plus frappant de sa personnalité est très certainement son attachement au vouvoiement à une époque où la France, s'alignant de plus en plus sur une culture mondialisée, a progressivement basculé vers l'usage quasi systématique du tutoiement, notamment au travail. Cela témoigne de l'attention scrupuleuse qu'il porte aux particularités de la langue du pays qui l'a accueilli. Avant d'écrire cette lettre, j'ai relu les courriels que William et moi avons échangés au fil des années, et je n'ai pu m'empêcher de sourire à l'un de ses messages où il s'excuse de m'écrire un texte sans caractères accentués, parce qu'il avait été tapé sur un clavier QWERTY. Les jeunes Français ne prennent même plus la peine d'écrire toutes les lettres censées composer les mots de leurs messages.

Mais au-delà de ces observations très locales et générationnelles, ce qui m'a immédiatement frappé chez William est une forme de réserve naturelle, une sorte de modestie devenue rare à notre époque. Je n'ai aucun souvenir de l'avoir jamais entendu parler de lui-même, sauf si on l'y invitait ou si cela s'inscrivait naturellement dans la conversation. Au cours de ma vie, j'ai croisé des personnes d'origines culturelles diverses, dont un grand nombre d'anglo-saxons, mais je dois dire que je n'ai jamais retrouvé chez aucun d'eux la profondeur de cette « politesse anglo-saxonne » observée chez lui, ce qui me conduit à penser qu'elle est davantage le résultat d'une excellente éducation reçue dans sa jeunesse, ou la marque distinctive de son caractère, qu'une simple conséquence de ses origines culturelles.

Sur le plan purement professionnel, je dirais que ce qui m'a le plus frappé chez William est son bagage d'ingénieur et la conception qu'il semble avoir du métier. Il est évident que l'intérêt de William pour l'ingénierie n'est pas motivé par la quête d'un statut social. De toute ma vie professionnelle, je n'ai jamais rencontré quelqu'un qui semble y être aussi indifférent. Je crois également pouvoir affirmer que la motivation financière n'a jamais été son principal moteur. Je n'ai jamais vu William afficher de signes extérieurs de richesse, ni même manifester le moindre intérêt pour la chose. Il me paraît aussi important de souligner qu'au regard de son expérience professionnelle, il lui aurait été extrêmement facile de tirer un rapide profit financier des multiples cycles d'engouement (« ICOs », « altcoins », « blockchain », etc.) qui ont conduit des investisseurs privés et institutionnels à déverser des centaines de millions de dollars dans des projets crypto éphémères au cours des dix dernières années. Non, je crois intimement que sa motivation pour cette activité repose avant tout sur sa passion pour les nouvelles technologies et sur ce qui a toujours été l'un des moteurs de l'artisanat et de l'ingénierie : la satisfaction de créer des outils qui trouvent une utilité immédiate dans la vie des gens en répondant à des besoins concrets. Et l'exemple le plus parlant est certainement son intérêt pour le protocole Bitcoin, auquel il a consacré l'intégralité des 13 ou 14 dernières années. Un ingénieur n'a qu'un nombre limité de projets significatifs dans sa carrière. Aucun ingénieur ne consacre dix ans de sa vie à une technologie ou à un projet qu'il ne considère pas comme majeur. Pour conclure ces observations purement professionnelles, je dirai qu'à aucun moment je n'ai discerné chez William une volonté de développer une entreprise qui sorte du cadre légal existant. Bien au contraire, j'ai souvenir de quelques échanges professionnels durant lesquels de potentiels choix techniques ont été écartés en raison des risques éventuels qu'ils pourraient représenter pour Samourai Wallet d'un point de vue légal.

Mais après toutes ces années, je dirais que la facette de la personnalité de William qui m'a le plus marquée est certainement la rare capacité qu'il semble avoir à mêler des données factuelles à une compréhension intuitive des dynamiques du système analysé afin d'anticiper, avec justesse, l'évolution de ce système à moyen ou long terme. Bien sûr, il lui arrive de se tromper, mais le fait est que je ne compte plus le nombre de fois où j'ai dû admettre qu'une de ses prédictions s'était de nouveau révélée exacte. Qu'il s'agisse des difficultés auxquelles une nouvelle solution technique se heurterait, de l'échec d'une autre, ou de l'évolution de la demande sur le réseau Bitcoin, ses « intuitions », souvent à contre-courant de l'opinion générale, se sont très souvent avérées justes.

Je crains que cette lettre soit déjà trop longue, mais aussi certainement bien trop courte pour rendre compte de la richesse d'une personne que le temps m'a appris à estimer. J'espère toutefois que ces quelques éléments vous seront utiles dans votre appréciation de l'homme qu'est William Hill.

Je vous prie d'agréer, Madame la Juge, l'expression de mes sentiments respectueux.

[s] Laurent Salat
Laurent Salat